JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| John Doe | The Hotchkiss School |

**(b)** County of Residence of First Listed Plaintiff   Litchfield
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Aaron A. Romney, Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport, CT 06604, 203-368-4234

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [x] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| | | | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332
Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| Aug 26, 2022 | /s/ Aaron A. Romney |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff, | CIVIL ACTION NO. |
| -v- | |
| THE HOTCHKISS SCHOOL, | |
| Defendant. | |

## **COMPLAINT**

Plaintiff John Doe ("Plaintiff" or "Doe"[1]), by and through his undersigned counsel,

brings this complaint against defendant The Hotchkiss School ("Defendant" or "Hotchkiss"), and

hereby alleges, upon knowledge as to his own actions and otherwise upon information and belief,

as follows:

### **NATURE OF ACTION**

1.      This action arises from Hotchkiss's decades-long betrayal of Doe, a survivor of

repeated sexual abuse, assault, and rape at the hands of Hotchkiss.  Perpetuating that pattern of

institutional betrayal, Hotchkiss has flagrantly breached its obligations to Doe under the 2020

settlement agreement that resolved Doe's original sexual-abuse lawsuit.  In addition to re-

traumatizing Doe, Hotchkiss's conduct has made clear that it never intended to perform, and that

its prior representations to Doe – that Hotchkiss had changed, and sincerely intended to turn the

page on its despicable past practices, disparagement, and retaliation – were false and intended to

fraudulently induce Doe's assent to a settlement.  As a result, Doe is no longer bound by the

---

[1]      As a survivor of childhood sexual assault, Plaintiff brings this action pseudonymously as
"John Doe."

prior release of his original claims, and brings this suit to assert those claims as well as new claims for breach of contract and fraudulent inducement.

2.     As a 14-year-old child, Doe's parents entrusted him to the care and supervision of Hotchkiss, a private boarding school in Lakeville, Connecticut.  Hotchkiss promised, and Doe trusted, that Hotchkiss would do all within its power to keep Doe safe from sexual crimes.

3.     Hotchkiss violated Doe's trust, propagating and condoning an environment of rampant sexual assaults, sexually violent hazing, and pedophilia by Hotchkiss faculty, dormitory proctors, and older students.

4.     A Hotchkiss teacher, athletic trainer, and dormitory master named Roy G. Smith fondled Doe's genitals, and later drugged and anally raped him when he was 15 years old.

5.     Upperclassmen, appointed by Hotchkiss as senior dormitory proctors, assaulted Doe by forcibly pulling down his pants and underwear, hitting his buttocks and genitals with wooden pledge paddles, and sticking objects in his anus when he was 14 years old.

6.     These and other equally vile acts occurred on Hotchkiss property, during the school year, and under the supervision of Hotchkiss's teachers and administrators.  The sexual abuse continued even after Hotchkiss faculty and leadership knew that Doe and other students had been and were being abused.  Doe's attempts to report and speak out against such crimes were and continue to be met with apathy, malicious retaliation, and institutional betrayal by Hotchkiss.

7.     In 2015, Doe commenced a lawsuit against Hotchkiss in this Court seeking damages and other relief arising from the sexual abuse he suffered (the "2015 Action").

8.     During settlement negotiations in 2019, Hotchkiss, through its Board of Trustees Co-Presidents Robert Gould and Elizabeth Hines and its Head of School Craig Bradley,

fraudulently represented to Doe that Hotchkiss would make specific, lasting, meaningful, and impactful changes to acknowledge and address Hotchkiss's history of sexual abuse, atrocities, and institutional betrayal of Doe and others, including by forming a specifically-named "Sexual Misconduct Advisory Committee" (the "Committee"), with specific requirements as to its composition and operation. ████████████████████████

████████████████████

9.      Hotchkiss also promised to deliver, at the same time the Settlement Agreement was executed, a separate written apology to Doe (the "Apology") for all of the misconduct underlying the 2015 Action; admit that Hotchkiss and its faculty, staff, trustees, proctors, and agents had committed the acts explicated in the 2015 Action's complaint; admit that those acts had caused Doe to suffer physical and psychological traumas and other severe harm; and commit to institutional change going forward, including by crediting numerous reports of sexual abuse of numerous children by past and current Hotchkiss faculty, which Hotchkiss continued to cover up and conceal.

10.      Relying on Hotchkiss's promises – in particular, to deliver to Doe a written apology prior to Doe's release of the 2015 Action's claims and prior to dismissal of the 2015 Action – Doe agreed to settle the 2015 Action, dismiss that action, and release his original claims against Hotchkiss.[2]

---

[2]      The parties are legally bound to a written settlement agreement dated February 13, 2020 (the "Settlement Agreement"), a true and correct copy of which is attached as **Exhibit 1**.  Doe pleads this action in accordance with this Court's ruling, affirmed by the Second Circuit, that the February 13, 2020 contract is the operative settlement agreement.  *See Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2020 WL 4271781 (D. Conn. July 24, 2020), *aff'd*, No. 20-2778-CV, 2022 WL 211699 (2d Cir. Jan. 25, 2022).

11.     Little did Doe know, however, that Hotchkiss's promises during the settlement negotiations and in the Settlement Agreement itself were a ruse and sham.

12.     Hotchkiss breached material and integral terms of the Settlement Agreement, including the provisions governing the Committee and the Apology.  Among its fundamental breaches, Hotchkiss misnamed the Committee, undermining its mission and purpose; mis-constituted the Committee by installing more members than agreed-upon, hindering Committee productivity and functioning; caused non-members adverse to the Committee's purpose to participate in, obstruct, and dictate Committee affairs; delayed publicizing the Committee's formation, thus delaying the validation of Doe's allegations and claims, and forestalling Hotchkiss's promised shift to acknowledge and atone for its long and horrific history of sexual misconduct; ███████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████; and failed to deliver the Apology to Doe personally and by the requisite deadline.

13.     In addition, Hotchkiss falsely represented to Doe during negotiations that it was, at the time, implementing or intending to implement lasting, meaningful, and specific institutional reforms.  Hotchkiss made those intentionally false statements to extract a quick settlement from Doe, rid itself of the 2015 Action prior to trial, and preserve its own reputation and name before the public, current and prospective students and their parents, and the influential circles of alumni, benefactors, and prospective donors – from whom Hotchkiss seeks to gain tens of millions of dollars in annual tuition and fees and hundreds of millions of dollars in donations and financial support.

14.     As a direct result of Hotchkiss's material breaches, fraud, and persistent institutional betrayal, Hotchkiss has caused and continues to cause Doe grave and irreparable harm, including the aggravation of Doe's severe PTSD, re-traumatization, emotional distress, and mental anguish.

15.     Because Hotchkiss materially breached the Settlement Agreement, Doe is relieved from any obligation to perform under that agreement's release provision.  And because Hotchkiss procured the execution of the Settlement Agreement by its fraud, the release of Doe's claims is no longer enforceable.  Accordingly, Doe is now entitled to assert his prior claims arising out of Hotchkiss's abominable sexual abuse, as well as new claims for breach of contract, fraudulent inducement, and infliction of emotional distress for Hotchkiss's more recent actions, behaviors, and omissions.

16.     Doe therefore brings this Complaint against Hotchkiss, seeking a declaration that he is excused from performing the release provision in the Settlement Agreement due to Hotchkiss's material breaches of the Settlement Agreement or, in the alternative, rescission of the Settlement Agreement; damages; and other relief for the injuries and life-long suffering Hotchkiss inflicted and continues to inflict on Doe through its condoning of sexual assault, material breaches of its contractual obligations, false promises to deceive Doe to enter into a Settlement Agreement it had no intention of honoring, and continued betrayal of and retaliation against Doe.

## PARTIES

17.     Plaintiff John Doe, a citizen and resident of ▮▮▮▮▮, attended and boarded at Hotchkiss as a student in the 1980s starting when he was 14 years old.

18.     Defendant The Hotchkiss School, a non-stock corporation formed pursuant to the laws of Connecticut with its principal place of business in Lakeville, Connecticut, is a private college-preparatory boarding school.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C § 1332(a).  This is a civil action between citizens of different States, ██████ and Connecticut, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     This Court also has jurisdiction over this action pursuant to Section 6.4 of the Settlement Agreement, which provides that this Court shall have "exclusive" jurisdiction over "any and all disputes arising out of" the Settlement Agreement.

21.     Venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendant resides in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

22.     Venue is also proper pursuant to Section 6.4 of the Settlement Agreement, which fixes the exclusive venue for resolving disputes arising from the Settlement Agreement in this District.

