**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN DOE,<br><br>                Plaintiff,<br><br>      -v-<br><br>THE HOTCHKISS SCHOOL,<br><br>          Defendant. | CIVIL ACTION NO.<br>3:22-cv-01088 (VAB) |

**AMENDED COMPLAINT**

Plaintiff John Doe ("Plaintiff" or "Doe"[1]), by and through his undersigned counsel, brings this amended complaint, pursuant to Federal Rule of Civil Procedure 15(a), against defendant The Hotchkiss School ("Defendant" or "Hotchkiss"), and hereby alleges, upon knowledge as to his own actions and otherwise upon information and belief, as follows:

**NATURE OF ACTION**

1.     This action arises from Hotchkiss's decades-long betrayal of Doe, a survivor of repeated sexual abuse, assault, and rape at the hands of Hotchkiss. Perpetuating that pattern of institutional betrayal, Hotchkiss has flagrantly breached its obligations to Doe under the 2020 settlement agreement that resolved Doe's original sexual-abuse lawsuit. In addition to re-traumatizing Doe, Hotchkiss's conduct has made clear that it never intended to perform, and that the prior representations Hotchkiss made to Doe to induce his assent to that settlement – representations that Hotchkiss had enacted and would sustain specific institutional changes, and sincerely intended to turn the page permanently on its despicable past practices, disparagement,

---

[1]    As a survivor of childhood sexual assault, Plaintiff brings this action pseudonymously as "John Doe."

and retaliation – were false, and intended to fraudulently induce Doe's assent. Doe has also learned that Hotchkiss improperly withheld material evidence from him in discovery during the 2015 Action. As a result, Doe is no longer bound by the prior release of his original claims, and brings this suit to assert those claims as well as new claims for breach of contract, fraud, and infliction of emotional distress.

2.      When Doe was a small 14-year-old child, his parents entrusted him to the care and supervision of Hotchkiss, a private boarding school in Lakeville, Connecticut. Hotchkiss promised, and Doe trusted, that Hotchkiss would do all within its power to keep Doe safe, including from sexual crimes at Hotchkiss.

3.      Hotchkiss violated Doe's trust, propagating and condoning an environment of rampant sexual assaults, sexual abuse, sexually violent hazing, and pedophilia by Hotchkiss faculty, medical staff, athletic staff, dormitory proctors, and older students.

4.      A Hotchkiss teacher, athletic trainer, and dormitory master named Roy G. Smith fondled Doe's genitals, and later drugged and anally raped him when he was 15 years old.

5.      Upperclassmen, appointed by Hotchkiss as senior dormitory proctors, assaulted Doe by forcibly pulling down his pants and underwear, hitting his buttocks and genitals with wooden pledge paddles, and sticking objects in his anus when he was 14 years old.

6.      These and other equally vile acts occurred on Hotchkiss property, during the school year, and under the supervision of Hotchkiss's teachers and administrators. The sexual abuse continued even after Hotchkiss faculty and leadership knew that Doe and other students had been and were being abused. Doe's attempts to report and speak out against such crimes were and continue to be met with apathy, malicious retaliation, and institutional betrayal by Hotchkiss.

7.      Unbeknownst to Doe when he had been recruited to and chose to attend Hotchkiss, countless other Hotchkiss students had been sexually abused by Hotchkiss faculty and staff, and Hotchkiss for many years had been covering up and concealing rampant sexual abuse at the school, protecting and retaining faculty who were known sexual abusers, and retaliating powerfully and maliciously against persons who had attempted to report or curtail the rampant sexual abuse at Hotchkiss.

8.      In 2015, Doe commenced a lawsuit against Hotchkiss in this Court, seeking damages and other relief arising from the sexual abuse he suffered (the "2015 Action").

9.      During settlement negotiations in 2019, Hotchkiss, through its Board of Trustees Co-Presidents Robert Gould and Elizabeth Hines and its Head of School Craig Bradley, fraudulently represented to Doe that Hotchkiss would make specific, lasting, meaningful, and impactful changes to acknowledge and address Hotchkiss's history of sexual abuse, atrocities, and institutional betrayal of Doe and others, including by forming a specifically-named "Sexual Misconduct Advisory Committee" (the "Committee"), with specific requirements as to its composition and operation.  Those requirements included appointing Doe as a Committee member with an unconditional three-year tenure.

10.     Hotchkiss separately promised to:  (a) deliver, at the same time that Hotchkiss executed the Settlement Agreement, a written and physically signed apology to Doe (the "Apology"), which would be ratified by a resolution of Hotchkiss's Board of Trustees, for all of the misconduct underlying the 2015 Action; (b) by its apology, acknowledge and no longer deny that Hotchkiss and its faculty, staff, trustees, proctors, and agents had committed the acts explicated in the 2015 Action's complaint; (c) acknowledge and no longer deny that those wrongful acts had caused Doe to suffer physical and psychological traumas and other severe

harm; and (d) commit to sustained institutional change going forward, including by crediting numerous reports of sexual abuse of numerous children by past and current Hotchkiss faculty, which Hotchkiss continued to cover up and conceal, and by no longer protecting, employing, or honoring faculty or trustees who had committed, covered up, or concealed sex abuse.

11.     Relying on Hotchkiss's promises – in particular, to deliver to Doe a written and signed apology *prior* to Doe's release of his claims in the 2015 Action and *prior* to dismissal of the 2015 Action – Doe agreed to settle the 2015 Action, dismiss that action, and release his claims in the 2015 Action against Hotchkiss.[2]

12.     Little did Doe know, however, that Hotchkiss's promises during the settlement negotiations and in the Settlement Agreement itself were a ruse and sham.

13.     Hotchkiss breached material, and indeed central, terms of the Settlement Agreement, including the provisions governing the Committee and the Apology.  Among its fundamental breaches, Hotchkiss:  (a) misnamed the Committee, undermining its mission and purpose; (b) inappropriately formed the Committee by appointing more members than agreed-upon, which hindered the Committee from being productive and functional; (c) caused non-members adverse to the Committee's purpose to participate in, obstruct, and dictate Committee affairs; (d) delayed the announcement of the Committee's formation, thus delaying public validation of Doe's sexual abuse allegations and claims, and forestalling Hotchkiss's promised shift to acknowledge and atone for its long and horrific history of sexual misconduct; (e)

---

[2]     The parties are legally bound to a written settlement agreement that Hotchkiss delivered to Doe's counsel on February 20, 2020 (the "Settlement Agreement"), a true and correct copy of which is attached as **Exhibit 1**.  Doe pleads this action in accordance with this Court's ruling, affirmed by the Second Circuit, that the February 20, 2020 document is the operative settlement agreement.  *See Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2020 WL 4271781 (D. Conn. July 24, 2020), *aff'd*, No. 20-2778-CV, 2022 WL 211699 (2d Cir. Jan. 25, 2022).

removed Doe from the Committee less than three months after the Committee had finally

purported to have adopted a charter and potentially to have begun its charter's work, denying

Doe his explicit contractual right to serve on the Committee for at least three years; and (f) failed

to deliver a signed Apology to Doe personally or by the requisite deadline.

14.     In addition, after the Settlement Agreement was executed, Doe learned that

Hotchkiss had intentionally made false representations during settlement negotiations that it was,

at such time, in the process of implementing, or intended to implement, lasting, meaningful, and

specific institutional reforms.  Hotchkiss also intentionally withheld material information from

Doe in discovery during the 2015 Action to conceal the full extent of its knowledge of, and

failure to address, widespread sex abuse, and to deceive and mislead Doe about the value of his

sex abuse claims.  Hotchkiss made those fraudulent statements and omissions to extract a

deficient settlement from Doe, rid itself of the 2015 Action prior to trial, and preserve its own

reputation and name before the public, before current and prospective students and their parents,

and before the influential circles of alumni, benefactors, and prospective donors – from whom

Hotchkiss seeks to gain tens of millions of dollars in annual tuition and fees, as well as hundreds

of millions of dollars in donations and financial support.

15.     As a direct result of Hotchkiss's material breaches, fraud, and persistent

institutional betrayal, Hotchkiss has caused and continues to cause Doe grave and irreparable

harm, including the aggravation of Doe's severe PTSD, trauma, emotional distress, and mental

anguish, and the physical injuries and monetary damages Doe has sustained and continues to

sustain as a result of his re-traumatization.

16.     Because Hotchkiss materially breached the Settlement Agreement, Doe is relieved

from any obligation to perform under that agreement's release provision.  In the alternative, the

release in the Settlement Agreement is no longer enforceable because Hotchkiss procured the execution of that agreement by fraud.  Accordingly, Doe is now entitled to assert his prior claims arising out of Hotchkiss's abominable sexual abuse, as well as new claims for breach of contract, fraud, and infliction of emotional distress for Hotchkiss's post-settlement conduct.

17.     Doe therefore brings this action against Hotchkiss, seeking a declaration that he is excused from performing the release provision in the Settlement Agreement due to Hotchkiss's material breaches of the Settlement Agreement or, in the alternative, rescission of the Settlement Agreement; damages; and other relief for the life-long trauma, both physical and psychological, and pain and suffering Hotchkiss inflicted and continues to inflict on Doe through its condoning of sexual assault, material breaches of its contractual obligations, false promises to deceive Doe to enter into a Settlement Agreement it had no intention of honoring, and continued betrayal and retaliation against Doe.

## **PARTIES**

18.     Plaintiff John Doe, a citizen and resident of New York, attended and boarded at Hotchkiss as a student in the 1980s starting when he was 14 years old.

19.     Defendant The Hotchkiss School, a non-stock corporation formed pursuant to the laws of Connecticut with its principal place of business in Lakeville, Connecticut, is a private college-preparatory boarding school.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C § 1332(a).  This is a civil action between citizens of different States, New York and Connecticut, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     This Court also has jurisdiction over this action pursuant to Section 6.4 of the Settlement Agreement, which provides that this Court shall have "exclusive" jurisdiction over "any and all disputes arising out of" the Settlement Agreement.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendant resides in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

23.     Venue is also proper pursuant to Section 6.4 of the Settlement Agreement, which fixes the exclusive venue for resolving disputes arising from the Settlement Agreement in this District.

## FACTS

### A.     Hotchkiss Authority Figures Rape and Sexually Abuse Doe.

24.     Founded in 1891, Hotchkiss is one of the wealthiest private boarding schools in the world, with approximately one billion dollars in total assets.  Hotchkiss's assets include reported financial investments, cash, and equivalents of nearly $700 million book value as of June 30, 2021; land, buildings, and equipment with an undepreciated book value of nearly $300 million; lucrative private investments with high returns on investment, including nearly $600 million book value of investments in assets such as hedge funds and private equity funds, over $50 million in public securities; and pledges for financial donations, including more than $40 million dollars in annual giving donations.  Hotchkiss's alumni base, from whom Hotchkiss aims

to raise several hundred million dollars in donations through an upcoming capital campaign[3] distinct from annual giving, includes numerous ultra-wealthy individuals who oppose institutional change at Hotchkiss and actively support the whitewashing of Hotchkiss's sordid, decades-long history of child sexual abuse and ongoing protection of faculty who sexually abused children.  As Hotchkiss itself puts it, Hotchkiss's "golden rule" when trying to manage change at Hotchkiss is "do not disturb the cherished memories of alumni – and, more recently, of alumnae as well."[4]  Hotchkiss, at its core, "is about setting wealth to music."[5]

25.     Throughout its history, Hotchkiss has touted itself as a pinnacle of pre-college education.  Hotchkiss, founded in the nineteenth century by Yale University to be "Yale Junior,"[6] a preparatory boarding school for Yale University, at times has been called the Yale Hotchkiss Preparatory School,[7] and in the twentieth century was reported as part of the holdings of Yale University.  Hotchkiss's recruiting pitch to Doe in the 1980s touted the privileged access Hotchkiss provided to send Hotchkiss graduates to matriculate top Ivy League colleges and

---

[3]     "The Hotchkiss School is currently planning a historic fundraising campaign (their first in more than 25 years), and the Director of The Hotchkiss Fund and The Hotchkiss Fund team will play a key role in the campaign's launch, implementation, and success." https://www.lindauerglobal.com/career-opportunity/the-hotchkiss-school-director-of-the-hotchkiss-fund/ (last accessed August 31, 2023).

[4]     E. Kolowrat, et al., HOTCHKISS: A CHRONICLE OF AN AMERICAN SCHOOL, The Hotchkiss School, at 39 (1992) ("CHRONICLE").

[5]     *Id.* at 546; *see also* J. Lemisch, HOTCHKISS IN THE 50'S: MYTHS AND REALITIES, *available at* https://historynewsnetwork.org/article/8588 (last accessed Aug. 31, 2023).