## FACTS

A.     **Hotchkiss Authority Figures Rape and Sexually Abuse Doe.**

23.     Founded in 1891, Hotchkiss is one of the wealthiest private boarding schools in the nation, with approximately one billion dollars in total assets.  Hotchkiss's assets include a reported financial endowment of $606.1 million as of June 30, 2021; land, buildings, and equipment with an undepreciated book value of at least $300 million; and lucrative private investments and pledges for financial donations.  Hotchkiss's alumni base, from whom

Hotchkiss aims to raise several hundred million dollars in donations through an upcoming capital campaign, includes numerous ultra-wealthy individuals who oppose institutional change at Hotchkiss and actively support the whitewashing of Hotchkiss's sordid, decades-long history of child sexual abuse.  As Hotchkiss itself has put it, Hotchkiss's "golden rule" when trying to manage change at Hotchkiss is "do not disturb the cherished memories of alumni – and, more recently, of alumnae as well."[3]  Hotchkiss, at its core, "is about setting wealth to music."[4]

24.     Throughout its history, Hotchkiss has touted itself as a pinnacle of pre-college education.  Hotchkiss currently boasts, as it has throughout the past, that it provides a "truly unparalleled" education dedicated to "learning and personal growth," and a "thriving campus," where "students have the unique opportunity to share life together as teammates, classmates, friends and community members."[5]  Hotchkiss has, at all relevant times, charged tens of thousands of dollars per year for tuition, fees, books, room, and board.

25.     In exchange for that substantial monetary compensation, Hotchkiss assumed responsibility for the protection, safety, and well-being of Doe and other children entrusted to its care and custody – including protection from sexual abuse by Hotchkiss's faculty and other students.  Hotchkiss branded itself as *in loco parentis*.  Former Headmaster Arthur White used to tell parents and students on the first day of school, "Parents, your job is to leave."  That was Hotchkiss's clear indication it had assumed the responsibility and duty of care for its child students and their education, health, and safety.

---

[3]     E. Kolowrat, et al., HOTCHKISS: A CHRONICLE OF AN AMERICAN SCHOOL, The Hotchkiss School, at 39 (1992) ("CHRONICLE").

[4]     *Id.* at 546; *see also* J. Lemisch, A RADICAL HISTORIAN'S 60TH REUNION AT HOTCHKISS, *available at* https://historynewsnetwork.org/article/156088 (last accessed Aug. 26, 2022).

[5]     https://www.hotchkiss.org/our-school/about (last accessed Aug. 26, 2022).

26.     Hotchkiss assured Doe and other students that the health and welfare of its students was its highest priority.  For instance, when Doe was deciding whether to matriculate at Hotchkiss, the school's admissions director told him that Hotchkiss strictly enforced its written rules prohibiting any sexual activity, as well as its written rules prohibiting alcohol and drugs on campus.  In fact, beginning in the early 1980s, Hotchkiss's admissions office, led by the Director of Admissions Frederic F. "Fred" Wesson, had distributed Hotchkiss marketing and recruitment materials, which Doe received, claiming that Hotchkiss embraced strict rules against sex, drugs, and alcohol.

27.     Hotchkiss, however, breached its duties of care to Doe and other students. Hotchkiss's administration, trustees, and faculty knew and should have known that Hotchkiss had a revolting history and ongoing occurrences of sexual abuse and rape by Hotchkiss faculty members and other authority figures, and significant use of alcohol and drugs by faculty and students.

28.     Since as early as the 1900s, Hotchkiss faculty and upperclassmen routinely and systematically committed sexual abuse and assaults against young boys on campus.  Survivors and witnesses reported these sexual abuses to Hotchkiss leadership and staff.  Rather than investigate and take steps to rectify those pervasive crimes, Hotchkiss facilitated and enabled them.  Hotchkiss failed to investigate allegations of sexual abuse or report incidents to law enforcement authorities, and instead dismissed students' reports or retaliated against and threatened students and faculty who dared to speak out.  It eschewed formal rules, training, and procedures designed to prevent sexual misconduct between teachers and students, failing to implement any sexual abuse policies until the 1990s.  And it violated its affirmative duty to warn

students, including Doe, about the abuse it could and should have reasonably anticipated based on the prior incidents of abuse witnessed or reported.

29.     Ample sources – including lawsuit filings; sworn deposition testimony; media reports, books and writings published by Hotchkiss and its alumni; and written and taped interviews of former students and faculty – substantiate Hotchkiss's stunning apathy, failure to act, and concealment of the sexual abuse that proliferated its campus.  And multiple meetings involving Hotchkiss trustees, alumni, administrators, and faculty since 2020, many recorded, have indicated that much more sex abuse occurred at Hotchkiss, including before Doe was abused, than Hotchkiss has admitted publicly.

30.     For instance, in August 2018, Hotchkiss's counsel Locke Lord LLP published an investigative report into the history of sexual abuse at Hotchkiss (the "Locke Lord Report").[6] While that report was incomplete, and documented only a fraction of the pervasive sex abuse at Hotchkiss, it found that at least seven Hotchkiss faculty members had sexually abused 17 students, and that Hotchkiss leaders were made aware of this horrific behavior but failed to take effective action.  Allegations against three additional faculty members were deemed "highly credible" in the report, along with several reports of faculty members crossing boundaries with and engaging in inappropriate sexual misconduct toward students.

31.     The Locke Lord Report concluded that "it is clear that Hotchkiss missed several key opportunities to protect the student body," and "inadequately responded to sexual misconduct by faculty members for a variety of reasons, including:  (a) a failure to be aware, and

---

[6]     *Report to the Board of Trustees of The Hotchkiss School* (Aug. 2018), *available at* https://www.hotchkiss.org/uploaded/documents/Hotchkiss_FINAL.pdf?1534530340087 (last accessed Aug. 26, 2022).

sensitive to, sexual misconduct generally; . . . [and] (d) a prioritization of the school's reputation and that of its faculty above the well-being of the individual students."

32.     The sexual abuse detailed in the Locke Lord Report was only the tip of the iceberg.  For instance, in August 2020, an update to the Locke Lord Report was released, substantiating additional accounts of abuse.[7]  In that updated report, Hotchkiss divulged, for the first time to the public and to Doe, that before Doe had applied to or attended Hotchkiss, Director of Admissions Frederic Wesson repeatedly had sex with a Hotchkiss student for two years starting when the child was 15 years old, while providing the child with alcohol and marijuana.[8]

33.     Hotchkiss's documented failures to abide by its duties of care directly led to the sexual assaults, sexual abuse, and rape of Doe by Smith and others in positions of power at Hotchkiss.

    **1.  Roy G. Smith Sexually Assaults And Rapes Doe.**

34.     At the time Doe entered Hotchkiss in the 1980s, Smith, known as "Uncle Roy," had worked at Hotchkiss for over a decade.  With Hotchkiss's blessing, Smith was an English teacher, the athletic trainer who treated sports injuries, and a dormitory master.

35.     In these capacities, Smith had unfettered opportunities to "groom" and touch minor boys in his care and who lived in the dormitory where Smith also resided.  Smith exploited his authority and access – raping, fondling, drugging, inspecting, massaging, and leering at

---

[7]     *Supplement to the Report of The Board of Trustees of The Hotchkiss School Issued in August 2018* (Aug. 7, 2020), *available at* https://www.hotchkiss.org/uploaded/documents/Hotchkiss_Supplemental-Report-to-the_Board.pdf (last accessed Aug. 26, 2020).

[8]     *Id.* at 6-8.

young schoolboys in Hotchkiss athletic facilities, and in his apartment located in a student dormitory where young boys also lived.

36.     Over many years preceding Doe's enrollment at Hotchkiss, multiple members of Hotchkiss's student body, faculty, and leadership suffered from, witnessed, or otherwise learned about Smith's sexual misconduct.  Hotchkiss, without question, knew and should have known that Smith held and expressed sexualized feelings about the minor boys in his care. Additionally, Hotchkiss knew and should have known that Smith groomed boys at Hotchkiss and discussed homoerotic topics with them in his apartment at night.

37.     Despite its actual and constructive knowledge of Smith's sexual misconduct, Hotchkiss made no effort to protect students from Smith.  It never took punitive measures against Smith; never reported him to the authorities; and never warned students or their parents about Smith.  Instead, Hotchkiss enabled and tolerated Smith's sexual crimes.  It allowed Smith to continue working for years as a teacher, dormitory master (later promoting him to dormitory head), and athletic trainer – and to continue molesting, sexually abusing, and sexually assaulting schoolchildren – until his retirement, after nearly three decades at Hotchkiss, when Hotchkiss honored Smith by naming an annual major school award for him.  Indeed, at the time of Smith's death in late 2014, neither the public, nor much of the larger Hotchkiss community, had any idea that Smith was a pedophile.[9]

38.     Doe was one victim of Smith's heinous crimes.

---

[9]     *See, e.g.*, Obituary for Roy G. Smith Jr., BOSTON HERALD (Jan. 4, 2015), *available at* https://www.bostonherald.com/2015/01/04/roy-g-smith-jr-at-72-of-wareham-a-teacher/ (last accessed Aug. 26, 2022).

39.     Doe participated in athletics at Hotchkiss and, in that capacity, was exposed to Smith, the athletic trainer who treated Doe.  In addition, Smith resided in an apartment and served as a dormitory and corridor master, in the Hotchkiss dormitory where Doe lived.