[6]     "Yale Farm Leases Net Poor Results, Buyer of Farm at Lakeville, Conn. Pays University Only Ten Cents an Acre," THE NEW YORK TIMES (Sept. 21, 1913).

[7]     *The New York Times*, April 16, 1893, article titled *Hotchkiss Yale Preparatory School:* "New Haven, Conn., April 15. – "A private dispatch to this city to-day states authoritatively that the instructors in the Hotchkiss Yale Preparatory School, who threatened to resign because of discord in school government, have withdrawn their resignations and will remain in the school."

specifically Yale University.  Hotchkiss currently boasts, as it has throughout the past, that it provides a "truly unparalleled" education dedicated to "learning and personal growth," and a "thriving campus," where "students have the unique opportunity to share life together as teammates, classmates, friends and community members."[8]  Hotchkiss has, at all relevant times, charged tens of thousands of dollars per student for four years of high school tuition, fees, books, room, and board:  when Doe attended, more than $40,000, and in 2023, more than $280,000 for four years of high school education.

26.     In exchange for that substantial monetary compensation, Hotchkiss assumed responsibility for the protection, safety, and well-being of Doe and other children entrusted to its care and custody – including protection from sexual abuse by Hotchkiss's faculty and other students.  Hotchkiss branded itself as *in loco parentis*.  Former Headmaster Arthur White used to tell parents and students on the first day of school, "Parents, your job is to leave."  That was Hotchkiss's clear indication it had assumed the responsibility and duty of care for its child students and their education, health, and safety.

27.     Hotchkiss assured Doe and other students that the health and welfare of its students was its highest priority.  For instance, when Doe was deciding whether to matriculate at Hotchkiss, the school's admissions director told him that Hotchkiss strictly enforced its written rules prohibiting any sexual activity of students, as well as its written rules prohibiting alcohol and drugs on campus.  In fact, in the early 1980s, Hotchkiss's admissions office, led by the Director of Admissions Frederic F. "Fred" Wesson, distributed Hotchkiss marketing and recruitment materials, which Doe received, claiming that Hotchkiss embraced strict rules against sex, drugs, and alcohol.

---

[8]     https://www.hotchkiss.org/our-school/about (last accessed Aug. 31, 2023).

28.     Hotchkiss, however, breached its duties of care to Doe and other students. Hotchkiss's administration, trustees, and faculty knew and should have known that Hotchkiss had a revolting history and ongoing occurrences of sexual abuse and rape by Hotchkiss faculty members and other authority figures, and significant use of alcohol and drugs by faculty and students, and by faculty with students.

29.     Since as early as the 1900s, Hotchkiss faculty and upperclassmen routinely and systematically committed physical and sexual abuse and assaults against young boys on campus. Survivors and witnesses reported these sexual abuses to Hotchkiss leadership and staff.  Rather than investigate and take steps to rectify those pervasive crimes, Hotchkiss facilitated and enabled them.  Hotchkiss failed to investigate allegations of sexual abuse or report incidents to law enforcement authorities, and instead dismissed students' reports or retaliated against and threatened students and faculty who dared to speak out.  It eschewed formal rules, training, and procedures designed to prevent sexual misconduct between teachers and students, failing to implement any sexual abuse policies until the 1990s (and even then, the newly enacted policies were grossly insufficient).  And Hotchkiss violated its affirmative duty to warn students, including Doe, about the sex abuse it could and should have reasonably anticipated based on the many prior incidents of sex abuse known to Hotchkiss, witnessed, and reported, including the abuse committed by faculty whom Hotchkiss continued to employ after learning of their crimes.

30.     Ample sources – including lawsuit filings, sworn deposition testimony, media reports, books and writings published by Hotchkiss and its alumni, and written and taped interviews of former students and faculty – substantiate Hotchkiss's stunning apathy, failure to act, and concealment of the sexual abuse that proliferated on its campus over many decades. And multiple meetings in-person and over Zoom involving Hotchkiss trustees, alumni,

administrators, and faculty, including since 2020 after the Settlement Agreement was executed, have indicated that much more sex abuse occurred and was reported and known at Hotchkiss, including before Doe was abused, than Hotchkiss has admitted publicly.  Despite knowing about and possessing evidence of those sex crimes, Hotchkiss failed to disclose them in response to discovery demands in the 2015 Action.

31.     For instance, in August 2018, Locke Lord LLP, acting as an independent investigator of facts only, and not as attorneys, published an investigative report into a subset of the history of sexual abuse at Hotchkiss (the "Locke Lord Report").[9]  While the Locke Lord report was incomplete, and documented only a fraction of the pervasive sex abuse at Hotchkiss, it found as credible reports, dating from as early as the late 1960s to as late as the early 1990s, that at least seven Hotchkiss faculty members had sexually abused 17 students, and that Hotchkiss leaders were made aware of this horrific behavior but failed to take effective action.  Allegations against three additional faculty members were deemed "highly credible" in the report, along with several reports of faculty members crossing boundaries with and engaging in inappropriate sexual misconduct toward students.

32.     The Locke Lord Report concluded:  "[I]t is clear that Hotchkiss missed several key opportunities to protect the student body," and "inadequately responded to sexual misconduct by faculty members for a variety of reasons, including:  (a) a failure to be aware, and sensitive to, sexual misconduct generally; . . . [and] (d) a prioritization of the school's reputation and that of its faculty above the well-being of the individual students."

---

[9]      *Report to the Board of Trustees of The Hotchkiss School* (Aug. 2018), *available at* https://www.hotchkiss.org/uploaded/documents/Hotchkiss_FINAL.pdf?1534530340087 (last accessed Aug. 31, 2023).

33.     The sexual abuse detailed in the Locke Lord Report was only the tip of the iceberg.  For instance, in August 2020, an update to the Locke Lord Report was released, substantiating additional accounts of abuse.[10]  In that updated report, Hotchkiss divulged, for the first time to the public and to Doe, that before Doe had applied to or attended Hotchkiss, Director of Admissions Frederic Wesson repeatedly had sex with a Hotchkiss student for two years starting when the child was 15 years old, while providing the child with alcohol and marijuana.[11]

34.     Hotchkiss's documented failures to abide by its duties of care directly led to the sexual assaults, sexual abuse, and rape of Doe by Smith and others in positions of power at Hotchkiss.

**1.  Roy G. Smith Sexually Assaults And Rapes Doe.**

35.     At the time Doe entered Hotchkiss in the 1980s, Smith, known as "Uncle Roy," had worked at Hotchkiss for over a decade.  With Hotchkiss's blessing, Smith was an English teacher, the athletic trainer who treated sports injuries, and a dormitory master living in a dormitory with minor boys in his care.

36.     In these capacities, Smith had unfettered opportunities to "groom" and touch the boys in his care who lived in the dormitory with Smith.  Smith exploited his authority and access – raping, fondling, drugging, inspecting, massaging, and leering at young schoolboys in Hotchkiss athletic facilities, and in his apartment in a student dormitory where Smith lived with the young boys.

---

[10]     *Supplement to the Report of The Board of Trustees of The Hotchkiss School Issued in August 2018* (Aug. 7, 2020), *available at* https://www.hotchkiss.org/uploaded/documents/Hotchkiss_Supplemental-Report-to-the_Board.pdf (last accessed Aug. 31, 2023).

[11]     *Id.* at 6-8.

37.     Over many years preceding Doe's enrollment at Hotchkiss, multiple members of Hotchkiss's student body, faculty, and leadership suffered from, witnessed, or otherwise learned about Smith's sexual misconduct.  Hotchkiss, without question, knew and should have known that Smith held and expressed sexualized feelings about the minor boys in his care. Additionally, Hotchkiss knew and should have known that Smith groomed boys at Hotchkiss and discussed homoerotic topics with them in his apartment at night.

38.     Despite its actual and constructive knowledge of Smith's sexual misconduct, Hotchkiss made no effort to protect students from Smith.  It never took disciplinary or punitive measures against Smith; never reported him to the authorities; and never warned students or their parents about Smith.  Instead, Hotchkiss enabled and tolerated Smith's sexual crimes.  It allowed Smith to continue working for years as a teacher, dormitory master (later promoting him to dormitory head), and athletic trainer – and to continue molesting, sexually abusing, and sexually assaulting schoolchildren – until his retirement, after nearly three decades at Hotchkiss, when Hotchkiss honored Smith by naming an annual major school award for him.  Indeed, at the time of Smith's death in late 2014, neither the public, nor much of the larger Hotchkiss community, had any idea that Smith was a pedophile.[12]

39.     Doe was one victim of Smith's heinous crimes.

40.     Doe participated in athletics at Hotchkiss and, in that capacity, was exposed to Smith, the athletic trainer who treated Doe.  In addition, Smith resided in an apartment, and served as a dormitory and corridor master, in the Hotchkiss dormitory where Doe lived.

---

[12]     *See, e.g.*, Obituary for Roy G. Smith Jr., BOSTON HERALD (Jan. 4, 2015), *available at* https://www.bostonherald.com/2015/01/04/roy-g-smith-jr-at-72-of-wareham-a-teacher/ (last accessed Aug. 31, 2023).

41.     Smith quickly took advantage of his authority over, influence on, and close proximity to Doe.  Smith engaged Doe in late-night socializing in Smith's apartment, and under the guise of providing athletic treatments, fondled, inspected, and touched Doe in inappropriate and sexualized ways, including reaching into Doe's shorts and touching his penis and scrotum, on multiple occasions.  These sexual abuses occurred at Hotchkiss, including in Smith's apartment.

42.     When Doe was 15 years old, Smith went further:  after luring Doe into his apartment in the late evening hours, Smith drugged Doe into unconsciousness with a pill and glass that he misrepresented as an aspirin and water.  Smith then anally raped Doe while he was helpless and alone in the Hotchkiss dormitory.

43.     Doe began to gradually regain some consciousness during the rape, groggy and impaired, with his underwear down, his rear end bare, lying prone on Smith's sofa with Smith over him penetrating Doe's anus.

44.     When Doe regained sufficient consciousness, he was in a state of shock.  Doe stumbled from Smith's apartment in the dormitory to a common bathroom, where he vomited violently in the toilet, before returning to his dormitory room.

**2.  Hotchkiss Senior Dormitory Proctors Haze And Sexually Abuse Doe.**

45.     In addition to the pattern of sexual abuse by faculty members, Hotchkiss had a sordid history of violent and sexualized hazing, which it failed to disclose to Doe at any time before his matriculation at the school.  Hotchkiss's hazing history included upperclassmen inflicting sexual assaults on younger students, such as paddling the younger students on their naked buttocks with wooden paddles and other humiliating and traumatizing forcible touching.

14

46.     Hotchkiss, as well as its teachers and administrators, permitted and condoned traditions of violent and sexualized hazing, and allowed sexual assaults to occur without punishment or even a meaningful threat of punishment.

47.     Hotchkiss leadership retaliated against those who spoke out against the school's sexualized hazing traditions.  For instance, Hotchkiss's Board of Trustees terminated Timothy Callard, Headmaster from 1981 to 1983, after he had attempted to institute sex abuse reforms. As Callard recounted:

> "Another old Hotchkiss tradition apparently was the spring raid on the preps.  The senior proctors would rouse the preps out of their dorms at dawn and lead them out onto the grounds in their underwear . . . tie them to trees and spray things on them. These sorts of things that happened bordered on sexual abuse. . . .  It just didn't seem right for the older kids to be doing this to younger kids, and I felt uncomfortable with it.  Yet the prep raid had clearly been condoned by the faculty."[13]

Callard was one of at least three short-tenured Headmasters whose position was suddenly terminated after each had sought to address sexually abusive behaviors at Hotchkiss.

48.     As a result of Hotchkiss's encouragement and toleration of sexualized hazing, and its failure to prevent such assaults and to punish the perpetrators, upperclassmen whom Hotchkiss appointed as senior dormitory proctors sexually assaulted Doe multiple times when he was 14 years old.

49.     During these assaults, the proctors forced Doe to lower his pants and underwear to his ankles and to bend over; hit Doe's naked buttocks and lower back violently and repeatedly with wooden pledge paddles, causing physical injuries, and forcibly inserted objects into Doe's anus, causing internal injury.

---

[13]     CHRONICLE, at 446.

### 3. Hotchkiss's Apathy Toward And Retaliation Against Doe.

50.    The sexual assaults by Hotchkiss faculty and upperclassmen caused Doe to suffer severe physical pain and humiliation.

51.    Doe reported the sexual assaults by the proctors to his dormitory corridor master. The corridor master, in response, told Doe to try to earn the respect of the older students who were assaulting him.  He also warned Doe that complaining about the hazing and assaults could impair his reputation at Hotchkiss.

52.    Doe reported the physical and sexual assaults to Hotchkiss physician Dr. Peter Gott, who treated the injuries to Doe's anus, buttocks, and lower back.  Dr. Gott did nothing to protect Doe from further assaults.