40.     Smith quickly took advantage of his authority over, influence on, and close proximity to Doe.  Smith engaged Doe in late-night socializing in Smith's apartment, and in the guise of providing athletic treatments, fondled, inspected, and touched Doe in inappropriate and sexualized ways, including reaching into Doe's shorts and touching his penis and scrotum, on multiple occasions.  These sexual abuses occurred at Hotchkiss, including in Smith's apartment.

41.     When Doe was 15 years old, Smith went further:  after luring Doe into his apartment in the late evening hours, Smith drugged Doe into unconsciousness with a pill and glass that he misrepresented as an aspirin and water.  Smith then anally raped Doe while he was helpless and alone in the Hotchkiss dormitory.

42.     Doe began to gradually regain some consciousness during the rape, groggy and impaired, with his underwear down, his rear end bare, lying flat on Smith's sofa with Smith over him penetrating Doe's anus.

43.     When Doe regained sufficient consciousness, he was in a state of shock.  Doe stumbled from Smith's apartment in the dormitory to a common bathroom, where he vomited violently in the toilet, before returning to his dormitory room.

**2.  Hotchkiss Senior Dormitory Proctors Haze And Sexually Abuse Doe.**

44.     In addition to the pattern of sexual abuse by faculty members, Hotchkiss had a sordid history of sexualized hazing, which it failed to disclose to Doe at any time before his matriculation at the school.  Hotchkiss's hazing traditions included upperclassmen inflicting

sexual assaults on younger students, such as paddling the younger students on their naked

buttocks with wooden paddles and other humiliating and traumatizing forcible touching.

45.     Hotchkiss, as well as its teachers and administrators, permitted and condoned

traditions of violent and sexualized hazing, and allowed sexual assaults to occur without

punishment or even a meaningful threat of punishment.

46.     Hotchkiss leadership retaliated against those who spoke out against the school's

sexualized hazing traditions.  For instance, Hotchkiss's Board of Trustees terminated Timothy

Callard, Headmaster from 1981 to 1983, after he had attempted to institute sex abuse reforms.

As Callard recounted:

> "Another old Hotchkiss tradition apparently was the spring raid on the preps.  The
> senior proctors would rouse the preps out of their dorms at dawn and lead them out
> onto the grounds in their underwear . . . tie them to trees and spray things on them.
> These sorts of things that happened bordered on sexual abuse. . . .  It just didn't
> seem right for the older kids to be doing this to younger kids, and I felt
> uncomfortable with it.  Yet the prep raid had clearly been condoned by the
> faculty."[10]

Callard was the one of at least three short-tenured Headmasters whose position suddenly

terminated after each had sought to address sexually abusive behaviors at Hotchkiss.

47.     As a result of Hotchkiss's encouragement and toleration of sexualized hazing, and

its failure to prevent such assaults and to punish the perpetrators, upperclassmen whom

Hotchkiss appointed as senior dormitory proctors sexually assaulted Doe multiple times when he

was 14 years old.

48.     During these assaults, the proctors forced Doe to lower his pants and underwear to

his ankles and to bend over; hit Doe's naked buttocks and lower back violently and repeatedly

---

[10]     CHRONICLE, at 446.

13

with wooden pledge paddles, causing physical injuries, and forcibly inserted objects into Doe's anus, causing internal injury.

### 3. Hotchkiss's Apathy Toward And Retaliation Against Doe.

49.     The sexual assaults by Hotchkiss faculty and upperclassmen caused Doe to suffer severe physical pain and humiliation.

50.     Doe reported the sexual assaults by the proctors to his dormitory corridor master. The corridor master, in response, told Doe to try to earn the respect of the older students who were assaulting him.  He also warned Doe that complaining about the hazing and assaults could impair his reputation at Hotchkiss.

51.     Doe reported the physical and sexual assaults to Hotchkiss physician Dr. Peter Gott, who treated the injuries to Doe's anus, buttocks, and lower back.  Dr. Gott did nothing to protect Doe from further assaults.

52.     Likewise, Hotchkiss's Assistant Headmaster Lawrence Becker, after learning of the assaults, simply asked Doe if his bottom was feeling better and did nothing else in response.

53.     After Smith anally raped him, Doe reported the rape to Hotchkiss teachers, staff, and administrators.  None lifted a finger to protect Doe or other vulnerable schoolchildren.

54.     Doe reported the rape to his faculty advisor, confiding in the advisor about the extreme confusion and mental suffering he was experiencing as a result of Smith's abuse.  In response, Doe's advisor dismissed Doe's concerns, instead indicating to Doe that such activity as teacher-student sex and an older man having sex with a boy was acceptable.  He took no steps to protect Doe and other vulnerable children from further assaults by Smith and took no steps to hold Smith accountable for raping Doe.

55.     Doe also reported the rape and other sexual abuses to a mental health counselor at Hotchkiss, from whom Doe had sought care and treatment.  But the counselor, like the faculty advisor, took no steps to protect Doe and other vulnerable children from further assaults by Smith; no steps to hold Smith accountable for raping a young boy; and no steps to protect Doe and other vulnerable children from further sexual hazing.  Instead, the counselor acted in concert with Hotchkiss's Headmaster at the time, Arthur White, in retaliating against Doe for reporting the sexual abuse.

56.     Dismissed and ignored by Hotchkiss's staff and administration, Doe attempted to take matters into his own hands and inform the Hotchkiss community about the harms of Hotchkiss's wrongful responses to child victims of the sexual abuse pervading Hotchkiss's campus.  Doe wrote an article intended for a student newspaper, discussing the failure of Hotchkiss's counselors, faculty, and administrators to respond appropriately to students' distressing experiences with sexual assaults and abuse.  Doe, attempting to seek guidance from Headmaster White, provided him with drafts of the proposed article.

57.     But White, too, dismissed Doe's situation.  White took no steps to protect Doe and other vulnerable children from further assaults by Smith, or to hold Smith accountable for raping a young boy.

58.     Instead, White surmised that the article was "unfair to the faculty," prevented Doe from publishing the article, and conspired to preclude Doe from communicating with the Hotchkiss community about faculty sexual misconduct, including Doe's own experience with Roy Smith.

59.     Among other wrongful acts aimed to hide Smith's sexual abuse of Doe and to bury Smith's and other faculty members' history of sexually molesting young children at

Hotchkiss, White threatened to tell people falsely that Doe, who did not identify as homosexual, was homosexual if he complained publicly about the rape – a label that, in the 1980s, carried heavy stigma, costing people their jobs and college admissions and leading to other harsh consequences.

60.     Soon thereafter, White instigated a campaign of vicious and damaging retaliation and disparagement against Doe for reporting the sexual abuse, aided and abetted by Hotchkiss Board of Trustees President Francis T. "Fay" Vincent, Jr., Assistant Headmaster John R. "Rusty" Chandler, Jr., and other Hotchkiss faculty and staff.

61.     As a result of Hotchkiss's acts and omissions, Doe's ability to engage in normal life activities has been permanently impaired, and he has been and will be unable to lead and enjoy a normal life.

62.     The harm inflicted on Doe as a young, vulnerable child at Hotchkiss has adversely affected his ability to enter and maintain lasting, meaningful relationships with others.  Doe's ability to maintain intimate physical, sexual, and emotional relationships with other human beings has been irreparably damaged.

63.     As a result of Hotchkiss's acts and omissions, Doe has sustained enormous physical pain and suffering, and has and will continue over the course of his lifetime to suffer severe emotional distress and mental pain and anguish.

**B.     Doe's 2015 Lawsuit And The Fraudulently Procured Settlement Agreement.**

**1.     Doe Files, Pursues, And Ultimately Settles, A Lawsuit Against Hotchkiss.**

64.     Because Hotchkiss tolerated and condoned sexual abuse of children by pedophile teachers and other students, including abuse of Doe as a child, Doe filed a lawsuit against Hotchkiss on February 5, 2015 in this Court (defined above as the "2015 Action").  Doe asserted

five causes of action against Hotchkiss:  (i) negligence; (ii) recklessness; (iii) negligent infliction of emotional distress; (iv) intentional infliction of emotional distress; and (v) breach of fiduciary duty.

65.     Doe vigorously litigated that case for over four years, including through protracted discovery exacerbated by Hotchkiss's withholding of key documents and information. After Doe prevailed in defeating Hotchkiss's motion for summary judgment, trial was set for Fall 2019.

66.     On August 27, 2019, the parties conducted a mediation followed by additional settlement negotiations directly between Doe and Hotchkiss's representatives Gould, Bradley, and its counsel Bradford Babbitt.  During these post-mediation negotiations, Hotchkiss's representatives made a series of promises and representations to Doe that were critical to Doe's decision to settle the 2015 Action.

67.     Specifically, Hotchkiss promised that it would deliver a sincere and meaningful apology to Doe and form an impactful "Sexual Misconduct Advisory Committee," primarily to address past sexual abuse at Hotchkiss.

68.     Hotchkiss also represented during the August 27, 2019 settlement negotiations that it was, at the time, already in the process of implementing, or intended to implement, additional institutional reforms.