53.    Likewise, Hotchkiss's Assistant Headmaster Lawrence Becker, after learning of the assaults, simply asked Doe if his bottom was feeling better and did nothing else in response.

54.    After Smith anally raped him, Doe reported the rape to Hotchkiss teachers, staff, and administrators.  None lifted a finger to protect Doe or other vulnerable schoolchildren.

55.    Doe reported the rape to his faculty advisor, confiding in the advisor about the extreme confusion and mental suffering he was experiencing as a result of Smith's abuse.  In response, Doe's advisor dismissed Doe's concerns, instead indicating to Doe that such activity as teacher-student sex and an older man having sex with a boy was acceptable.  He took no steps to protect Doe and other vulnerable children from further assaults by Smith and took no steps to hold Smith accountable for raping Doe.

56.    Doe also reported the rape and other sexual abuses to a mental health counselor at Hotchkiss, from whom Doe had sought care and treatment.  But the counselor, like the faculty advisor, took no steps to protect Doe and other vulnerable children from further assaults by

Smith; no steps to hold Smith accountable for raping a young boy; and no steps to protect Doe and other vulnerable children from further sexual hazing.  Instead, the counselor acted in concert with Hotchkiss's Headmaster at the time, Arthur White, in retaliating against Doe for reporting the sexual abuse.

57.     Dismissed and ignored by Hotchkiss's staff and administration, Doe attempted to take matters into his own hands and inform the Hotchkiss community about the harms of Hotchkiss's wrongful responses to child victims of the sexual abuse pervading Hotchkiss's campus.  Doe wrote an article intended for a student newspaper, discussing the failure of Hotchkiss's counselors, faculty, and administrators to respond appropriately to students' distressing experiences with sexual assaults and abuse.  Doe, attempting to seek guidance from Headmaster White, provided him with drafts of the proposed article.

58.     But White, too, dismissed Doe's situation.  White took no steps to protect Doe and other vulnerable children from further assaults by Smith, or to hold Smith accountable for raping a young boy.

59.     Instead, White surmised that the article was "unfair to the faculty," prevented Doe from publishing the article, and conspired to preclude Doe from communicating with the Hotchkiss community about faculty sexual misconduct, including Doe's own experience with Roy Smith.

60.     Among other wrongful acts aimed to hide Smith's sexual abuse of Doe and to bury Smith's and other faculty members' history of sexually molesting young children at Hotchkiss, White threatened to tell people falsely that Doe, who did not identify as homosexual, was homosexual if he complained publicly about the rape – a label that, in the 1980s, carried

heavy stigma, costing people their jobs and college admissions opportunities and leading to other harsh consequences.

61.     Soon thereafter, White instigated a campaign of vicious and damaging retaliation and disparagement against Doe for reporting the sexual abuse, aided and abetted by Hotchkiss Board of Trustees President Francis T. "Fay" Vincent, Jr., Assistant Headmaster John R. "Rusty" Chandler, Jr., and other Hotchkiss faculty and staff.

62.     At no time did any Hotchkiss faculty member or professional staff, including the Headmaster and healthcare professionals, report to the State of Connecticut or to law enforcement the sexual abuse of Doe, or the sexual abuses of many other students, by Hotchkiss faculty.

63.     As a result of Hotchkiss's acts and omissions, Doe's ability to engage in normal life activities has been permanently impaired, and he has been and will be unable to lead and enjoy a normal life.

64.     The harm inflicted on Doe as a young, vulnerable child at Hotchkiss has adversely affected his ability to enter and maintain lasting, meaningful relationships with others.  Doe's ability to maintain intimate physical, sexual, and emotional relationships with other human beings has been irreparably damaged.

65.     As a result of Hotchkiss's acts and omissions, Doe has sustained enormous physical pain and suffering, and has and will continue over the course of his lifetime to suffer severe emotional distress and mental pain and anguish.

**B.      Doe's 2015 Lawsuit And The Fraudulently Procured Settlement Agreement.**

**1.  Doe Files, Pursues, And Ultimately Settles, A Lawsuit Against Hotchkiss.**

66.      Because Hotchkiss tolerated and condoned sexual abuse of children by pedophile teachers and other students, including abuse of Doe as a child, Doe filed a lawsuit against Hotchkiss in this Court on February 5, 2015 (defined above as the "2015 Action").  Doe asserted five causes of action against Hotchkiss:  (i) negligence; (ii) recklessness; (iii) negligent infliction of emotional distress; (iv) intentional infliction of emotional distress; and (v) breach of fiduciary duty.

67.      Doe vigorously litigated that case for over four years, including through protracted discovery exacerbated by Hotchkiss's withholding of key documents and information. After Doe defeated Hotchkiss's motion for summary judgment, trial was set for Fall 2019.

68.      The parties had discussed potential settlement terms for more than a year before finally striking common ground in August 2019.  During those negotiations, Doe and his counsel communicated to Hotchkiss and its counsel in meticulous detail the terms and conditions that Doe would be willing to accept in any settlement of the 2015 Action, the most important of which were nonmonetary.

69.      On August 27, 2019, the parties conducted a formal mediation session, followed by significant additional settlement negotiations after the mediation concluded and directly between Doe and Hotchkiss's representatives Gould and Bradley.  Those discussions occurred between the parties, at times with their counsel present and at times without.  During these post-mediation negotiations on August 27, Hotchkiss's representatives made a series of promises and representations to Doe that adopted many of the mandatory settlement terms that had previously

expressed and were therefore instrumental – indeed, necessary – to Doe's decision to settle the 2015 Action.

70.     Specifically, Gould and Bradley promised that Hotchkiss would deliver a sincere and meaningful apology to Doe for all of Hotchkiss's wrongdoing as alleged in the 2015 Action and the resulting harm.  Gould and Bradley represented that Hotchkiss's apology to Doe would and did constitute Hotchkiss's admission that it had committed all of the wrongdoing alleged in the 2015 Action; that such wrongdoing caused Doe extreme harm; and that through the apology Hotchkiss was obligating itself to cease and never again commit the same or similar wrongdoing against, or to cause the same or similar harm to, Doe or any other past, present, or future victim, survivor, or reporter of sexual abuse at Hotchkiss.

71.     Gould and Bradley further promised that Hotchkiss would form an impactful "Sexual Misconduct Advisory Committee," primarily to address and account for past sexual abuse at Hotchkiss.

72.     Gould represented that Hotchkiss would fund and arrange for the full membership of that Sexual Misconduct Advisory Committee to meet with the full membership of Hotchkiss's Board of Trustees in person at Hotchkiss, twice each year, for substantive discussions where all Committee members would have an opportunity to speak.

73.     Gould and Bradley also represented to Doe during these August 27, 2019 settlement negotiations that Hotchkiss was, at the time, already in the process of implementing, or intended to implement, additional institutional reforms.

74.     *First*, Gould and Bradley promised that Hotchkiss had already implemented the majority of recommendations set forth in a 2018 report by the Rape, Abuse & Incest National Network (the "RAINN Report"); and that Hotchkiss would finish implementing all of RAINN's

recommendations within the 2019-2020 school year.[14]  For instance, Gould and Bradley specifically stated that Hotchkiss would implement a recommendation by the RAINN Report to hire a full-time Sexual Misconduct Coordinator.

75.    *Second*, Gould promised that Hotchkiss would publicly acknowledge the credibility of sexual abuse allegations against Smith, including Doe's allegations; and of multiple sexual abuse allegations against another former faculty member, Stuart "Smokey" Robinson, whose sexual misconduct was amply corroborated by evidence from the 2015 Action.

76.    *Third*, Gould promised that Hotchkiss had removed, or promptly would remove, all honors for and in the name of Arthur White due to his central role in enabling, dismissing, and covering up sex abuse at Hotchkiss, including Doe's rape and abuse by Smith and dormitory proctors, including the removal of White's portrait at Hotchkiss and the termination of an annual Hotchkiss award named for White; and that those changes would be permanent.

77.    Specifically, among other things, Gould claimed that Hotchkiss had:

   a.   Permanently removed White's portrait from the entirety of the school's campus and would never display portraits of White at Hotchkiss or at school events on or off campus;

   b.   Permanently terminated an award, the Arthur W. White Trophy in White's name, awarded to a Hotchkiss baseball player annually;

   c.   Permanently terminated White as a Trustee Emeritus of Hotchkiss; and

---

[14]    Hotchkiss retained RAINN in 2018 to conduct an audit of the school's sexual abuse policies and procedures.  On December 7, 2018, RAINN issued its report, a 17-page *Program Assessment: Executive Report and a 134-page Program Assessment: Evaluation Matrix*, assessing Hotchkiss's current policies with recommendations for concrete changes.

    d.   Permanently banned White from Hotchkiss's campus, school events, and all Hotchkiss-sponsored events.

78.    *Fourth*, Gould promised, consistent with Hotchkiss's disclosures in ongoing discovery, that Hotchkiss had not made any other significant or comparable monetary settlements related to sex abuse lawsuits in recent years.

79.    *Fifth*, Gould promised that Hotchkiss itself, rather than its insurer, would be funding the settlement payment to Doe.  Gould told Doe that Hotchkiss had used up the insurance coverage limit on legal costs defending against the 2015 Action, so the settlement payment would be paid directly from Hotchkiss's own accounts and not from or funded by the insurer.  It was important to Doe that Hotchkiss itself pay and incur the material monetary consideration – an actual incurred expense and loss of funds for Hotchkiss – that could act as actual reparation from Hotchkiss to Doe.  Direct payment by Hotchkiss would also require it to report the settlement payment in its financial books and records and that expense amount in IRS filings, and thus act as a further long-term deterrent against sexual abuse.

80.    *Sixth*, Gould promised that Hotchkiss would promptly and fully investigate, with independent resources the full history of all sexual abuses at Hotchkiss, document same, and admit all alleged sexual abuse at Hotchkiss committed by faculty, staff, dormitory proctors, trustees, or students (while protecting the confidentiality of identities of child sex abuse victims). In connection therewith, Hotchkiss promised that it would no longer treat survivors and reporters of sexual abuse at Hotchkiss in a dismissive, retaliatory, harmful, or remorseless manner. Hotchkiss also promised that it would make best efforts to reconcile with and be supportive of all survivors and all reporters of sexual abuse at Hotchkiss, including those whom Hotchkiss has mistreated and continues to mistreat.  This includes Hotchkiss's unequal treatment and

credibility assessments of reported sexual abuse by those who are minorities without the protection of powerful persons or family ties in the Hotchkiss community.

81.    *Seventh*, Gould and Bradley promised that Hotchkiss would promptly investigate evidence in the 2015 Action of alleged sex abuse and misconduct by several specific long-time members of Hotchkiss's faculty.  Among other abusers, that evidence implicated former long-time faculty member Alban Barker – modern languages department chairman and tennis coach, in whose honor Hotchkiss annually awards its Alban F. Barker Tennis Award for Boys – who appeared might have engaged in sexual misconduct with a male student, including a photograph of Barker in a bed with one of his male students in the 1980s, both without clothes.  This photo was produced in the 2015 Action, and Hotchkiss has been in possession of the photo since at least 1984.

82.    Gould and Bradley likewise promised that Hotchkiss would promptly and fully investigate evidence in the 2015 Action of sexual misconduct and abuse by at least five other members of Hotchkiss's faculty, including a current long-time faculty member, each of whom Hotchkiss had sought to protect despite apparent evidence of their alleged sex abuse and misconduct.

83.    *Eighth*, Gould promised that Hotchkiss would investigate the role of all past and current headmasters, administrators, faculty, and trustees, including Rusty Chandler, Lawrence "Larry" Becker, and Fay Vincent, who were alleged to have enabled, facilitated, covered up, concealed, failed to report, or remained silent about sex abuse at Hotchkiss, and who are alleged to have retaliated against sexual abuse survivors and reporters.

84.    *Ninth*, Gould and Bradley promised that Hotchkiss, in apologizing to Doe and settling the 2015 Action, would cease denying that Smith sexually abused Doe, and would never

disparage Doe by falsely misrepresenting that Doe was untruthful about sex abuse at Hotchkiss. In connection therewith, Gould, Bradley, and Hotchkiss would work with Doe to restore his good reputation, which Hotchkiss in retaliation had tarnished.  Specifically, they promised to assist Doe by cooperating to correct falsehoods that Hotchkiss had fabricated in Doe's permanent school records, helping to restore his reputation with those to whom Hotchkiss previously defamed Doe including universities, and would discuss how Hotchkiss might award Doe a Hotchkiss diploma, which Hotchkiss in retaliation had precluded Doe from receiving.