69.     *First*, Gould and Bradley represented to Doe that Hotchkiss had already implemented the majority of recommendations set forth in a 2018 report by the Rape, Abuse & Incest National Network (the "RAINN Report"); and that Hotchkiss would finish implementing

all of RAINN's recommendations within the 2019-2020 school year.[11]  For instance, Gould and Bradley specifically stated that Hotchkiss would implement a RAINN Report recommendation to hire a full-time Sexual Misconduct Coordinator.

70.    *Second*, Gould promised Doe that Hotchkiss would, in an update to its 2018 Locke Lord Report, acknowledge the credibility of sexual abuse allegations against Smith, including Doe's allegations; and of multiple sexual abuse allegations against another former faculty member, ████████████████, whose sexual misconduct was amply corroborated by evidence from the 2015 Action.

71.    *Third*, Hotchkiss promised that it had removed all honors for Arthur White due to his central role in enabling, dismissing, and covering up sex abuse at Hotchkiss, including Doe's rape and abuse by Smith and dormitory proctors, including the removal of White's portrait at Hotchkiss and the termination of an annual Hotchkiss award named for White; and that those changes would be permanent.

72.    *Fourth*, Gould told Doe, consistent with Hotchkiss's disclosures in ongoing discovery, that Hotchkiss had not made any other significant or comparable monetary settlements related to sex abuse lawsuits in recent years.

73.    *Finally*, Gould promised Doe that Hotchkiss itself, rather than its insurer, would be funding the settlement payment to Doe.  Gould told Doe that Hotchkiss had used up the insurance coverage limit on legal costs defending against the 2015 Action, so the settlement payment would be paid directly from Hotchkiss's own accounts and not from the insurer.  It was

---

[11]    Hotchkiss retained RAINN in 2018 to conduct an audit of the school's sexual abuse policies and procedures.  On December 7, 2018, RAINN issued its report, a 17-page Program Assessment: Executive Report and a 134-page Program Assessment: Evaluation Matrix, assessing Hotchkiss's current policies with recommendations for concrete changes.

important to Doe that Hotchkiss itself pay the material monetary consideration – an actual

incurred expense and loss of funds for Hotchkiss – that could act as actual reparation from

Hotchkiss to Doe.  Direct payment by Hotchkiss would also require it to report the settlement

payment in its financial books and records and IRS filings, and thus act as a further long-term

deterrent against sexual abuse.

74.     Each of these representations by Hotchkiss on August 27, 2019 was material to

Doe's decision to settle the 2015 Action.

75.     Hotchkiss knew, based on its discussions with Doe that day and on prior

settlement attempts, that such representations would induce Doe into settling the 2015 Action on

terms and conditions that were favorable to Hotchkiss, including a monetary settlement payment

that was a fraction (approximately ███%) of the damages Doe anticipated he reasonably could

recover at trial.

76.     In addition, Hotchkiss was motivated to extract a quick settlement agreement (or

an agreement in principle) at the time, given the looming November 2019 trial, Hotchkiss's

representation that it had already used up the insurance coverage available for its ongoing legal

defense of the 2015 Action; and Hotchkiss's unlaunched capital campaign, which Hotchkiss told

Doe had been delayed due to the negative publicity from the 2015 Action's exposure of sex

abuse at Hotchkiss.  A settlement and dismissal of that action in August 2019 would net a

significant victory for Hotchkiss.  It would avoid a highly publicized jury trial that would have

cast further shame, reputational damage, and scrutiny over Hotchkiss's history and pattern of

sexual abuse; avoid a further hit to Hotchkiss's waning prestige among the wider public,

prospective students, and prospective employees, as well as its image and fundraising efforts

among its circles of affluent alumni and benefactors; and avoid the risk of a substantial monetary judgment against Hotchkiss at trial.

77.     As Hotchkiss intended, its assurances tipped the scale for Doe, who reached a settlement agreement in principle with Hotchkiss and executed a Memorandum of Understanding ("MOU") memorializing key settlement terms on August 27, 2019.  Hotchkiss immediately reported the case settled to the Court and obtained a dismissal order, and the 2015 Action was administratively closed.  On February 13, 2020, the Settlement Agreement was fully executed.

### 2.  Key Material Settlement Terms.

78.     In exchange for a stipulation of dismissal of the 2015 Action and release, the Settlement Agreement obligated Hotchkiss to apologize and atone for the wrongdoing described in the 2015 Action's complaint by establishing a specifically named "Sexual Misconduct Advisory Committee" at Hotchkiss, with specific requirements for the Committee's naming, composition, publicization, and member tenure; and by apologizing to Doe for the allegations in the complaint in writing.[12]  These terms were pivotal to the Settlement Agreement, and without them, Doe would not have agreed to settle the 2015 Action.

### i.  The Sexual Misconduct Advisory Committee.

79.     During the parties' settlement discussions on August 27, 2019, Hotchkiss proposed creating the Committee.  The Committee's primary task would be to conduct a three-year investigation leading to a comprehensive report on the full history of sexual misconduct at Hotchkiss, including the roles of Hotchkiss administrators and trustees in systematically enabling and facilitating sexual abuse at Hotchkiss; how and why illegal sexual abuse at Hotchkiss had pervaded for more than a century; and how Hotchkiss's policies and practices had fallen short of

---

[12]     In addition, Hotchkiss had to make a settlement payment of a confidential amount.

best practices.  The Committee would also advise the school on providing redress and justice for all survivors, victims, and whistleblowers of Hotchkiss's past sexual abuse.

80.     While Doe was receptive to Hotchkiss's idea, he wanted to ensure that the Committee would not be simply a rubberstamp, but rather, would expend the requisite substantial time, work, and effort to effectuate meaningful change.  Hotchkiss represented that it, too, wanted the Committee to have a meaningful mission and role in effecting sustained institutional change by publishing a comprehensive and credible fact-finding report on the history of sexual misconduct at Hotchkiss from its founding in 1891 to the present.

81.     As such, the parties agreed to a provision in the Settlement Agreement, Section 2.5, stating in relevant part that:

> "By May 29, 2020, the School will create a Sexual Misconduct Advisory Committee (the "Committee"). . . .  The Committee will consist of not less than two Trustees and at least three and not more than five non-Trustee members.  Each member of the Committee will be appointed to serve for a term of three years. . . . The School will announce the formation of the Committee in the *Hotchkiss Magazine* and on the School's website and will include in these announcements the names of the Committee members."

82.     The specific requirements in Section 2.5 – on Committee naming, composition, publicization, and member tenure – were designed to ensure that the Committee had teeth. These requirements were not simply semantical or technical in nature.  Rather, each was integral and material to Doe's decision to enter into the Settlement Agreement.

### a)  Naming.

83.     The parties agreed to name the Committee the "Sexual Misconduct Advisory Committee."  That wording was deliberate and intentional.

84.     While Hotchkiss at one point proposed changing the name to include the term sexual misconduct "prevention," Doe expressly rejected that suggestion.  "Prevention" implied, incorrectly, that the Committee's focus would be prospective and prophylactic.  Doe, however,

wanted the Committee's name to reflect its true focus: primarily retroactive, not just prospective, in order to heal and reconcile Hotchkiss with all survivors of Hotchkiss sexual misconduct and retaliation; fully investigate and redress past sexual misconduct at Hotchkiss; then, based on the lessons learned through its investigation, recommend appropriate changes to prevent future sexual misconduct.

85.     Similarly, it was important to Doe that the Committee's name begin with the words "Sexual Misconduct" to acknowledge and admit that sexual misconduct has already occurred at Hotchkiss, and to signal that such historical misconduct was the primary focus of the Committee. Such admission is critical to shaping the perception of the public, alumni, trustees, donors, faculty and other powerful individuals who have the means and influence to pressure Hotchkiss into making real, long-overdue change. Hotchkiss cannot fully take responsibility for its actions, or prevent recurrence, unless and until its leadership knows of and confesses to all, not just a fraction, of Hotchkiss's past sexual misconduct.

### b) Composition.

86.     Similarly, the composition of the Committee had to reflect its mission to educate the Hotchkiss community about its sexual abuse violations – from the top down – and effectuate meaningful, lasting change.

87.     The parties thus agreed that the Committee would include at least three and not more than five non-trustees, who are more independent than trustees and less likely to defend or espouse Hotchkiss's past practices out of loyalty to Hotchkiss rather than loyalty to truth. The parties intended that the non-trustee members be a mix of alumni and others (including paid independent experts), with at least one member having professional experience in investigations of sexual abuse, and one member with professional expertise in historical and best-practice

sexual misconduct policies and practices at schools.  The parties also wanted to put a cap on the number of non-trustees and members for practical reasons.  Too many members would hinder the efficiency and productivity of the Committee by having too many voices at the table.

88.     In addition, the parties agreed that some of the Committee members should be Hotchkiss trustees.  It was important for trustees to learn about the past and ongoing instances of sexual abuse at Hotchkiss; and to use their knowledge on the inner workings of the Hotchkiss administration, and their influence on Hotchkiss leadership and donors, to help devise, promote, and push through institutional reforms.  Trustees would also facilitate the Committee's access to other Hotchkiss trustees and administrators for interviews and information requests.