85.    *Finally*, Gould promised that Hotchkiss would do everything in its power to ensure that future Hotchkiss students will be safe from sexual abuse, including by ensuring that the Hotchkiss community, beyond the Locke Lord Report, would have access to a full, proactive, professionally advised, thoroughly researched subsequent investigation of the history of sex abuse at Hotchkiss, the concealment of such abuse, and the retaliation against victims, survivors, and reporters of sex abuse at Hotchkiss.

86.    Every single one of the foregoing representations, made on August 27, 2019 by Gould and Bradley on Hotchkiss's behalf, was material to Doe's decision to settle the 2015 Action.  And each of them was false at the time it was made, as discussed more fully below.

87.    Hotchkiss knew, based on its discussions with Doe that day and on prior settlement attempts, that such misrepresentations would induce Doe into settling the 2015 Action on terms and conditions that were favorable to Hotchkiss, including a monetary settlement payment that was a small fraction (approximately 10-15%) of the damages Doe anticipated he reasonably could recover at trial.

88.    In addition, Hotchkiss was motivated to extract a quick settlement agreement (or an agreement in principle) at the time, given the looming November 2019 trial, Hotchkiss's

representation that it had already used up the insurance coverage available for its ongoing legal defense of the 2015 Action; and Hotchkiss's unlaunched capital campaign, which Hotchkiss told Doe had been delayed due to the negative publicity from the 2015 Action's exposure of sex abuse at Hotchkiss.  A settlement and dismissal of that action in August 2019 would net a significant victory for Hotchkiss.  It would avoid a highly publicized jury trial that would have cast further shame, reputational damage, and scrutiny over Hotchkiss's history and pattern of sexual abuse; avoid a further hit to Hotchkiss's waning prestige among the wider public, prospective students, and prospective employees, as well as its image and fundraising efforts among its circles of affluent alumni and benefactors; and avoid the risk of a substantial monetary judgment against Hotchkiss at trial.

89.     As Hotchkiss intended, its assurances tipped the scale for Doe, who reached a settlement agreement in principle with Hotchkiss and executed a Memorandum of Understanding memorializing key settlement terms on August 27, 2019.  Hotchkiss immediately reported the case settled to the Court and obtained a dismissal order, and the 2015 Action was administratively closed.  On February 13, 2020, the Settlement Agreement was fully executed.

## 2.  Key Material Settlement Terms.

90.     In exchange for a stipulation of dismissal of the 2015 Action and release, the Settlement Agreement obligated Hotchkiss to apologize and atone for the wrongdoing described in the 2015 Action's complaint by establishing a specifically named "Sexual Misconduct Advisory Committee" at Hotchkiss, with specific requirements for the Committee's naming, composition, publicization, and member tenure; and by apologizing to Doe for the allegations in

the complaint in writing.[15]  These terms were pivotal to the Settlement Agreement, and without

them, Doe would not have agreed to settle the 2015 Action.

### i.  The Sexual Misconduct Advisory Committee.

91.     During the parties' settlement discussions on August 27, 2019, Hotchkiss

proposed creating the Committee.  The Committee's primary task would be to conduct a three-

year investigation leading to a comprehensive report on the full history of sexual misconduct at

Hotchkiss, including the roles of Hotchkiss administrators and trustees in systematically enabling

and facilitating sexual abuse at Hotchkiss; how and why illegal sexual abuse at Hotchkiss had

pervaded for more than a century; and how Hotchkiss's policies and practices had fallen short of

best practices.  The Committee would also advise the school on providing redress and justice for

all survivors, victims, and whistleblowers of Hotchkiss's past sexual abuse.

92.     While Doe was receptive to Hotchkiss's idea, he wanted to ensure that the

Committee would not be simply a rubberstamp, but rather, would expend the requisite

substantial time, work, and effort to effectuate meaningful change.  Hotchkiss represented that it,

too, wanted the Committee to have a meaningful mission and role in effecting sustained

institutional change by publishing a comprehensive and credible fact-finding report on the

history of sexual misconduct at Hotchkiss from its founding in 1891 to the present.

93.     As such, the parties agreed to a provision in the Settlement Agreement, Section

2.5, stating in relevant part that:

> "By May 29, 2020, the School will create a Sexual Misconduct Advisory
> Committee (the "Committee") . . . .  The Committee will consist of not less than
> two Trustees and at least three and not more than five non-Trustee members.  Each
> member of the Committee will be appointed to serve for a term of three years . . . .
> The School will announce the formation of the Committee in the *Hotchkiss*

---

[15]     In addition, Hotchkiss had to make a settlement payment of a confidential amount.

*Magazine* and on the School's website and will include in these announcements the names of the Committee members."

94.     The specific requirements in Section 2.5 – on Committee naming, composition, publicization, and member tenure – were designed to ensure that the Committee had teeth. These requirements were not simply semantical or technical in nature.  Rather, each was integral and material to Doe's decision to enter into the Settlement Agreement.

### a)  Naming.

95.     The parties agreed to name the Committee the "Sexual Misconduct Advisory Committee."  That wording was deliberate and intentional.

96.     While Hotchkiss at one point proposed changing the name to include the term sexual misconduct "prevention," Doe expressly rejected that suggestion.  "Prevention" implied, incorrectly, that the Committee's focus would be prospective and prophylactic.  Doe, however, wanted the Committee's name to reflect its true focus:  primarily retroactive, not just prospective, in order to heal and reconcile Hotchkiss with all survivors of Hotchkiss sexual misconduct and retaliation; fully investigate and redress past sexual misconduct at Hotchkiss; then, based on the lessons learned through its investigation, recommend appropriate changes to prevent future sexual misconduct.

97.     Similarly, it was important to Doe that the Committee's name begin with the words "Sexual Misconduct" to acknowledge and admit that sexual misconduct has already occurred at Hotchkiss, and to signal that such historical misconduct was the primary focus of the Committee.  Such admission is critical to shaping the perception of the public, alumni, trustees, donors, faculty, and other powerful individuals who have the means and influence to pressure Hotchkiss into making real, long-overdue change.  Hotchkiss cannot fully take responsibility for

its actions, or prevent recurrence, unless and until its leadership knows of and confesses to all, not just a small fraction, of Hotchkiss's past sexual misconduct.

### b) Composition.

98.     Similarly, the composition of the Committee had to reflect its mission to educate the Hotchkiss community about its sexual abuse violations – from the top down – and effectuate meaningful, lasting change.

99.     The parties thus agreed that the Committee would include at least three and not more than five non-trustees, who are more independent than trustees and less likely to defend or espouse Hotchkiss's past practices out of loyalty to Hotchkiss rather than loyalty to truth.  The parties intended that the non-trustee members be a mix of alumni and others (including paid independent experts), with at least one member having professional experience in investigations of sexual abuse, and one member with professional expertise in historical and best-practice sexual misconduct policies and practices at schools.  The parties also wanted to put a cap on the number of non-trustees and members for practical reasons.  Too many members would hinder the efficiency and productivity of the Committee by having too many voices at the table.

100.    In addition, the parties agreed that some of the Committee members should be Hotchkiss trustees.  It was important for trustees to learn about the past and ongoing instances of sexual abuse at Hotchkiss; and to use their knowledge of the inner workings of the Hotchkiss administration, and their influence on Hotchkiss leadership and donors, to help devise, promote, and push through institutional reforms.  Trustees would also facilitate the Committee's access to other Hotchkiss trustees and administrators for interviews and information requests.

### c)  Publicization.

101.     The Settlement Agreement required that Hotchkiss form the Committee by May 29, 2020.  Hotchkiss was also required to announce the Committee's formation on the Hotchkiss website and in the Hotchkiss alumni magazine (*Hotchkiss Magazine*) by that same date.

102.     It was important to Doe for the announcement to be in print, because numerous alumni, especially some who are older, wealthier, and/or more influential, may not read news online or regularly check the contents of the Hotchkiss website.

103.     Moreover, recipients of *Hotchkiss Magazine* would not need to conduct their own searches to learn of the formation of the Committee – rather, that information would be sent directly to them.  Including the announcement of the Committee in *Hotchkiss Magazine*, and not merely on the school's website, enabled Hotchkiss to reach a far larger audience of influential alumni, and proactively reach that audience, with news of the Committee's formation.

104.     The timing of the announcement was also material to Doe.  Hotchkiss's formation and announcement of the Committee was a significant way to validate and lend credence to Doe's allegations against Hotchkiss, and signal to the Hotchkiss community that Doe had told the truth about sexual abuse at Hotchkiss.  It was equally material to Doe that Hotchkiss be proactive in dispelling its prior positive spin on the school's handling of the egregious, systemic, and longstanding culture of sexual abuse and assault.  Thus, time was of the essence.

### d)  Member Tenure.

105.     Each Committee member had a fixed unconditional three-year initial tenure under Section 2.5 of the Settlement Agreement.  The purpose of the tenure provision was to ensure that Hotchkiss could not remove members in retaliation for their viewpoints or voting decisions, to ensure a stable consistent membership, and to preempt Hotchkiss and its trustees and

administrators from obstructing the Committee's work.  The guaranteed three-year tenure would also guarantee that the Committee would have the requisite time to educate itself, do the necessary work, and publish a report.

106.     The Settlement Agreement did not contain any provision permitting the removal or termination of any member before the expiration of a three-year tenure.

107.     Thus, under the three-year tenure provision, no Committee member's tenure could expire in less than three years, and thus no Committee member could be removed or terminated involuntarily until at least three years had elapsed from the date the Committee was formed.

**ii.  Hotchkiss's Apology.**

108.     The Apology provision in the Settlement Agreement, Section 2.3, is the most important component of the settlement for Doe.  It requires that, "[u]pon the Effective Date, the School will deliver to John Doe a written apology, the text of which is attached hereto as Attachment A."

109.     Before Hotchkiss agreed to the Apology provision, years earlier when Hotchkiss had asked for a money-only demand and before Doe knew how extensive the history of sex abuse at Hotchkiss had been, Doe had demanded $25 million to settle the 2015 Action.  That amount represented the damages Doe believed he would likely obtain at trial, and resembled amounts awarded in similar child sex abuse judgments in Connecticut around that time.  Once Hotchkiss agreed to the Apology, however, Doe agreed to drastically reduce his settlement demand by over $22 million – a nearly 90% discount – to $2.9 million, an amount approximating Doe's costs of having litigated intensely for several years.  That $22-million difference in settlement demand illustrates the considerable value of the Apology to Doe.

110.    The gravity of the Apology to Doe stems from his deep religious convictions, which inform his ethical identity, as well as the horrific traumas and other harm that Doe suffered at the hands of Hotchkiss's abusers and enablers.

111.    For Doe, settling the 2015 Action – and thereby agreeing to dismiss the 2015 Action and releasing Hotchkiss from further liability for the claims in the 2015 action – meant forgiving Hotchkiss.  But Doe could not forgive Hotchkiss unless Hotchkiss first made a sincere and meaningful apology.

112.    To authentically apologize, Hotchkiss had to admit the full extent of Hotchkiss's wrongdoing described in the 2015 Action's complaint.  Hotchkiss had to express genuine guilt and remorse for the harm that Hotchkiss's wrongdoing inflicted on Doe.  Hotchkiss had to make acceptable amends to Doe.  And Hotchkiss had to commit to the parties' (supposedly) now-shared values by promising and demonstrating it had changed its wrongful behavior that had harmed Doe and would sustain such change.  A genuine apology from Hotchkiss to Doe must signal actual remorse for the sexual abuse of Doe and, for Hotchkiss, a fundamental and sustained departure from its past pattern of denial, apathy, and retaliation.

113.    Doe's perspectives on the Apology and its significance, which Doe conveyed to Hotchkiss's representatives Gould, Bradley, and Babbitt during settlement negotiations, are reinforced by scientific and legal literature.  The importance of an apology to the healing of a trauma survivor – in particular, a sexual abuse survivor – has been documented extensively in academic scholarship and caselaw.

114.    As Professor Brent T. White writes, "sexual assault victims often pursue civil claims for therapeutic rather than financial reasons.  The desire to be heard, have their experience

validated, and receive an apology are important aspects of their therapeutic expectations for the legal process."[16]

115.    Similarly, Professor Aaron Lazare explains that "successful apologies heal because they satisfy at least one – and sometimes several – distinct psychological needs of the offended party.  These needs are:  restoration of self-respect and dignity[;] assurance that both parties have shared values[;] assurance that the offenses were not their fault[;] assurance of safety in their relationships[;] seeing the offender suffer[;] reparation for the harm caused by the offense[;] [and] having meaningful dialogues with the offenders."  Professor Lazare further cautions that "offenders so frequently try to manipulate the acknowledgment stage of an apology in order to reduce or avoid responsibility for the offense.  The results are failed or pseudo-apologies:  apologies that, at best, do not heal the damaged relationship and, at worse, further offend the aggrieved party."[17]

116.    Moreover, Professor Jennifer Freyd, editor of the journal *Trauma and Dissociation*, has explained:  "A sincere apology is extremely healing.  In our society people are afraid to apologize even if they want to because they think it could somehow be used against them (legally or socially), but what I have observed is sincere apologies are extremely healing to both the person who apologizes and the person apologized to."[18]  As Dr. Freyd reflected in a May 2021 presentation to a Hotchkiss audience, "[w]hat I have seen is indication through search evidence that when apologies are permitted by an institution, that results on litigation is actually

---

[16]    B. T. White, *Say You're Sorry: Court-Ordered Apologies As A Civil Rights Remedy*, 91 CORNELL L. REV. 1261, 1271 (2006).