### c)  Publicization.

89.     The Settlement Agreement required that Hotchkiss form the Committee by May 29, 2020.  Hotchkiss was also required to announce the Committee's formation on the Hotchkiss website and in the Hotchkiss alumni magazine (*Hotchkiss Magazine*) by that same date.

90.     It was important to Doe for the announcement to be in print, because numerous alumni, especially some who are older, wealthier, and/or more influential, may not read news online or regularly check the contents of the Hotchkiss website.

91.     Moreover, recipients of *Hotchkiss Magazine* would not need to conduct their own searches to learn of the formation of the Committee – rather, that information would be sent directly to them.  Including the announcement of the Committee in *Hotchkiss Magazine*, and not merely on the school's website, enabled Hotchkiss to reach a far larger audience of influential alumni, and proactively reach that audience, with news of the Committee's formation.

92.     The timing of the announcement was also material to Doe.  Hotchkiss's formation and announcement of the Committee was a significant way to ███████████████████

23

████████████████████████████████████████████████████

████████████████████████. It was equally material to Doe that Hotchkiss be

proactive in dispelling its prior positive spin on the school's handling of the egregious, systemic,

and longstanding culture of sexual abuse and assault.  Thus, time was of the essence.

### d)  Member Tenure.

93.     Each Committee member had a fixed unconditional three-year initial tenure under

Section 2.5 of the Settlement Agreement.  The purpose of the tenure provision was to ensure that

Hotchkiss could not remove members in retaliation for their viewpoints or voting decisions, and

to preempt Hotchkiss and its trustees and administrators from obstructing the Committee's work.

The guaranteed three-year tenure would also guarantee that the Committee would have the

requisite time to educate itself, do the necessary work, and publish a report.

94.     The Settlement Agreement did not contain any provision permitting the removal

or termination of any member before the expiration of a three-year tenure.

95.     Thus, under the three-year tenure provision, no Committee member's tenure could

expire in less than three years, and thus no Committee member could be removed or terminated

involuntarily until at least three years had elapsed from the date the Committee was formed.

### ii.  Hotchkiss's Apology.

96.     The Apology provision in the Settlement Agreement, Section 2.3, is the most

important component of the settlement for Doe.  It requires that, "[u]pon the Effective Date, the

School will deliver to John Doe a written apology, the text of which is attached hereto as

Attachment A."

97.     Before Hotchkiss agreed to the Apology provision, Doe had demanded ███

██████ to settle the 2015 Action.  That amount represented the damages Doe believed he would

24

likely obtain at trial, and resembled amounts awarded in similar child sex abuse judgments in Connecticut around that time.  Once Hotchkiss agreed to the Apology, however, Doe agreed to drastically reduce his settlement demand by over $████████ – a nearly ██% discount – to $██ ██████, an amount approximating Doe's costs of having litigated intensely for several years. That $████████ difference in settlement demand illustrates the considerable value of the Apology to Doe.

98.     The gravity of the Apology to Doe stems from his deep religious convictions, which inform his ethical identity, as well as the horrific traumas and other harm that Doe suffered at the hands of Hotchkiss's abusers and enablers.

99.     For Doe, settling the 2015 Action – and thereby agreeing to dismiss the 2015 Action and releasing Hotchkiss from further liability for the claims in the 2015 action – meant forgiving Hotchkiss.  But Doe could not forgive Hotchkiss unless Hotchkiss first made a sincere and meaningful apology.

100.    To authentically apologize, Hotchkiss had to admit the full extent of Hotchkiss's wrongdoing described in the 2015 Action's complaint.  Hotchkiss had to express genuine guilt and remorse for the harm that Hotchkiss's wrongdoing inflicted on Doe.  Hotchkiss had to make acceptable amends to Doe.  And Hotchkiss had to commit to the parties' (supposedly) now-shared values by promising and demonstrating it had changed its wrongful behavior that had harmed Doe and would sustain such change.  A genuine apology from Hotchkiss to Doe must signal actual remorse for the sexual abuse of Doe and, for Hotchkiss, a fundamental and sustained departure from its past pattern of denial, apathy, and retaliation.

101.    Doe's perspectives on the Apology and its significance, which Doe conveyed to Hotchkiss's representatives Gould and Bradley during settlement negotiations, are reinforced by

scientific and legal literature.  The importance of an apology to the healing of a trauma survivor – in particular, a sexual abuse survivor – has been documented extensively in academic scholarship and caselaw.

102.    As Professor Brent T. White writes, "sexual assault victims often pursue civil claims for therapeutic rather than financial reasons.  The desire to be heard, have their experience validated, and receive an apology are important aspects of their therapeutic expectations for the legal process."[13]

103.    Similarly, Professor Aaron Lazare explains that "successful apologies heal because they satisfy at least one – and sometimes several – distinct psychological needs of the offended party.  These needs are:  restoration of self-respect and dignity[;] assurance that both parties have shared values[;] assurance that the offenses were not their fault[;] assurance of safety in their relationships[;] seeing the offender suffer[;] reparation for the harm caused by the offense[;] [and] having meaningful dialogues with the offenders."  Professor Lazare further cautions that "offenders so frequently try to manipulate the acknowledgment stage of an apology in order to reduce or avoid responsibility for the offense.  The results are failed or pseudo-apologies:  apologies that, at best, do not heal the damaged relationship and, at worse, further offend the aggrieved party."[14]

104.    Moreover, Professor Jennifer Freyd, editor of the journal *Trauma and Dissociation*, has explained:  "A sincere apology is extremely healing.  In our society people are afraid to apologize even if they want to because they think it could somehow be used against them (legally or socially), but what I have observed is sincere apologies are extremely healing to

---

[13]    B. T. White, *Say You're Sorry: Court-Ordered Apologies As A Civil Rights Remedy*, 91 CORNELL L. REV. 1261, 1271 (2006).

[14]    A. Lazare, ON APOLOGY, at 44, 84 (Oxford University Press 2005).

both the person who apologizes and the person apologized to."[15]  As Dr. Freyd reflected in a

May 2021 presentation to a Hotchkiss audience, "[w]hat I have seen is indication through search

evidence that when apologies are permitted by an institution, that results on litigation is actually

often good, but because I mean it doesn't, it's not a guarantee it will be, but the logic is that

people sue when their needs aren't getting met.  And often their needs are to be heard and

apologized to."

105.    Doe conveyed these principles to Hotchkiss during the parties' settlement

negotiations.  During those same negotiations, Hotchkiss – through Board of Trustees Co-

President Robert Gould and Head of School Craig Bradley – indicated that it understood these

principles, including the need to express sincere remorse and to commit to a fundamental shift in

the ways that Hotchkiss, as an institution, treated Doe and addressed past, present, and future

sexual abuse on campus.

106.    To effectuate these principles, the parties agreed that Hotchkiss should deliver its

written Apology "to John Doe" – personally, addressed to his real name, and not to his counsel –

and to do so on the date the Settlement Agreement was fully executed.

107.    These two key requirements, the recipient and timing, were not merely technical

in nature.  Instead, they were substantive and material.  They were intended to ensure that the

Apology would not be merely a perfunctory statement by Hotchkiss, but rather, a candid

commitment to the parties' shared values, an acknowledgement that Hotchkiss did not act in

accordance with those values before, and a promise that Hotchkiss will change sustainably.

---

[15]    https://around.uoregon.edu/content/sincere-apologies-are-healing-uo-psychologist-tells-verily (last accessed Aug. 26, 2022).

108.    By dictating that Hotchkiss must deliver the Apology "to Doe," the Settlement Agreement required that the Apology be personal and direct in nature – to Doe himself – and not filtered or diluted through Doe's counsel.

109.    The timing of the Apology was likewise crucial.  The Apology had to be contemporaneous with the execution of the Settlement Agreement.  The importance of this timing stems from Doe's deep religious convictions, faith, and personal ethics.  Under these core personal principles, Doe cannot forgive Hotchkiss (by releasing it from liability) before receiving a genuine apology.  In fact, the very idea of forgiving an unrepentant Hotchkiss – forgiving Hotchkiss before it sincerely performed the Apology – traumatizes Doe severely, because doing so would be a grievous sin.  To Doe, following these long-held ethical and religious convictions in resolving his dispute with Hotchkiss was far more important than any sum of money.

### C.    HOTCHKISS MATERIALLY BREACHES THE SETTLEMENT AGREEMENT AND REVEALS THAT IT FRAUDULENTLY MISREPRESENTED ITS COMMITMENT TO INSTITUTIONAL REFORM.

110.    Hotchkiss's promises to Doe turned out to be a fiction.  Even after litigating its position that the Settlement Agreement is binding and operative in this Court and the Second Circuit – and prevailing – and even though that agreement required an irrevocable three-year term for every Committee member, Hotchkiss ███████████████████████████████ █████████████████████████████ and, in so doing, materially breached its obligations and commitments under the Settlement Agreement.

111.    Hotchkiss reneged on its promises to show remorse and implement specific institutional reforms, thus deepening and re-inflicting in the present day the profound psychological harm it historically caused Doe.