[17]    A. Lazare, ON APOLOGY, at 44, 84 (Oxford University Press 2005).

[18]    https://around.uoregon.edu/content/sincere-apologies-are-healing-uo-psychologist-tells-verily (last accessed Aug. 31, 2023).

often good, but because I mean it doesn't, it's not a guarantee it will be, but the logic is that people sue when their needs aren't getting met.  And often their needs are to be heard and apologized to."

117.    Doe conveyed these principles to Hotchkiss during the parties' settlement negotiations.  During those same negotiations, Hotchkiss – through Board of Trustees Co-President Robert Gould and Head of School Craig Bradley – indicated that it understood these principles, including the need to express sincere remorse and to commit to a fundamental shift in the ways that Hotchkiss, as an institution, treated Doe and addressed past, present, and future sexual abuse on campus.

118.    To effectuate these principles, the parties agreed that Hotchkiss should deliver its written Apology "to John Doe" – personally, addressed to his real name, and not to his counsel – and to do so on the date the Settlement Agreement was fully executed.  Pursuant to the Settlement Agreement and the parties' underlying negotiations, Gould and Hines, as co-presidents of Hotchkiss's Board of Trustees, as well as Hotchkiss personally (and not its counsel), were to physically sign the written apology, which was to include language signaling that it was a resolution of the Board of Trustees.

119.    These two key requirements, personal delivery to Doe and timing, were not merely technical in nature.  Instead, they were substantive and material.  They were intended to ensure that the Apology would not be merely a perfunctory statement by Hotchkiss, but rather, a candid commitment to the parties' shared values, an acknowledgement that Hotchkiss did not act in accordance with those values before, and a promise that Hotchkiss will change sustainably.  Likewise, the timing requirement was essential for Doe to ensure that he would not violate his

religious beliefs and obligations, as he could not release Hotchkiss from liability before Hotchkiss performed its Apology sincerely and in good faith.

120.    By dictating that Hotchkiss must deliver the Apology "to Doe," the Settlement Agreement required that the Apology be personal and direct in nature – to Doe himself – and not filtered or diluted through Doe's counsel.

121.    The timing of the Apology was likewise crucial.  The Apology had to be contemporaneous with the execution of the Settlement Agreement.  The importance of this timing stems from Doe's deep religious convictions, faith, and personal ethics.  Under these core personal principles, Doe cannot forgive Hotchkiss (by releasing it from liability) before receiving a genuine apology.  In fact, the very idea of forgiving an unrepentant Hotchkiss – forgiving Hotchkiss before it sincerely performed the Apology – traumatizes Doe severely, because doing so would be a grievous sin.  To Doe, following these long-held ethical and religious convictions in resolving his dispute with Hotchkiss was far more important than any sum of money.

**C.     HOTCHKISS MATERIALLY BREACHES THE SETTLEMENT AGREEMENT AND REVEALS THAT IT FRAUDULENTLY MISREPRESENTED ITS COMMITMENT TO INSTITUTIONAL REFORM.**

122.    Hotchkiss's promises to Doe turned out to be a fiction.  Even after litigating its position that the Settlement Agreement is binding and operative in this Court and the Second Circuit – and prevailing – and even though that agreement required an irrevocable three-year term for every Committee member, Hotchkiss removed Doe and another Committee member well before the end of their three-year tenures and, in so doing, materially breached its obligations and commitments under the Settlement Agreement.

123.    Hotchkiss reneged on its promises to show remorse and implement specific institutional reforms, thus deepening and re-inflicting in the present day the profound psychological harm it historically caused Doe.

124.    From the moment it executed the Settlement Agreement to the present, Hotchkiss has materially breached, and continues to materially breach, the Settlement Agreement – defeating its essential purpose – by violating the agreement's Committee naming, composition, and announcement requirements; by removing Doe and another Committee member from the Committee in blatant violation of its member tenure requirement; and by failing to deliver a timely written apology to Doe personally.

125.    Moreover, Hotchkiss's promises that it intended to implement real, lasting change at Hotchkiss – through the Committee and other reforms that represent the performance of the Apology – were false.  As time passed and other persons, including Hotchkiss trustees and other sex abuse survivors and witnesses, volunteered new information to Doe, it has become evident to Doe that Hotchkiss had no intention, at the time it negotiated the Settlement Agreement, of honoring such promises.  Instead, Hotchkiss made false representations to deceive Doe into agreeing to a bad-faith settlement, thus avoiding trial, obtaining a dismissal, and securing a broad release – all to protect its own name, reputation, and financial interests.

### 1.    Hotchkiss Misnamed The Committee.

126.    Hotchkiss unilaterally misnamed the Committee the "Advisory Committee for Sexual Misconduct Prevention and Education," in square breach of the Settlement Agreement's requirement to name the Committee the "Sexual Misconduct Advisory Committee."

127.    Hotchkiss blindsided Doe in the months following the parties' execution of the Settlement Agreement, failing to give him any indication that it would call the Committee anything other than the "Sexual Misconduct Advisory Committee."  Doe did not find out about the improper name until Hotchkiss (belatedly) announced the Committee to the public.

128.     Doe made multiple demands to Hotchkiss to cure its breach of the Committee

naming provision, including in letters from counsel dated September 4, 2020, October 1, 2020,

November 5, 2020, and December 29, 2020.  Doe's letters described Hotchkiss's breaches in

detail, underscoring their material and intentional nature.  In response, Hotchkiss rebuffed Doe's

demands to cure, made no effort to resolve Doe's concerns through compromise, and continued

to call the Committee by its erroneous name in complete disregard of Doe's concerns and the

Settlement Agreement's explicit requirements.

129.     Hotchkiss's breach of the Committee's naming provision is material.  The

Committee's name was specifically and expressly negotiated and agreed by the parties, and

Hotchkiss's breach impedes and dilutes the Committee's mission, its identity in the broader

Hotchkiss community, and its focus on Hotchkiss's tragic history – and continuing practice – of

tolerating and covering up known and knowable sexual abuses of children.  The name "Advisory

Committee for Sexual Misconduct Prevention and Education" ostensibly confines the

Committee's purview to preventing *future* occurrences of sexual misconduct at Hotchkiss, and

educating members of the Hotchkiss community about preventing sexual misconduct.  That

name excludes any admission by Hotchkiss, to its community and the public at-large, that it

enabled sexual misconduct to pervade its campus in the past and continues to do so; or that one

central purpose of the Committee was to redress past violations and help heal survivors, such as

Doe, who have suffered for years.

130.     Reinforcing the materiality of Hotchkiss's breach, the Committee has, to date,

failed to take steps to redress past abuse and bring healing, let alone reconciliation, to survivors.

It has – true to its inappropriate name – purported to focus on preventing future instances of

misconduct, but practically doing nothing material other than to rubberstamp the self-interested

decisions of Hotchkiss's current leadership.  Indeed, the Committee, as of the time Hotchkiss had removed two of its members and nearly two years after its formation, had never met in person but only intermittently by Zoom, and never had met with the Board of Trustees.  The Committee did not even vote to adopt a charter so it could start to do whatever work it might do until January 2022, more than halfway through its three-year tenure.  And even at that meeting, less than a quorum of Hotchkiss's appointed members even bothered to show up, resulting in just a minority of three members voting to adopt a charter that is inconsistent with the Committee's intended mission and purpose.  To date, Hotchkiss has never posted anything under the "Recent Announcements" section of the Committee's webpage, which always has and remains blank. The Committee that Hotchkiss formed is a farce, rubberstamping and whitewashing Hotchkiss's continuing cover-up and concealment of sex abuse, and doing nothing to reconcile Hotchkiss with all of Hotchkiss's sex abuse survivors.  Tellingly, leaders of a significant group of Hotchkiss alumni, organized as Hotchkiss Alumni For Reconciliation And Healing ("HAFRAH"), refused to even meet with the Committee, because Hotchkiss's current leadership had reneged on promises of change at Hotchkiss.  That is not enough, and that is not what Doe bargained for, and what Hotchkiss agreed to, in the Settlement Agreement.

## 2. Hotchkiss Improperly Constituted The Committee.

131.    Hotchkiss further breached the Settlement Agreement's requirements as to member composition.  When forming the Committee, Hotchkiss appointed at least eight non-trustees to the Committee, in violation of the Settlement Agreement's requirement that the Committee include only three to five non-trustee members.  Specifically, in published announcements, emails, and an introductory meeting, Hotchkiss has introduced the following eight individuals, and permitted them to participate, as non-trustee committee members:  (1)

Mark Berkowitz, (2) Ann Sprole Cheston, (3) Christina Cooper, (4) Brandeis Nilaja Green, (5) Elizabeth Krimendahl, (6) Charlie Lord, (7) Jennifer Mahon, and (8) Steve McKibben.  In the months that followed, some of those non-trustee members who were employees of Hotchkiss, and one whom Hotchkiss claims is a representative of a recognized Hotchkiss alumni group HAFRAH, also enjoyed prominent speaking roles and exerted outsize influence over Committee deliberations, including by obstructing, delaying, and diverting from the Committee's mission.

132.    Exacerbating matters, Hotchkiss permitted people not named in Hotchkiss's announcement – who were beholden to Hotchkiss – at times to attend and actively participate in Committee meetings as though they were members.  Those Hotchkiss loyalists and "de facto members" included Gould, Hines, Bradley, and paid consultants to Hotchkiss.  Hotchkiss attempted to conceal such violations at the meetings, insisting that certain of those present were not actual members, that others were faculty liaisons or merely a "guest" (who, contrary to that label, said he was a "member").  How Hotchkiss chose to inconsistently characterize these de facto members did not matter, because in reality, they were permitted to attend, speak, direct, control, and vote at Committee meetings – and even to chair the Committee and repeatedly cancel scheduled Committee meetings.

133.    Despite Doe's demands for Hotchkiss to cure its breaches of the Committee's composition requirements, Hotchkiss has kept more than five non-trustee members on the Committee until, in material breach of the Settlement Agreement, it involuntarily removed Doe and another underrepresented minority non-Trustee member from the Committee long before their three-years terms had completed.

134.    Hotchkiss's breaches of the Committee composition requirements are material.  In agreeing to the Settlement Agreement's requirements for the Committee's composition, the

parties agreed to strike a balance between inviting diverse perspectives, voices, and opinions, while making sure the Committee was compact enough to accomplish reforms in a timely and effective manner.  Hotchkiss's breaches upended this agreed-upon structure.  Unsurprisingly, the Committee has consistently experienced significant delays in performing its functions. Committee meetings were frequently delayed or canceled, and plans for the committee, including adopting a charter, were continually deferred with constant obstruction and non-cooperation by Hotchkiss.

### 3.   Hotchkiss Belatedly Publicized The Committee.

135.    Hotchkiss has also breached its contractual obligation to publicize the formation of the Committee in Hotchkiss's alumni magazine, *Hotchkiss Magazine*, and on Hotchkiss's website by May 29, 2020.

136.    Hotchkiss did not publish an announcement in *Hotchkiss Magazine* until more than six months (approximately two magazine issues) after the Committee's formation.

137.    Moreover, while Hotchkiss *did* announce the Committee's formation on its website, the committee named in that announcement is not the same as the one Doe agreed would be formed when Hotchkiss fraudulently induced him to sign the Settlement Agreement.  It was misnamed, and comprised more members than the Settlement Agreement permitted – too many members to operate efficiently.[19]

138.    Hotchkiss's breach of the committee publicization provision is material.  Doe needed the announcement to occur in print and by the agreed-upon date to validate his decades-

---

[19]      In addition, the website announcement disingenuously omitted the name of Committee member Charlie Lord.

long allegations against Hotchkiss, and to sustain momentum for the changes Hotchkiss had promised to make.

139.    It was not enough for Hotchkiss to announce the Committee on Hotchkiss's website, because Hotchkiss community members relied on Hotchkiss's alumni magazine for Hotchkiss-related news and developments.  Thus, inclusion in *Hotchkiss Magazine* ensured that far more of the Hotchkiss network would actually see the announcement – rather than only those who happened to come across the announcement while they happened to browse Hotchkiss's website and its numerous subpages.