112.    From the moment it executed the Settlement Agreement to the present, Hotchkiss has materially breached, and continues to materially breach, the Settlement Agreement –

defeating its essential purpose – by violating the agreement's Committee naming, composition, and announcement requirements; ███████████████████████████████ ████████████████████████████████████████; and by failing to deliver a timely written apology to Doe personally.

113.    Moreover, Hotchkiss's promises that it intended to implement real, lasting change at Hotchkiss – through the Committee and other reforms that represent the performance of the Apology – were false.  As time passed and other persons, including Hotchkiss trustees and other sex abuse survivors and witnesses, volunteered new information to Doe, it has become evident to Doe that Hotchkiss had no intention, at the time it negotiated the Settlement Agreement, of honoring such promises.  Instead, Hotchkiss made false representations to deceive Doe into agreeing to a bad-faith settlement, thus avoiding trial, obtaining a dismissal, and securing a broad release – all to protect its own name, reputation, and financial interests.

### 1.   Hotchkiss Misnamed The Committee.

114.    Hotchkiss unilaterally misnamed the Committee the "Advisory Committee for Sexual Misconduct Prevention and Education," in square breach of the Settlement Agreement's requirement to name the Committee the "Sexual Misconduct Advisory Committee."

115.    Hotchkiss blindsided Doe in the months following the parties' execution of the Settlement Agreement, failing to give him any indication that it would call the Committee anything other than the "Sexual Misconduct Advisory Committee."  Doe did not find out about the improper name until Hotchkiss (belatedly) announced the Committee to the public.

116.    Doe made multiple demands to Hotchkiss to cure its breach of the Committee naming provision, including in letters from counsel dated September 4, 2020, October 1, 2020, November 5, 2020, and December 29, 2020.  Doe's letters described Hotchkiss's breaches in

detail, underscoring their material and intentional nature.  In response, Hotchkiss rebuffed Doe's demands to cure, made no effort to resolve Doe's concerns through compromise, and continued to call the Committee by its erroneous name in complete disregard of Doe's concerns and the Settlement Agreement's explicit requirements.

117.    Hotchkiss's breach of the Committee's naming provision is material.  The Committee's name was specifically and expressly negotiated and agreed by the parties, and Hotchkiss's breach impedes and dilutes the Committee's mission, its identity in the broader Hotchkiss community, and its focus on Hotchkiss's tragic history – and continuing practice – of tolerating and covering up known and knowable sexual abuses of children.  The name "Advisory Committee for Sexual Misconduct Prevention and Education" ostensibly confines the Committee's purview to preventing *future* occurrences of sexual misconduct at Hotchkiss, and educating members of the Hotchkiss community about sexual misconduct.  That name excludes any admission by Hotchkiss, to its community and the public at-large, that it enabled sexual misconduct to pervade its campus in the past and continues to do so; or that one central purpose of the Committee was to redress past violations and help heal survivors, such as Doe, who have suffered for years.

118.    Reinforcing the materiality of Hotchkiss's breach, the Committee has, to date, failed to take steps to redress past abuse and bring healing, let alone reconciliation, to survivors. It has – true to its inappropriate name – purported to focus on preventing future instances of misconduct, but practically doing nothing material other than rubberstamp the self-interested decisions of Hotchkiss's current leadership.  Indeed, the Committee has never met in person but only intermittently by Zoom, and never has met with the Board of Trustees. ████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

The Committee that Hotchkiss formed is a farce, rubberstamping and whitewashing Hotchkiss's continuing cover-up and concealment of sex abuse, and doing nothing to reconcile with sex abuse survivors.  Tellingly, a significant group of Hotchkiss alumni, organized as Hotchkiss Alumni For Reconciliation And Healing ("HAFRAH"), has refused to even meet with the Committee, because Hotchkiss's current leadership had reneged on promises of change at Hotchkiss.  That is not enough, and that is not what Doe bargained for, and what Hotchkiss agreed to, in the Settlement Agreement.

### 2.  Hotchkiss Improperly Constituted The Committee.

119.    Hotchkiss further breached the Settlement Agreement's requirements as to member composition.  When forming the Committee, Hotchkiss appointed at least eight non-trustees to the Committee, in violation of the Settlement Agreement's requirement that the Committee include only three to five non-trustee members.  Specifically, in published announcements, emails, and an introductory meeting, Hotchkiss has introduced the following eight individuals, and permitted them to participate, as non-trustee committee members:  (1) Mark Berkowitz, (2) Ann Sprole Cheston, (3) Christina Cooper, (4) Brandeis Nilaja Green, (5) Elizabeth Krimendahl, (6) Charlie Lord, (7) Jennifer Mahon, and (8) Steve McKibben.  In the months that followed, some of those non-trustee members who were employees of Hotchkiss,

████████████████████████████████████████████

███████, also enjoyed prominent speaking roles and exerted outsize influence over Committee deliberations, including by obstructing, delaying, and diverting from the Committee's mission.

120.    Exacerbating matters, Hotchkiss permitted people not named in Hotchkiss's announcement – who were beholden to Hotchkiss – ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████. How Hotchkiss chose to inconsistently characterize these de facto members did not matter, because in reality, they were permitted to attend, speak, direct, control, and vote at Committee meetings – and even to chair the Committee and repeatedly cancel scheduled Committee meetings.

121.    Despite Doe's demands for Hotchkiss to cure its breaches of the Committee's composition requirements, Hotchkiss has kept more than five non-trustee members on the Committee ████████████████████████████████████ ████████████████████████████████████████████ ████████████.

122.    Hotchkiss's breaches of the Committee composition requirements are material.  In agreeing to the Settlement Agreement's requirements for the Committee's composition, the parties agreed to strike a balance between inviting diverse perspectives, voices, and opinions, while making sure the Committee was compact enough to accomplish reforms in a timely and effective manner.  Hotchkiss's breaches upended this agreed-upon structure.  Unsurprisingly, the Committee has consistently experienced significant delays in performing its functions. Committee meetings were frequently delayed or canceled, and plans for the committee, including

adopting a charter, were continually deferred with constant obstruction and non-cooperation by Hotchkiss.

### 3.   Hotchkiss Belatedly Publicized The Committee.

123.   Hotchkiss has also breached its contractual obligation to publicize the formation of the Committee in Hotchkiss's alumni magazine, *Hotchkiss Magazine*, and on Hotchkiss's website by May 29, 2020.

124.   Hotchkiss did not publish an announcement in *Hotchkiss Magazine* until more than six months (approximately two magazine issues) after the Committee's formation.

125.   Moreover, while Hotchkiss *did* announce the Committee's formation on its website, the committee named in that announcement is not the same as the one Doe agreed would be formed when Hotchkiss fraudulently induced him to sign the Settlement Agreement.  It was misnamed, and comprised more members than the Settlement Agreement permitted – too many members to operate efficiently.[16]

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████

127.   It was not enough for Hotchkiss to announce the Committee on Hotchkiss's website, because Hotchkiss community members relied on Hotchkiss's alumni magazine for Hotchkiss-related news and developments.  Thus, inclusion in *Hotchkiss Magazine* ensured that far more of the Hotchkiss network would actually see the announcement – rather than only those

---

[16]    In addition, the website announcement disingenuously omitted the name of Committee member Charlie Lord.

who happened to come across the announcement while they happened to browse Hotchkiss's website and its numerous subpages.

128.    Hotchkiss's six-month delay was a material violation of this Settlement Agreement provision. ███████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

129.    One of the core purposes of the Settlement Agreement was for Hotchkiss to be proactive about dispelling its self-created pristine image and reputation.  By failing to publish a timely announcement in a source that the Hotchkiss community actually reads and relies on for Hotchkiss-related news, Hotchkiss did just the opposite.  Hotchkiss continued its reprehensible history of cover-up and denial:  protecting its image by burying the existence of sexual abuse on campus and silencing the voices of survivors.

**4.  Hotchkiss Improperly** ████████████████████████████

130.    In perhaps its most egregious breach of the Settlement Agreement, Hotchkiss improperly █████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████





█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████

142.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ in blatant breach of the Settlement Agreement's provision █

███████████████████████████████████████████

143.    The next day, undersigned counsel served Hotchkiss with a demand to cure its

breach of the Settlement Agreement, explaining that Hotchkiss's ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

144.    ███████████████████████████████████████████████████████████

███████████████████████████ and the broader goals that Hotchkiss purported to espouse in

settlement negotiations that were fundamental to Doe's agreement to settle, including:

(i) correcting significant failures, errors, and omissions in a public report the Committee would

publish based on its investigations into past sexual abuse at Hotchkiss; (ii) helping Hotchkiss

provide restorative justice to and facilitate healing for and reconciliation with survivors of past

sexual abuse and victims of retaliation and institutional betrayal by Hotchkiss; and (iii)

preventing future sexual abuse and institutional betrayal by ceasing to cover up and conceal past

sexual abuse.

145.    Hotchkiss refused to cure this breach of the Settlement Agreement, despite Doe's

demand ██████████████ .