140.    Hotchkiss's six-month delay was a material violation of this Settlement Agreement provision.  Time was of the essence for Doe to vindicate his name and reputation among the Hotchkiss community – particularly as Hotchkiss improperly disclosed Doe's identity to multiple members of the Hotchkiss community during the 2015 Action to further disparage and retaliate against Doe.

141.    One of the core purposes of the Settlement Agreement was for Hotchkiss to be proactive about dispelling its self-created pristine image and reputation.  By failing to publish a timely announcement in a source that the Hotchkiss community actually reads and relies on for Hotchkiss-related news, Hotchkiss did just the opposite.  Hotchkiss continued its reprehensible history of cover-up and denial:  protecting its image by burying the existence of sexual abuse on campus and silencing the voices of survivors.

### 4.    Hotchkiss Improperly Removed Doe From The Committee.

142.    Revealing its sheer indifference to the Settlement Agreement and the mendacity of its promises to Doe, Hotchkiss improperly removed Doe from the Committee over a year before the end of his unconditional three-year tenure.

143.    At a preliminary Committee meeting in mid-2020, the members indicated that one of the first courses of Committee action should be adopting a Committee charter.  A charter would enable the Committee to begin the work that Hotchkiss had represented the Committee would accomplish.

144.    True to its pattern of inaction, however, Hotchkiss serially delayed discussions surrounding the Committee's charter, as well as any voting to adopt a charter, due to disagreements among certain members and Hotchkiss about the Committee's intended purpose, composition, name, membership, leadership, voting rights, role, and mechanics – factors that led to the Committee's inefficacy and incapacity to enact real, meaningful change.  Video-recordings of the Committee's meetings, which Hotchkiss recorded and provided to Doe, demonstrate the Committee's non-performance and dysfunction by Hotchkiss's design, and Hotchkiss's noncompliance with the Settlement Agreement.

145.    After more than 18 months of obstruction and delays and stalling by Hotchkiss, and after Hotchkiss made changes to the Committee's voting membership and appointed leadership, the Committee was again scheduled to discuss the adoption of a charter at a January 6, 2022 meeting.

146.    On the night of January 5, however, Hotchkiss sent Doe a specious letter from two Hotchkiss Committee members, who had previously endorsed policies that concealed sexual abuse at Hotchkiss and protected faculty members who were sexual abusers.

147.    In conclusory fashion, those two Committee members alleged that "the Committee has been unable to carry out its charge due to [Doe's] consistent, disruptive behavior during meetings," and, disregarding Doe's unconditional three-year tenure, threatened that

"continued issues with [his] behavior could lead to suspension or removal if we are unable to carry out [the Committee's] mandate."

148.    Those two Committee members' accusations against Doe were false and pretextual.  Doe's behavior at Committee meetings was not "disruptive."  Doe routinely engaged civilly, constructively, collaboratively, and productively, to try to ensure that the Committee was effective and faithful to its original mission – and that the Committee steered clear of any decision that could whitewash, cover up, or conceal sex abuse at Hotchkiss; protect rapists, sexual abusers, and child molesters such as Roy Smith and countless other faculty and staff; or rubberstamp Hotchkiss's current leaders' choices to continue to protect rapists and sex abusers and betray victims.

149.    Doe attended the January 6 meeting regardless of and without broaching the January 5 letter.  When the few members present, who had sent the letter, raised to Doe allegations like they had made in the letter, Doe disputed their allegations and asked for specific examples of those allegations.  None were provided.  Rather, certain Hotchkiss Committee members' hostility toward Doe at the meeting was palpable.  The Committee previously had agreed to adopt the Robert's Rules of Order, which provide that any member has the right to make a motion to propose a resolution; if another member seconds, then that matter is discussed.  Everyone is allowed to speak once before anyone gets to speak a second time, and all members get to speak as much as they want, subject to time limits, until resolved.  Only then is the motion voted upon.

150.    The few members present at the January 6 meeting – which was not a quorum – completely disregarded that established protocol, and voted on Hotchkiss's proposed charter with few members present, without discussion prior to voting; in fact, Doe was virtually ordered, in

intentionally or recklessly traumatizing behavior by Hotchkiss' Committee members, to not speak.

151.    Ultimately, a "charter" – bearing the incorrect Committee name and chartering the Committee to be materially different from that which the Settlement Agreement and Hotchkiss's promises obligated it to form – was improperly "adopted" by an affirmative vote of only a minority of three Committee members, with no discussion or comment before the vote and without any member having seconded the motion to vote.

152.    Hotchkiss's retaliatory actions toward and attempts to silence Doe continued, before culminating in an April 5, 2022 letter from Committee members (and Hotchkiss trustees) Timothy Sullivan and Rhonda Trotter, on the eve of an April 6, 2022 Committee meeting.

153.    The April 5 letter alludes to alleged complaints – by unknown persons – of vague "negative" behavior by Doe at a prior Committee meeting on March 3, 2022.  But the "negative" behavior by Doe that other Committee members took issue with at that meeting was to suggest that the Committee recommend that Hotchkiss reverse its decision to reinstate an annual award named in honor of Arthur White – a serial accomplice to sexual abuse.  That decision by Hotchkiss to reinstate Arthur White's prominent honor at the school was so re-traumatizing to non-Trustee Committee members that when the issue was discussed, three non-Trustee members, accomplished adults over fifty, at times broke down crying.  Doe was re-traumatized.

154.    The April 5 letter proceeded to charge Doe with "refusal to engage in civil or constructive engagement with respect to certain of the Committee's core functions on behalf of current and future students," and purported to remove him as a member of the Committee, "effective immediately," in blatant breach of the Settlement Agreement's provision of irrevocable three-year tenures for all Committee members.

155.    The next day, undersigned counsel served Hotchkiss with a demand to cure its breach of the Settlement Agreement, explaining that Hotchkiss's attempt at removal is wholly improper pursuant to Section 2.5 of the Settlement Agreement, notwithstanding that Doe has acted with civility and respect for other members, even in moments when Doe was shouted and/or cursed at by another Committee member and Hotchkiss's Head of School Bradley.

156.    Moreover, Doe, in his capacity as a member, endeavored to further both the stated objectives of the Committee and the broader goals that Hotchkiss purported to espouse in settlement negotiations that were fundamental to Doe's agreement to settle, including: (i) correcting significant failures, errors, and omissions in a public report by Locke Lord, which the Committee would publish based on its investigations into past sexual abuse at Hotchkiss; (ii) helping Hotchkiss provide restorative justice to and facilitate healing for and reconciliation with survivors of past sexual abuse and victims of retaliation and institutional betrayal by Hotchkiss; and (iii) preventing future sexual abuse and institutional betrayal by ceasing to cover up and conceal past sexual abuse.

157.    Hotchkiss refused to cure this breach of the Settlement Agreement, despite Doe's demand that it reinstate him to the Committee.

158.    Hotchkiss's removal of Doe was not its only violation of the Settlement Agreement's mandatory tenure provision.  Hotchkiss also involuntarily removed Dr. Green, another Committee member who, like Doe, was an underrepresented minority, before her three-year term expired.

159.    Hotchkiss's removal of Doe was a material breach of the Settlement Agreement, which expressly provides that the initial members, which expressly include Doe, have a three-year tenure – without exception.

44

160.     Hotchkiss's unauthorized removal robbed Doe of his contractual rights.  The removals marked a continuation of the history of false disparagement and retaliation by Hotchkiss and its leadership against Doe and others who speak up against sex abuse and sexual abusers and accessories to their crimes.  Hotchkiss's longstanding retaliatory behavior includes inaccurately disparaging those pushing for change as "disruptive" or "disgruntled" or "negative" or "troublemaker" as pretext for retaliation, expulsion, suspension, termination – and, as to Doe, removal from the Committee for speaking out against sexual abuse at Hotchkiss and the ongoing concealment of sexual abuse by Hotchkiss's trustees, leadership, faculty, and staff.

### 5.     Hotchkiss Violated The Settlement Agreement's Apology Provision.

161.     In addition to its numerous Committee violations, Hotchkiss violated the Apology provision of the Settlement Agreement, Section 2.3, in multiple respects.

162.     First, Hotchkiss never delivered the Apology to Doe; instead, only after demands from Doe for the Apology was a defective, purported apology letter delivered to Doe's then-counsel.  The purported apology came not from Hotchkiss itself, but instead from Hotchkiss's outside counsel in the 2015 Action; did not include Doe's legal name; was not addressed to Doe; and was not signed by Hotchkiss's Board of Trustees co-presidents or Hotchkiss itself, but instead contained electronic images of their signatures pasted onto the document by counsel. There is no indication that Hotchkiss's Board of Trustees even met, and the purported apology letter makes no mention of a Board resolution.

163.     Later, in 2021, Hotchkiss Trustee Tim Sullivan represented to Hotchkiss alumni, faculty, and administrators in a recorded and official Hotchkiss meeting that Hotchkiss had not apologized to Doe in 2020 and had no intention to do so.

164.     Moreover, Hotchkiss failed to deliver the Apology by the agreed-upon deadline: the "Effective Date" of the Settlement Agreement, or February 20, 2020.  Instead, Hotchkiss delivered an obviously noncompliant "apology" weeks later, on March 3, 2020, followed by another noncompliant "apology" on March 6, 2020.

165.     Hotchkiss has not cured its breach by delivering the Apology to Doe personally. In addition, Hotchkiss's breach of the timing requirements and requisite good faith for the Apology can never be cured.

166.     Hotchkiss's breaches of the Apology provision were and remain material.  It was critical to Doe that Hotchkiss deliver the Apology to him directly and personally, and equally critical that Hotchkiss's Apology was timely and contemporaneous with the parties' exchange of the fully executed Settlement Agreement – *before* Doe forgave Hotchkiss by release or dismissal of the 2015 Action.

**6.   Hotchkiss Fraudulently Withheld Material Discovery From Doe.**

167.     Moreover, Hotchkiss withheld material information from Doe throughout discovery in the 2015 Action.  Had Doe been aware of these critical facts and documents, he would not have entered into the Settlement Agreement.

168.     As just one example, Hotchkiss refused to produce, in response to Doe's discovery requests, the investigative materials underlying the Locke Lord Report, which contained facts, interview notes, summaries, and other information that reveal many additional reports of and witnesses to sexual abuse *not* published in the final report.  To justify its non-production, Hotchkiss misrepresented that the Locke Lord materials were subject to the attorney-client and work product privileges because Locke Lord was supposedly retained by Hotchkiss's outside counsel to conduct the investigation as part of Hotchkiss's defense of the 2015 Action.

Those misrepresentations were communicated to Doe and his counsel during discovery in the 2015 Action – including by Hotchkiss's 30(b)(6) representative, Chief Financial Officer John Tuke, during his deposition on May 4, 2018 – and reiterated by Gould to Doe during settlement discussions, including after the mediation on August 27, 2019 and another mediation on February 11, 2020.

169.    That was false.  After the parties' settlement, Doe learned that Hotchkiss (through its Board of Trustees) – *not* Hotchkiss's outside counsel – directly retained Locke Lord as an independent consultant to conduct a purely factual investigation.  Locke Lord's role was not legal in nature:  it provided no legal advice to Hotchkiss, and it performed the same work as a private investigator for the purpose of publishing a public report.  Accordingly, the Locke Lord investigative materials, which stemmed from a purely factual investigation, were *not* privileged, as Hotchkiss misrepresented as a pretext to withhold material information from Doe in discovery.  Moreover, the Locke Lord Report itself was plainly not privileged, as it was made public in August 2018; thus, Hotchkiss also had no basis to withhold the report from Doe on privilege grounds.

170.    In addition, Hotchkiss refused to produce underlying investigative material related to a separate report that was prepared by the Carlton Fields firm in 2016-2018 (and never published), which revealed even more instances of sexual abuse not covered by the Locke Lord Report or the investigative materials thereto.  Once again, Hotchkiss claimed that the Carlton Fields investigative materials were protected by the attorney-client and work product privileges. Hotchkiss made those assertions to Doe and his counsel throughout discovery in the 2015 Action, including in its motion to quash a subpoena served on Carlton Fields' lead investigator dated March 6, 2018, and in a written discovery response dated April 6, 2018.

171.     Hotchkiss, however, elided over the fact that those materials were shared with Locke Lord.  Because Locke Lord had no privilege with Hotchkiss, sharing the Carlton Fields materials with Locke Lord, a third-party consultant preparing a public report, defeated any privilege between Carlton Fields and Hotchkiss.[20]  Thus, the Carlton Fields investigative materials were also non-privileged, contrary to Hotchkiss's averments to Doe at the time.