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

147.    Hotchkiss's breaches are material.  The Settlement Agreement expressly provides

that ████████████████████████████████████████████

██████████████████████████████████████

148.    Hotchkiss's ████████████████ robbed Doe of these contractual rights.  ██████

████████████████████ Hotchkiss and its leadership's history of falsely disparaging,

and retaliating against, Doe and others who speak up against sex abuse and sexual abusers and

accessories to their crimes.  Hotchkiss's longstanding retaliatory behavior includes disparaging

those pushing for change as "disruptive" or "disgruntled" or "negative" or "troublemaker" as

pretext for retaliation, expulsion, suspension, termination, and, as to Doe, ████████████

██████████ for speaking out against sexual abuse at Hotchkiss and against the concealment of

that abuse by Hotchkiss's trustees, leadership, faculty, and staff.

**1.   Hotchkiss Violated The Settlement Agreement's Apology Provision.**

149.    In addition to its numerous Committee violations, Hotchkiss violated the Apology

provision of the Settlement Agreement, Section 2.3, in multiple respects.

150.   First, it never delivered the Apology to Doe; instead, only after demands from Doe for the Apology was an ostensible apology letter delivered to Doe's then-counsel.

151.   Moreover, Hotchkiss failed to deliver the Apology by the agreed-upon deadline: the "Effective Date" of the Settlement Agreement, or February 19, 2020.  Instead, Hotchkiss delivered an obviously noncompliant "apology" weeks later, on March 3, 2020, followed by another noncompliant "apology" on March 6, 2020.

152.   Hotchkiss has not cured its breach by delivering the Apology to Doe personally. In addition, Hotchkiss's breach of the timing requirements and requisite good faith for the Apology can never be cured.

153.   Hotchkiss's breaches of the Apology provision were and remain material.  It was critical to Doe that Hotchkiss deliver the Apology to him directly and personally, and equally critical that Hotchkiss's Apology was timely and contemporaneous with the parties' exchange of the fully executed Settlement Agreement – *before* Doe forgave Hotchkiss by release or dismissal of the 2015 Action.

**2.   Hotchkiss Fraudulently Induced Doe Into Settling The 2015 Action.**

154.   Throughout the August 27, 2019 settlement negotiations, Hotchkiss made misrepresentations to Doe regarding institutional reforms that it was purportedly implementing at the time, as well as reforms it would implement in the future.

155.   After Doe agreed to settle the 2015 Action, he learned that those representations were utterly false.

156.   To date, Hotchkiss has not carried out material reforms that it held itself out as having made or currently making, or those it promised it would make in the future.  At the time it

made those misrepresentations and unfulfilled promises of reform, Hotchkiss knew that they were false and/or had no intention of following through on the reforms.

157.    Contradicting Hotchkiss's representations during settlement negotiations, Hotchkiss officials have indicated to Doe that Hotchkiss has not implemented all of the RAINN Report recommendations – and, worse yet, that it does not intend to implement all of them.  For instance, Hotchkiss never hired a full-time experienced Sexual Misconduct Coordinator and instead appointed Christina Cooper part-time, who also works as a dean, teacher, and coach, and had no relevant professional experience or credentials for the coordinator position.  Hotchkiss has evaded repeated inquiries by Doe to provide further information on what specific recommendations were and were not implemented.

158.    In addition, Hotchkiss failed to publish and admit the credibility of the allegations against Roy "Uncle Roy" Smith and ████████████████, including Doe's allegations against Smith.  Quite the contrary, on May 30, 2020, Hotchkiss publicly supported ████ ████████████████████████████████████████████████████████.[17] Likewise, during a live global webcast to the Hotchkiss community held on February 27, 2020, a mere week after the Settlement Agreement was executed and delivered, Gould publicly praised Roy Smith as one of his most important teachers whose class he had taken at Hotchkiss and as a primary reason he chose to become a Hotchkiss trustee.  Thereafter, Hotchkiss continued to deny the truth of Doe's allegations in another sexual abuse litigation, *Roe v. Hotchkiss School*, Case No. 3:18-CV-01701 (VAB) (D. Conn.).

---

[17] ████████████████████████████████████████████████████████
████████████████████████

159.     Contrary to its assurances to Doe that it would permanently strip Arthur White of all Hotchkiss honors, Hotchkiss reinstated and again publicly awarded and announced the award of the so-called "Arthur White Trophy" in 2021.

160.     In addition, Hotchkiss deceived Doe when claiming that it did not enter into significant or comparable monetary settlements for sex abuse lawsuits in recent years.  Its own admissions since the August 27, 2019 settlement negotiations belie that claim.  For instance, Hotchkiss's own public tax filings disclose that it incurred at least $7,445,000 in settlements in the 12 months ended June 30, 2019, the Hotchkiss tax year prior to the August 2019 negotiations.  And, in Winter 2020, Gould himself admitted to Doe that he had personally negotiated settlements with "10 or 11" other sex abuse victims for Hotchkiss in the year prior to the August 2019 negotiations.

161.     Finally, Hotchkiss's publicly released financial information, including its IRS Form 990s, do not report or otherwise indicate that Hotchkiss made the settlement payment to Doe – even though similar records have reflected settlement payments by Hotchkiss to other sex abuse victims.

162.     Hotchkiss's representations as to its ongoing and forthcoming institutional reforms were material to Doe's ultimate decision to sign the MOU, execute the Settlement Agreement, and release his claims against Hotchkiss – none of which he would have done had he known that Hotchkiss's representations were false, and that it never intended to fulfill its promises.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
## Breach of Contract

163.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

164.    Plaintiff and Defendant entered into a binding and enforceable Settlement Agreement, pursuant to which Defendant agreed to form the Committee to advise Defendant, its alumni and trustees, and its employees and students as to the past and ongoing culture of sexual abuse and assault at the school, and use the Committee to implement lasting and meaningful change by performing the following material terms pursuant to Section 2.5:  (i) name that Committee the "Sexual Misconduct Advisory Committee"; (ii) appoint between three and five non-trustees to the Committee; and (iii) provide all Committee members with three-year tenures, during which they could not be removed from the Committee.  In addition, Section 2.3 of the Settlement Agreement required Defendant to apologize to Plaintiff personally and upon the "Effective Date" of the Settlement Agreement, February 19, 2020.

165.    Plaintiff performed all of his obligations under the Settlement Agreement.

166.    Defendant materially breached Sections 2.3 and 2.5 of the Settlement Agreement by:  (i) failing to properly name the Committee; (ii) failing to appoint the agreed-upon number of members; (iii) ██████████████████████████████████████████████ ████████████████████████████████████; and (iv) failing to personally deliver to Plaintiff an apology by the Settlement Agreement's Effective Date.

167.    As a direct and proximate consequence of Defendant's material breaches, Plaintiff has sustained harm.

168.    Accordingly, as a result of Defendant's material breaches of the Settlement Agreement, Plaintiff's own performance under the contract is excused, including his release of Defendant and any others from any claims related to the 2015 Action or that are otherwise included under Section 3.1 of the Settlement Agreement.

**SECOND CAUSE OF ACTION**
**<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>**

169.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

170.    The implied covenant of good faith and fair dealing is implied into every contract or a contractual relationship; in other words, every contract, including the Settlement Agreement, carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.

171.    As set forth more fully above, Defendant materially breached the implied duty of good faith and fair dealing by defeating the underlying purpose and benefits to Doe of the Settlement Agreement.

172.    Among other things, Defendant, despite its promises, failed to implement specific and material meaningful institutional changes at Hotchkiss, including through the Committee, or to express real remorse, timely or otherwise, to Plaintiff.

173.    As a direct and proximate consequence of Defendant's material breaches of the implied covenant of good faith and fair dealing in the Settlement Agreement, Plaintiff has sustained harm.

174.    Accordingly, as a result of Defendant's material breaches of the Settlement Agreement, Plaintiff's own performance under the contract is excused, including his release of

Defendant and any others from any claims related to the 2015 Action or that are otherwise included under Section 3.1 of the Settlement Agreement.

### THIRD CAUSE OF ACTION
### <u>Fraud and Fraudulent Inducement</u>

175.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

176.    In the course of negotiations leading up to the Settlement Agreement, Defendant represented, and Plaintiff reasonably understood, that Defendant was committed to implementing material changes regarding its long history of sexual abuse, and that █████████████████ ███████████████████████████████████.

177.    Defendant made material misrepresentations and/or misleading omissions of fact regarding its own actions and future intentions, under the purported Settlement Agreement and otherwise.  Specifically, Defendant represented that, at the time of the parties' settlement negotiations on August 27, 2019, Defendant was in the process of implementing and/or intended to implement concrete, meaningful institutional changes that admitted to and addressed specific past sexual abuse at the school.  In addition, Defendant represented that it intended to:  (i) create a specifically-named "Sexual Misconduct Advisory Committee" with a specific membership that would provide its members a three-year tenure during which they could not be removed and that would work toward addressing the systemic sexual abuse at Hotchkiss; and (ii) publicly acknowledge and apologize to Plaintiff for the harm he experienced at the hands of Defendant's students and teachers.