172.     Likewise, Hotchkiss withheld from Doe, in part or in whole, other and prior reports and investigative materials regarding instances and allegations of sexual abuse at Hotchkiss that would have materially impacted his decision to enter into the Settlement Agreement, including:

    a.   A 1992 special advisory committee investigation into allegations from a former student of sexual misconduct by Hotchkiss teacher Leif Thorne-Thomsen in the early 1980s, which ultimately resulted in Hotchkiss's Head of School placing Thorne-Thomsen on a brief leave of absence and Thorne-Thomsen agreeing to seek counseling;

    b.   A 1992 investigation conducted by retired Judge James Stapleton after Thorne-Thomsen was placed on leave following the findings of the Special Advisory Committee, based on two Hotchkiss alumni's accounts of sexual abuse at the hands of Thorne-Thomsen while students at Hotchkiss; Judge Stapleton's report concluded that Thorne-Thomsen had engaged in significant sexual misconduct with multiple female students for years, and Hotchkiss dismissed Thorne-Thomsen in the spring of 1992; and

---

[20]     Upon information and belief, there was no joint defense or similar arrangement between Locke Lord and Carlton Fields.

     c.   A 2011 investigation by the firm Cowdery, Ecker & Murphy, LLC into allegations by an alumni of sexual misconduct committed by faculty members, including Damon White, Blair Torrey, and Geoff Marchant, in the early 1980s; the firm's report substantiated the former student's account of sexual misconduct against Damon White.

173.    These investigations involved interviews of survivors, witnesses, and alleged perpetrators of sexual abuse.  In particular, Judge Stapleton's report included extensive interviews and transcripts that later proved helpful to Locke Lord in its investigation of sex abuse at Hotchkiss.  In fact, Locke Lord discussed details from Judge Stapleton's report publicly in its own report.  Nevertheless, Hotchkiss provided these reports to Locke Lord in 2018, waiving any purported privilege, but refused to produce any of this critical, relevant, nonprivileged information to Doe at any point throughout the 2015 Action, despite being subject to numerous discovery requests, noticed 30(b)(6) topics, and deposition questions to which this information would have been relevant.

174.    Moreover, Hotchkiss's corporate representative omitted material information that should have been provided to Doe in the 2015 Action by way of deposition testimony and documents produced.  Hotchkiss's material omissions include many other allegations of rapes, sexual assaults, sexual abuses, sexual misconduct, physical assaults, and hazing of children at Hotchkiss that Hotchkiss was aware of – which were well-documented in records that Hotchkiss had retained and well-known to Hotchkiss and its leadership.

175.    Shockingly, at the first Committee meeting in late-2020, several Hotchkiss leaders, including Trustees Gould and Trotter, admitted for the first time to Doe that they were each "directly aware of faculty misconduct with students at Hotchkiss" for decades, as early as

when two of them were students before Doe was sexually abused at Hotchkiss.  Hotchkiss never

disclosed such information to Doe at any point during discovery in the 2015 Action.

176.     Hotchkiss's improper refusal to provide Doe with all relevant, nonprivileged

information in response to his discovery requests in the 2015 Action furthered Hotchkiss's

scheme to fraudulently induce Doe to enter into the Settlement Agreement.  Doe was deprived of

material information concerning a large number of witnesses to many other reports and instances

of sexual abuse at Hotchkiss, as well as Hotchkiss's modus operandi of covering up and

concealing those abuses, and agreed to enter into the Settlement Agreement without knowledge

of such critical information.  Doe only found out about the information between the spring of

2020 and 2023, after the Settlement Agreement, from inside sources, including certain

disclosures made by Hotchkiss trustees, administrators, alumni, and based on discussions with

the lead investigator on the Locke Lord investigation.  Had Doe been aware of the critical

information that Hotchkiss withheld from him, he would not have entered into the Settlement

Agreement in the 2015 Action.

### 7.  Hotchkiss Made Fraudulent Representations To Doe During Settlement Negotiations.

177.     Throughout the August 27, 2019 settlement negotiations, Hotchkiss made

misrepresentations to Doe regarding material institutional reforms that it was purportedly

implementing at the time, as well as reforms Hotchkiss claimed it would promptly implement.

178.     After Doe agreed to settle the 2015 Action, he learned that those representations

were utterly false.

179.     To date, Hotchkiss has not carried out some of the reforms that it held itself out as

having made or currently making, or those it claimed it would promptly make.  At the time

Hotchkiss made those misrepresentations and unfulfilled promises of reform, it knew that they were false and/or had no intention of following through on the reforms.

180.    Contradicting Hotchkiss's representations during settlement negotiations, Hotchkiss officials have indicated to Doe that Hotchkiss has not implemented all of the RAINN Report recommendations – and, worse yet, that it does not intend to implement all of them.  For instance, Hotchkiss never hired a full-time experienced Sexual Misconduct Coordinator and instead appointed Christina Cooper part-time, who also works as a dean, teacher, and coach, and had no relevant professional experience or credentials for the coordinator position.  Hotchkiss has evaded repeated inquiries by Doe and others to provide further information on what specific recommendations were and were not implemented.

181.    In addition, Hotchkiss failed to publicly acknowledge the allegations against Roy "Uncle Roy" Smith and Stuart "Smokey" Robinson, including Doe's allegations against Smith, and the credibility thereof.  Quite the contrary, on May 30, 2020, Hotchkiss publicly supported Stuart Robinson on social media when he was hired as Director of Athletics at New York University.[21]  Likewise, during a live global webcast to the Hotchkiss community held on February 27, 2020, a mere week after the Settlement Agreement was executed and delivered, Gould publicly praised Roy Smith as one of his most important teachers whose class he had taken at Hotchkiss and as a primary reason he chose to become a Hotchkiss trustee.  Thereafter, Hotchkiss continued to deny the truth of Doe's allegations in another sexual abuse litigation, *Roe v. Hotchkiss School*, Case No. 3:18-CV-01701 (VAB) (D. Conn.).

---

[21]    *See, e.g.*, https://twitter.com/hotchkisssports/status/1266733123292839938?lang=en (last accessed Aug. 31, 2023).

182.    Contrary to its assurances to Doe that it would permanently strip Arthur White of all Hotchkiss honors, Hotchkiss reinstated and again publicly awarded and announced the award of the so-called "Arthur White Trophy" in 2021.  In fact, in a December 2022 letter to certain alumni, the Hotchkiss Board of Trustees noted just how little action it took regarding Arthur White and Bill Olsen, yet another Hotchkiss abuser:  "To be clear, the removal of [certain] distinctions . . . is the only action the Board took in regard to Messrs. Olsen and White. Neither of them were banned from campus, and though Mr. Olsen is deceased, there is no prohibition on Mr. White returning to campus or participating in alumni events, either on campus or off."

183.    In addition, Hotchkiss deceived Doe when claiming that it did not enter into significant or comparable monetary settlements for sex abuse lawsuits in recent years.  Its own admissions since the August 27, 2019 settlement negotiations belie that claim.  For instance, Hotchkiss's own public tax filings disclose that it incurred at least $7,445,000 in settlements in the 12 months ended June 30, 2019, the Hotchkiss tax year prior to the August 2019 negotiations.  And, in Winter 2020, Gould himself told Doe that he had personally negotiated settlements with "10 or 11" other sex abuse victims for Hotchkiss in the year prior to the August 2019 negotiations.

184.    Finally, Hotchkiss's publicly released financial information, including its IRS Form 990s, do not report or otherwise indicate that Hotchkiss made the settlement payment to Doe – even though similar records have reflected settlement payments by Hotchkiss to other sex abuse victims.  The absence of disclosure put the lie to Hotchkiss's representation that it would pay Doe the settlement amount directly, and thus be required to report the fact of the settlement in its books and IRS filings.  Hotchkiss's concealment of the amount, in square contradiction to

its representations during settlement negotiations, was yet another corrupt effort by Hotchkiss to

cover up and conceal its past sex crimes.

185.    Hotchkiss's representations as to its ongoing and forthcoming institutional

reforms were material to Doe's ultimate decision to sign the MOU, execute the Settlement

Agreement, and release his claims against Hotchkiss – none of which he would have done had he

known that Hotchkiss's representations were false, and that it never intended to fulfill its

promises.

186.    Hotchkiss's continued and new institutional betrayals after the Settlement

Agreement have caused and continue to cause Doe new injuries and ongoing severe stress and

emotional and physical pain and suffering, and have triggered and exacerbated his existing post-

traumatic stress disorder from Hotchkiss's yearslong abuse, abandonment of its promises to Doe,

and manipulation.  As a result, Doe has developed additional debilitating and permanent physical

injuries after the Settlement Agreement was executed, including irreversible damage to his

vision and consequent traumatic debilitating physical injuries, which have severely impacted

Doe's day-to-day functioning and his long-term health.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

## Breach of Contract

187.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth

herein.

188.    Plaintiff and Defendant entered into a binding and enforceable Settlement

Agreement, pursuant to which Defendant agreed to form the Committee to advise Defendant, its

alumni and trustees, and its employees and students as to the past and ongoing culture of sexual

abuse and assault at the school, and use the Committee to implement lasting and meaningful

change by performing the following material terms pursuant to Section 2.5:  (i) name that Committee the "Sexual Misconduct Advisory Committee"; (ii) appoint between three and five non-trustees to the Committee; and (iii) provide all Committee members with three-year tenures, during which they could not be removed from the Committee.  In addition, Section 2.3 of the Settlement Agreement required Defendant to apologize to Plaintiff personally and upon the "Effective Date" of the Settlement Agreement, February 19, 2020.

189.    Plaintiff performed all of his obligations under the Settlement Agreement.

190.    Defendant materially breached Sections 2.3 and 2.5 of the Settlement Agreement by:  (i) failing to properly name the Committee; (ii) failing to appoint the agreed-upon number of members; (iii) improperly removing Plaintiff and another underrepresented minority from the Committee well before the expiration of their three-year tenures; and (iv) failing to personally deliver to Plaintiff an apology by the Settlement Agreement's Effective Date.

191.    As a direct and proximate consequence of Defendant's material breaches, Plaintiff has sustained harm.

192.    Accordingly, as a result of Defendant's material breaches of the Settlement Agreement, Plaintiff's own performance under the contract is excused, including his release of Defendant and any others from any claims related to the 2015 Action or that are otherwise included under Section 3.1 of the Settlement Agreement.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

193.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

194.    The implied covenant of good faith and fair dealing is implied into every contract or a contractual relationship; in other words, every contract, including the Settlement Agreement,

carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.

195.    As set forth more fully above, Defendant materially breached the implied duty of good faith and fair dealing by defeating the underlying purpose and benefits to Plaintiff of the Settlement Agreement.

196.    Among other things, Defendant, despite its promises, failed to implement specific and material meaningful institutional changes at Hotchkiss, including through the Committee, or to express real remorse, timely or otherwise, to Plaintiff.

197.    As a direct and proximate consequence of Defendant's material breaches of the implied covenant of good faith and fair dealing in the Settlement Agreement, Plaintiff has sustained harm.

198.    Accordingly, as a result of Defendant's material breaches of the Settlement Agreement, Plaintiff's own performance under the contract is excused, including his release of Defendant and any others from any claims related to the 2015 Action or that are otherwise included under Section 3.1 of the Settlement Agreement.

### THIRD CAUSE OF ACTION

### **Fraud and Fraudulent Inducement**

199.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

200.    During the parties' negotiations leading up to the Settlement Agreement, Defendant made fraudulent misrepresentations of fact and fraudulent omissions to induce Plaintiff into the Settlement Agreement.

201. First, Defendant made material misrepresentations and/or misleading omissions of fact regarding its own actions and future intentions, including under the purported Settlement Agreement.

202. Specifically, Defendant represented that, at the time of the parties' settlement negotiations on August 27, 2019, Defendant was in the process of implementing and/or intended to implement concrete, meaningful institutional changes that would admit to and address specific past sexual abuse at the school.

203. Defendant also represented that it intended to:  (i) create a specifically-named "Sexual Misconduct Advisory Committee" with a specific membership that would provide its members a three-year tenure during which they could not be removed and that would work toward addressing the systemic sexual abuse at Hotchkiss; and (ii) publicly acknowledge and apologize to Plaintiff for the harm he experienced at the hands of Defendant's students and teachers.

204. Each of those representations was false because, in fact, Defendant had no present intent to follow through with those changes or adhere to its promises pursuant to the Settlement Agreement.  This is demonstrated by Defendant's conduct throughout the post-Settlement Agreement period, including its:  (a) failure, to this day, to implement the material institutional changes it touted during settlement negotiations four years ago; (b) removal of Plaintiff from the Committee long before his three-year tenure expired; (c) failure to deliver an Apology that complied with the requirements agreed to by the parties and that was genuine and meaningful; and (d) distortion of the Committee's name, structure, and purpose.