178.    Those statements were false because, in fact, Defendant had no present intent to follow through with those changes or adhere to its promises pursuant to the Settlement Agreement.  This is demonstrated by Defendant's failure, to date, to implement institutional

changes, and its misnaming of the Committee, ███████████████████████ ███████████████████████, and failure to abide by the terms of the Apology provision of the Settlement Agreement.

179.     Defendant knew or was reckless in not knowing that those statements were false when made.

180.     Defendant made these statements with an intent to induce Plaintiff to agree to the Settlement Agreement, thereby dismissing the 2015 Action, releasing his claims against Defendant, and avoiding a jury trial that would have embarrassed Defendant and harmed its reputation and financial prospects.  Defendant knew that Plaintiff would not have agreed to do so but-for Defendant's commitment to change and meaningfully apologize.

181.     Plaintiff reasonably relied on Defendant's misrepresentations and omissions in agreeing to the Settlement Agreement.

182.     Plaintiff was damaged as a result of Defendant's fraudulent statements in an amount to be proven at trial.

183.     Moreover, the Settlement Agreement is void and should be rescinded as fraudulently induced.

## FOURTH CAUSE OF ACTION

### Negligence

184.     Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

185.     Defendant assumed a duty to Plaintiff and to the other minor children in its care and custody to do everything within its power to protect them from sexual abuse by other students and by Hotchkiss's faculty.  Before Plaintiff chose to attend Hotchkiss, Defendant's

Director of Admissions promised him that rules prohibiting consensual and non-consensual sexual activity were strictly enforced.

186.    Defendant agreed that it had a duty and responsibility to keep the children in its care and custody safe from harm.

187.    Notwithstanding these duties, responsibilities, and promises, Hotchkiss and its teachers and administrators knew, at the time Plaintiff entered and attended Hotchkiss, that there was a history and tradition at the school of older male students, including students 18 years of age and older, subjecting younger students to sexualized hazing.

188.    Also notwithstanding Defendant's duties, responsibilities, and promises to keep Plaintiff safe from harm, at the time he entered and attended Hotchkiss, Hotchkiss and its teachers and administrators knew, and should have known, that at least one of Hotchkiss's male teachers and dormitory masters was a pedophile and that multiple Hotchkiss teachers had been sexually abusing children.

189.    Defendant knew and should have known that teacher, athletic trainer, and dormitory master Roy G. Smith was sexually attracted to pubescent boys.

190.    During Smith's tenure at Hotchkiss, including prior to and during the time Plaintiff was exposed to Smith, Defendant knew and should have known that Smith discussed schoolboy homosexuality and homo-erotic topics with male students in his apartment at night and had a history of sexual misconduct and sexually abusive grooming behavior.

191.    At the time that Defendant exposed Plaintiff to Smith, Defendant was on actual and constructive notice that Smith desired young boys and had acted on his desires in the past by engaging young boys in sexualized conversation and by touching them in inappropriate and sexual ways.

46

192.    Defendant's affirmative acts, including housing Smith in and giving him unfettered access to and authority over a boys' dormitory, in which at night boys were locked in the dormitory with him, allowing him unsafe access to vulnerable, young children, and allowing him to work in the athletics program and locker room areas where he was able to touch and leer at the naked and partially-clothed bodies of pubescent boys, created and exposed Plaintiff to a known high degree of risk of harm.

193.    Defendant was on actual and constructive notice of Smith's aberrant character, past conduct, and tendencies.

194.    Defendant was on actual and constructive notice of the temptation and opportunity afforded to Smith for molesting young boys.

195.    Defendant was on actual and constructive notice of the gravity of the harm that would result if Smith molested one or more of the boys in Hotchkiss's care and custody.

196.    Defendant knew that no other person or entity would assume the responsibility for preventing Smith from molesting young boys.

197.    Even if Defendant had not been on actual or constructive notice of the past aberrant behavior and propensities of Smith, Defendant knew and should have known that housing adult teachers who are sexually attracted to pubescent schoolchildren with, and giving them unrestricted access to, a never-ending community of young vulnerable children created a high degree of risk of inappropriate and sexualized behavior.

198.    Therefore, Defendant created a situation that it knew and should have known was likely to be dangerous to Plaintiff and to the other young children in its care.

199.    Despite having created this dangerous situation, Defendant failed and refused to take appropriate precautions against the risk of harm.

200.    As a result of Defendant's acts and omissions, Plaintiff's ability to engage in normal life activities has been permanently impaired and he has been and will be unable to lead and enjoy a normal life.

201.    The harm inflicted upon Plaintiff as a young, vulnerable child at Hotchkiss has adversely affected his ability to enter into and maintain lasting, meaningful relationships with others.

202.    Plaintiff's ability to maintain intimate physical, sexual, and emotional relationships with other human beings has been irreparably damaged.

203.    As a result of Defendant's negligence, Plaintiff has sustained physical pain and suffering.

204.    As a further result of Defendant's negligence, Plaintiff has sustained, and will continue over the course of his lifetime to suffer, severe emotional distress and mental pain and anguish.

205.    Plaintiff's injuries and damages were caused by the negligence of Defendant, its teachers, administrators, employees, and agents, for whose negligence Defendant is liable, in the ways previously described and in the following ways:

   a. Defendant, by commission and omission, allowed and encouraged a tradition of hazing and bullying of young boys by older students, including hazing and bullying that consisted of sexual assaults and humiliation;

   b. Defendant, by commission and omission, failed and refused to properly train and supervise Hotchkiss teachers and other school employees, including Smith;

c.  Defendant hired teachers and other employees, including Smith, despite actual and constructive knowledge of their propensity and desire to molest young boys and without proper vetting and background checks; and

d.  Defendant failed to warn Plaintiff of the risk of harm to which he was subjected while attending Hotchkiss.

206.  Defendant owed Plaintiff a duty of care, it breached that duty, and its breach caused Plaintiff to be assaulted and molested, suffering damages as a result.

## FIFTH CAUSE OF ACTION

### Recklessness

207.  Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

208.  Defendant, acting through its administrators, teachers, and staff, was consciously aware of the fact that it created a substantial risk to Plaintiff.

209.  Notwithstanding Defendant's conscious awareness of the risk to Plaintiff, Defendant failed to take the necessary and appropriate steps to reduce or eliminate the risk.

210.  Notwithstanding Defendant's conscious awareness of the risk to Plaintiff, Defendant took affirmative steps to exacerbate the risk and make harm and injury to Plaintiff more likely.

211.  The injuries Plaintiff suffered were caused by the recklessness or callous indifference, or the wanton misconduct, of Defendant.

## SIXTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

212.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

213.    Defendant created an unreasonable risk of causing Plaintiff emotional distress in (a) fostering, facilitating, and concealing the sexual abuse that Plaintiff and others suffered, and (b) intentionally and callously making false promises to Doe to deceive him into settling the 2015 Action.

214.    Plaintiff's distress was foreseeable.

215.    Defendant should have known that Plaintiff's emotional distress was severe enough that it might result in illness or bodily harm.  And in fact, Plaintiff's distress did result in illness and bodily harm.

216.    Defendant's conduct was the cause of Plaintiff's distress.

## SEVENTH CAUSE OF ACTION

### Breach of Fiduciary Duty

217.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

218.    A fiduciary relationship existed between Defendant and Plaintiff, which gave rise to:  (i) a duty of loyalty on the part of Defendant to Plaintiff; (ii) an obligation on the part of Defendant to act in the best interests of Plaintiff; and (iii) an obligation on the part of Defendant to act in good faith in any manner relating to Plaintiff.

219.    Defendant advanced its own interests to the detriment of Plaintiff.

220.    Plaintiff has sustained damages.

221.    Plaintiff's damages were proximately caused by Defendant's breach of its fiduciary duty.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff and against Defendant:

    a.   Awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial;

    b.   Declaring that Plaintiff is excused from performing the release provision of the Settlement Agreement; or, in the alternative, rescinding the Settlement Agreement;

    c.   Awarding Plaintiff his reasonable costs and disbursements, including reasonable attorneys' fees; and

    d.   Granting such other and further relief that the Court deems just and proper.

### **JURY DEMAND**

Plaintiff requests a trial by jury for all issues so triable.

DATED: August 26, 2022        **GLENN AGRE BERGMAN & FUENTES LLP**

        By:   */s/ Jed I. Bergman*

        Jed I. Bergman (*pro hac vice forthcoming*)
        Tian "Skye" Gao (*pro hac vice forthcoming*)
        Megan M. Reilly (*pro hac vice forthcoming*)
        1185 Avenue of the Americas, 22nd Floor
        New York, NY 10036
        Tel.: (212) 970-1600
        jbergman@glennagre.com
        sgao@glennagre.com
        mreilly@glennagre.com

        -and-

**ZEISLER & ZEISLER, P.C.**

By:   */s/ Aaron A. Romney*

Aaron A. Romney (ct28144)
10 Middle Street
Bridgeport, CT 06604
Tel.: (203) 368-4234
Fax: (203) 367-9678
aromney@zeislaw.com

*Counsel for Plaintiff John Doe*