205. Defendant also made fraudulent representations and omissions during the discovery process in the 2015 Action.  Specifically, Defendant withheld material discovery that

was responsive to Plaintiff's discovery requests, and attempted to justify and conceal its withholding based on deceptive and pretextual bases such as attorney-client and work product privilege.

206.    Defendant made each of the foregoing material misrepresentations with knowledge of their falsity.

207.    Similarly, Defendant made each of the foregoing material omissions with knowledge that they were fraudulent under the surrounding circumstances.  Defendant had a duty to disclose, including because (i) relevant statute and/or discovery rules impose that duty; (ii) because it voluntarily made some disclosure, and therefore had the duty to make full and fair disclosure as to the matters on which it chose to speak; and (iii) a special relationship of trust and confidence existed between the parties.

208.    Defendant made each of the foregoing misrepresentations and omissions with the intent to induce Plaintiff to agree to the Settlement Agreement, so that the 2015 Action would be dismissed, Plaintiff's claims against Defendant would be released, and a jury trial with a high risk of embarrassment and reputational harm to Defendants would be avoided.

209.    Plaintiff reasonably relied on Defendant's misrepresentations and omissions in entering into the Settlement Agreement, including by relying on the discovery record, which was tainted by Defendant's omissions and misrepresentations, in assessing whether and on what terms to settle the 2015 Action.

210.    Plaintiff would not have agreed to the Settlement Agreement but-for Defendant's representations that it would genuinely and meaningfully committed to institutional change.

211.    Plaintiff was damaged as a result of Defendant's fraudulent statements in an amount to be proven at trial.

212.    Moreover, the Settlement Agreement is void and should be rescinded as fraudulently induced.  If awarded a judgment of rescission, Plaintiff would be ready and willing to take all necessary steps to restore the parties to the status quo before the Settlement Agreement was executed, including, for instance, by returning the full settlement payment to Defendant's insurer.

## FOURTH CAUSE OF ACTION

## <u>Negligent Misrepresentation</u>

213.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

214.    During the parties' negotiations leading up to the Settlement Agreement, Defendant, acting with gross negligence, made material misrepresentations.

215.    First, Defendant made material misrepresentations and/or misleading omissions of fact regarding its own actions and future intentions, including under the purported Settlement Agreement.

216.    Specifically, Defendant represented that, at the time of the parties' settlement negotiations on August 27, 2019, Defendant was in the process of implementing and/or intended to implement concrete, meaningful institutional changes that would admit to and address specific past sexual abuse at the school.

217.    Defendant also represented that it intended to:  (i) create a specifically-named "Sexual Misconduct Advisory Committee" with a specific membership that would provide its members a three-year tenure during which they could not be removed and that would work toward addressing the systemic sexual abuse at Hotchkiss; and (ii) acknowledge and apologize to Plaintiff for the harm he experienced at the hands of Defendant's students and teachers.

218.    Each of those representations was false because, in fact, Defendant had no present intent to follow through with those changes or adhere to its promises pursuant to the Settlement Agreement.  This is demonstrated by Defendant's conduct throughout the post-Settlement Agreement period, including its:  (a) failure, to this day, to implement the material institutional changes it touted during settlement negotiations four years ago; (b) removal of Plaintiff from the Committee long before his three-year tenure expired; (c) failure to deliver an Apology that complied with the requirements agreed to by the parties and that was genuine and meaningful; and (d) distortion of the Committee's name, structure, and purpose.

219.    Defendant also made negligent representations and omissions during the discovery process in the 2015 Action.  Specifically, Defendant withheld material discovery that was responsive to Plaintiff's discovery requests, and attempted to justify and conceal its withholding based on deceptive and pretextual bases such as attorney-client and work product privilege.

220.    At the time Defendant made the foregoing representations, Defendant knew or should have known these statements were false.

221.    Based on these misrepresentations, Plaintiff agreed to the Settlement Agreement, dismissing the 2015 Action, released his claims against Defendant, and Defendant avoided a jury trial with a high risk of embarrassment and reputational harm to Defendants.

222.    Plaintiff reasonably relied on Defendant's misrepresentations and omissions in entering into the Settlement Agreement, including by relying on the discovery record, which was tainted by Defendant's omissions and misrepresentations, in assessing whether and on what terms to settle the 2015 Action.

223.    Plaintiff would not have agreed to the Settlement Agreement but-for Defendant's representations that it would genuinely and meaningfully committed to institutional change. Plaintiff was damaged as a result of Defendant's negligent misrepresentations in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**Negligence**

224.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

225.    Defendant assumed a duty to Plaintiff and to the other minor children in its care and custody to do everything within its power to protect them from sexual abuse by other students and by Hotchkiss's faculty.  Before Plaintiff chose to attend Hotchkiss, Defendant's Director of Admissions promised him that rules prohibiting consensual and non-consensual sexual activity were strictly enforced.

226.    Defendant agreed that it had a duty and responsibility to keep the children in its care and custody safe from harm.

227.    Notwithstanding these duties, responsibilities, and promises, Hotchkiss and its teachers and administrators knew, at the time Plaintiff entered and attended Hotchkiss, that there was a history and tradition at the school of older male students, including students 18 years of age and older, subjecting younger students to sexualized hazing.

228.    Also notwithstanding Defendant's duties, responsibilities, and promises to keep Plaintiff safe from harm, at the time he entered and attended Hotchkiss, Hotchkiss and its teachers and administrators knew, and should have known, that at least one of Hotchkiss's male

teachers and dormitory masters was a pedophile and that multiple Hotchkiss teachers had been sexually abusing children.

229.    Defendant knew and should have known that teacher, athletic trainer, and dormitory master Roy G. Smith was sexually attracted to pubescent boys.

230.    During Smith's tenure at Hotchkiss, including prior to and during the time Plaintiff was exposed to Smith, Defendant knew and should have known that Smith discussed schoolboy homosexuality and homo-erotic topics with male students in his apartment at night and had a history of sexual misconduct and sexually abusive grooming behavior.

231.    At the time that Defendant exposed Plaintiff to Smith, Defendant was on actual and constructive notice that Smith desired young boys and had acted on his desires in the past by engaging young boys in sexualized conversation and by touching them in inappropriate and sexual ways.

232.    Defendant's affirmative acts, including housing Smith in and giving him unfettered access to and authority over a boys' dormitory, in which at night boys were locked in the dormitory with him, allowing him unsafe access to vulnerable, young children, and allowing him to work in the athletics program and locker room areas where he was able to touch and leer at the naked and partially-clothed bodies of pubescent boys, created and exposed Plaintiff to a known high degree of risk of harm.

233.    Defendant was on actual and constructive notice of Smith's aberrant character, past conduct, and tendencies.

234.    Defendant was on actual and constructive notice of the temptation and opportunity afforded to Smith for molesting young boys.

235. Defendant was on actual and constructive notice of the gravity of the harm that would result if Smith molested one or more of the boys in Defendant's care and custody.

236. Defendant knew that no other person or entity would assume the responsibility for preventing Smith from molesting young boys.

237. Even if Defendant had not been on actual or constructive notice of the past aberrant behavior and propensities of Smith, Defendant knew and should have known that housing adult teachers who are sexually attracted to pubescent schoolchildren with, and giving them unrestricted access to, a never-ending community of young vulnerable children created a high degree of risk of inappropriate and sexualized behavior.

238. Therefore, Defendant created a situation that it knew and should have known was likely to be dangerous to Plaintiff and to the other young children in its care.

239. Despite having created this dangerous situation, Defendant failed and refused to take appropriate precautions against the risk of harm.

240. As a result of Defendant's acts and omissions, Plaintiff's ability to engage in normal life activities has been permanently impaired and he has been and will be unable to lead and enjoy a normal life.

241. The harm inflicted upon Plaintiff as a young, vulnerable child at Hotchkiss has adversely affected his ability to enter into and maintain lasting, meaningful relationships with others.

242. Plaintiff's ability to maintain intimate physical, sexual, and emotional relationships with other human beings has been irreparably damaged.

243. As a result of Defendant's negligence, Plaintiff has sustained physical pain and suffering.

244.     As a further result of Defendant's negligence, Plaintiff has sustained, and will continue over the course of his lifetime to suffer, severe emotional distress and mental pain and anguish.

245.     Plaintiff's injuries and damages were caused by the negligence of Defendant, its teachers, administrators, employees, and agents, for whose negligence Defendant is liable, in the ways previously described and in the following ways:

      a.  Defendant, by commission and omission, allowed and encouraged a tradition of hazing and bullying of young boys by older students, including hazing and bullying that consisted of sexual assaults and humiliation;

      b.  Defendant, by commission and omission, failed and refused to properly train and supervise Hotchkiss teachers and other school employees, including Smith;

      c.  Defendant hired teachers and other employees, including Smith, despite actual and constructive knowledge of their propensity and desire to molest young boys and without proper vetting and background checks; and

      d.  Defendant failed to warn Plaintiff of the risk of harm to which he was subjected while attending Hotchkiss.

246.     Defendant owed Plaintiff a duty of care, it breached that duty, and its breach caused Plaintiff to be assaulted and molested, suffering damages as a result.

### SIXTH CAUSE OF ACTION

### Recklessness

247.     Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

248.    Defendant, acting through its administrators, teachers, and staff, was consciously aware of the fact that it created a substantial risk to Plaintiff.

249.    Notwithstanding Defendant's conscious awareness of the risk to Plaintiff, Defendant failed to take the necessary and appropriate steps to reduce or eliminate the risk.

250.    Notwithstanding Defendant's conscious awareness of the risk to Plaintiff, Defendant took affirmative steps to exacerbate the risk and make harm and injury to Plaintiff more likely.

251.    The injuries Plaintiff suffered were caused by the recklessness or callous indifference, or the wanton misconduct, of Defendant.

## SEVENTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

252.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

253.    Defendant created an unreasonable risk of causing Plaintiff emotional distress in (a) fostering, facilitating, and concealing the sexual abuse that Plaintiff and others suffered, and (b) intentionally and callously making false promises to Plaintiff to deceive him into settling the 2015 Action.

254.    Plaintiff's distress was foreseeable.

255.    Defendant should have known that Plaintiff's emotional distress was severe enough that it might result in illness or bodily harm.  And in fact, Plaintiff's distress did result in illness and bodily harm.

256.    Defendant's conduct was the cause of Plaintiff's distress.

## EIGHTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress**

257.  Plaintiff repeats and realleges the allegations contained in the preceding paragraphs.

258.  Defendant intended to inflict emotional distress or it knew or should have known that emotional distress was the likely result of its conduct, in (a) fostering, facilitating, and concealing the sexual abuse that Plaintiff and others suffered, and (b) intentionally and callously making false promises to Plaintiff to deceive him into settling the 2015 Action.

259.  Defendant's conduct was extreme and outrageous.

260.  Defendant's conduct was the cause of Plaintiff's distress.

261.  Plaintiff's emotional distress sustained was severe.

## NINTH CAUSE OF ACTION

**Breach of Fiduciary Duty**

262.  Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

263.  A fiduciary relationship existed between Defendant and Plaintiff, which gave rise to:  (i) a duty of loyalty on the part of Defendant to Plaintiff; (ii) an obligation on the part of Defendant to act in the best interests of Plaintiff; and (iii) an obligation on the part of Defendant to act in good faith in any manner relating to Plaintiff.

264.  Defendant advanced its own interests to the detriment of Plaintiff.

265.  Plaintiff has sustained damages.

266.  Plaintiff's damages were proximately caused by Defendant's breach of its fiduciary duty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff and against Defendant:

     a.  Awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial;

     b.  Declaring that Plaintiff is excused from performing the release provision of the Settlement Agreement; or, in the alternative, rescinding the Settlement Agreement;

     c.  Awarding Plaintiff his reasonable costs and disbursements, including reasonable attorneys' fees; and

     d.  Granting such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury for all issues so triable.

DATED: August 31, 2023       **GLENN AGRE BERGMAN & FUENTES LLP**

     By:   _/s/ Jed I. Bergman_

     Jed I. Bergman (admitted _pro hac vice_)
     Tian "Skye" Gao (admitted _pro hac vice_)
     Megan M. Reilly (admitted _pro hac vice_)
     1185 Avenue of the Americas, 22nd Floor
     New York, NY 10036
     Tel.: (212) 970-1600
     jbergman@glennagre.com
     sgao@glennagre.com
     mreilly@glennagre.com

     -and-

     **ZEISLER & ZEISLER, P.C.**

     By:   _/s/ Aaron A. Romney_

     Aaron A. Romney (ct28144)
     10 Middle Street
     Bridgeport, CT 06604
     Tel.: (203) 368-4234

Fax: (203) 367-9678
aromney@zeislaw.com

*Counsel for Plaintiff John Doe*