## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JOHN DOE,

*Plaintiff,*

v.

THE HOTCHKISS SCHOOL,

*Defendant.*

CIVIL ACTION NO.
3:22-cv-01088 (VAB)

## PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW IN OPPOSITION TO THE HOTCHKISS SCHOOL'S MOTION TO DISMISS THE AMENDED COMPLAINT

**GLENN AGRE BERGMAN & FUENTES LLP**

Jed I. Bergman (admitted *pro hac vice*)
Tian "Skye" Gao (admitted *pro hac vice*)
Megan M. Reilly (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, NY 10036
Telephone: (212) 970-1600

**ZEISLER & ZEISLER, P.C.**

Aaron A. Romney (ct28144)
10 Middle Street
Bridgeport, CT 06604
Tel: (203) 368-4234
Fax: (203) 367-9678

*Attorneys for Plaintiff John Doe*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

FACT ALLEGATIONS .................................................................................................. 3

    A.   Doe Suffers Sex Abuse And Institutional Betrayal By Hotchkiss And Its
        Agents. ................................................................................................................ 3

    B.   The 2015 Action And Settlement Agreement. ................................................ 4

        1.   Doe Brings The 2015 Action Against Hotchkiss. ................................ 4

        2.   Hotchkiss Fraudulently Procures A Settlement. ................................. 5

        3.   Key Settlement Terms. ........................................................................ 6

            a.   The Sexual Misconduct Advisory Committee. ........................ 7

            b.   Hotchkiss's Apology. ................................................................ 9

    C.   Hotchkiss Materially Breaches The Settlement Agreement. ....................... 10

    D.   Hotchkiss's Fraud Comes To Light After Doe Settles The 2015 Action. ...... 13

        1.   Hotchkiss Made Fraudulent Representations To Doe During
            Settlement Negotiations. ..................................................................... 13

        2.   Hotchkiss Fraudulently Withheld Material Discovery From Doe
            In The 2015 Action. ............................................................................ 14

    E.   Doe, Gravely Harmed By Hotchkiss's Ongoing Betrayals, Files This Action. ............ 16

ARGUMENT .................................................................................................................. 17

    I.   Doe's Claims Are Not Barred By Claim Or Issue Preclusion. .......................... 17

    II.   Doe States A Claim For Fraud And The Corollary Right To Rescission. .................... 24

        A.   Hotchkiss's Multiple False Statements During Settlement Negotiations
            Give Rise To A Fraud Claim. ............................................................... 24

        B.   None Of Hotchkiss's Remaining Arguments For Dismissal Has Merit. ............... 27

i.  The Settlement Agreement Does Not Defeat Doe's Fraud Claim. .................. 27

ii. Hotchkiss's Privilege Arguments Mischaracterize Doe's Allegations. ........... 29

iii. Hotchkiss's Cursory Argument That It "Performed" Under The Settlement Agreement Likewise Fails. ............................................................... 30

C.  Hotchkiss's Fraud Entitles Doe To Rescission Of The Settlement Agreement. ...... 32

III. The Amended Complaint States Claims For Breach Of Contract And Of The Implied Covenant Of Good Faith And Fair Dealing. ............................................. 34

A.  ███████████████████████████████████████████ ...... 34

B.  The Settlement Agreement Prohibits Hotchkiss's Improper Naming Of The Committee. ............................................................................. 35

C.  The Settlement Agreement Prohibits Hotchkiss's Improper Constitution Of The Committee. ....................................................................... 35

D.  The Settlement Agreement Prohibits Hotchkiss's Improper and Untimely Announcement Of The Committee. .......................................... 36

E.  The Settlement Agreement Prohibits Hotchkiss's Insincere And Feigned Apology. ................................................................................. 37

F.  Alternatively, The Settlement Agreement's Implied Duty Of Good Faith And Fair Dealing Prohibits Hotchkiss's Breaches. .................................. 38

IV. The Amended Complaint States Causes Of Action For Intentional And Negligent Infliction Of Emotional Distress. ................................................... 39

V.  Doe Properly Revives The Sex Abuse Claims He Was Defrauded Into Settling. ............................................................................................. 39

CONCLUSION ................................................................................................. 41

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ackerman v. Sobol Fam. P'ship, LLP*,
  4 A.3d 288 (2010)...................................................................................... 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 17

*Audubon Parking Assocs. Ltd. P'ship v. Barclays & Stubbs, Inc.*,
  225 Conn. 804 (1993)............................................................................*passim*

*Aviamax Aviation Limited v. Bombardier Aerospace Corporation*,
  2010 WL 1882316 (D. Conn. May 10, 2010) ........................................... 29

*Ball v. A.O. Smith Corp.*,
  451 F.3d 66 (2d Cir. 2006) .................................................................. 22, 23

*Beckenstein v. Naier*,
  2010 WL 4885648 (Conn. Super. Ct. Nov. 4, 2010)........................... 32, 33

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................... 17

*Bonner v. City of New Haven*,
  2017 WL 6029567 (Conn. Super. Ct. Nov. 13, 2017)......................... 20, 21

*Bowen v. Daley*,
  1994 WL 197592 (Conn. Super. Ct. Apr. 28, 1994) ................................. 26

*Burt's Spirit Shop, Inc. v. Ridgway*,
  576 A.2d 1267 (Conn. 1990) ..................................................................... 33

*Cadle Co. v. Drubner*,
  303 F. Supp. 2d 143 (D. Conn. 2004)........................................................ 23

*Caiola v. Citibank, N.A., New York*,
  295 F.3d 312 (2d Cir. 2002) ...................................................................... 28

*Carlin v. Martinez*,
  2021 WL 2011207 (Conn. Super. Ct. Apr. 26, 2021) ................... 28, 29, 33

*Conley v. 1008 Bank St., LLC*,
  2020 WL 4926599 (D. Conn. Aug. 22, 2020)....................................... 33, 34

*Doe v. Bemer*,
   2021 WL 2458375 (Super. Ct. May 28, 2021) ................................................................... 21

*Drbul v. Gooding*,
   2018 WL 11399595 (Conn. Super. Ct. Feb. 15, 2018) ...................................................... 27

*Earth Tech., Inc. v. Fluor NE, Inc.*,
   2009 WL 1424649 (Conn. Super. Ct. Apr. 30, 2009) ....................................................... 20

*FIH, LLC v. Found. Cap. Partners LLC*,
   920 F.3d 134 (2d Cir. 2019) ............................................................................................ 27

*Final Cut, LLC v. Sharkey*,
   2009 WL 1532281 (Conn. Super. Ct. May 5, 2009) ......................................................... 33

*Girolametti v. Michael Horton Assocs., Inc.*,
   164 A.3d 731 (Conn. App. 2017), *aff'd*, 208 A.3d 1223 (Conn. 2019) .................................. 19

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996) .............................................................................................. 28

*Hawkins v. Shoneck*,
   2010 WL 3341606 (Conn. Super. Ct. Aug. 4, 2010) ........................................................ 26

*Henderson v. City of Meriden*,
   2013 WL 2149706 (D. Conn. May 16, 2013) ................................................................... 23

*Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*,
   240 F.R.D. 44 (D. Conn. 2007) ....................................................................................... 30

*Internet Airport Parking, LLC v. Parking Access, LLC*,
   2015 WL 5893996 ......................................................................................................... 20

*Landry v. Spitz*,
   925 A.2d 334 (Conn. App. 2007) ..................................................................................... 38

*Lazzaro v. JFS, Inc.*,
   1998 WL 27148 (Conn. Super. Ct. Jan. 15, 1998) ........................................................... 33

*Leach Fam. Holdings, Inc. v. Raymark Indus.*,
   1998 WL 211949 (Conn. Super. Ct. Apr. 24, 1998) ........................................................ 26

*Longi v. New York*,
   2006 WL 8441210 (E.D.N.Y. June 26, 2006), *aff'd*, 363 F. App'x 57 (2d Cir. 2010) ............. 19

*Martinez v. Zovich*,
   867 A.2d 149 (Conn. App. 2005), *cert. denied*, 876 A.2d 1202 (Conn. 2005) .................. 27, 28

*Meetings & Expositions, Inc. v. Tandy Corp.*,
　490 F.2d 714 (2d Cir. 1974) ................................................................ 20

*Microboard Processing, Inc. v. Crestron Elec., Inc.*,
　2011 WL 1213177,n.3 (D. Conn. Mar. 29, 2011) ................................ 39

*Milanese v. Rust-Oleum Corp.*,
　244 F.3d 104 (2d Cir. 2001) ................................................................ 41

*Monahan v. N.Y.C. Dep't of Corr.*,
　214 F.3d 275 (2d Cir. 2000) ................................................................ 17

*Moore v. Connecticut Dept. of Correction*,
　2015 WL 778626 (D. Conn. 2015) ...................................................... 17

*Omotosho v. Freeman Inv. & Loan*,
　136 F. Supp. 3d 235 (D. Conn. 2016) .................................................. 23

*Petrucelli v. Palmer*,
　596 F. Supp. 2d 347 (D. Conn. 2009) .................................................. 29

*Prime Mgmt. Co. v. Steinegger*,
　904 F.2d 811 (2d Cir. 1990) ................................................................ 18

*Pultney Arms LLC v. Shaw Indus., Inc.*,
　2002 WL 31094971 (D. Conn. Sept. 6, 2002) ..................................... 20

*Putnam Precision Molding, Inc. v. Toutant*,
　2010 WL 796767,n.1 (Conn. Super. Ct. Jan. 29, 2010) ...................... 21

*R&R Pool & Home, Inc. v. Fong*,
　2021 WL 1782324 (Conn. Super. Ct. Apr. 6, 2021) ............................ 33

*Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v.*
　*Bank of New York Mellon*,
　775 F.3d 154 (2d Cir. 2014) ................................................................ 17

*Ridgefield Pro. Off. Park v. ASML US, Inc.*,
　2008 WL 5511219 (Conn. Super. Ct. Dec. 8, 2008) ....................... 27, 28

*Salce v. Wolczek*,
　2010 WL 4517717 (Conn. Super. Ct. Oct. 26, 2010) ...................... 34, 35

*Sasmor v. Meisels*,
　708 F. App'x 728 (2d Cir. 2017) .......................................................... 30

*Storey v. Cello Holdings, L.L.C.*,
　347 F.3d 370 (2d Cir. 2003) ................................................................ 18

*TechnoMarine SA v. Giftports, Inc.*,
   758 F.3d 493 (2d Cir. 2014) ........................................................................................ 17, 18

*United States Reg'l Econ. Dev. Auth., LLC v. Matthews*,
   2017 WL 5992384 (D. Conn. Dec. 4, 2017) ................................................................... 31

*United States v. Town of Oyster Bay*,
   2022 WL 34586 (E.D.N.Y. Jan. 3, 2022), *aff'd as modified*,
   2022 WL 4485154 (E.D.N.Y. Sept. 27, 2022) ............................................................... 30

*W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*,
   78 A.3d 167 (2013), *aff'd but criticized*, 153 A.3d 574 (2016) ................................... 29

*Warner v. Rossignol*,
   513 F.2d 678 (1st Cir. 1975) ..................................................................................... 39, 40

*Wilenta Feed, Inc. v. Arnold Food Co.*,
   2006 WL 798916 (D. Conn. Mar. 29, 2006) ............................................................. 31, 32

*Yeadon v. New York City Transit Auth.*,
   719 F. Supp. 204 (S.D.N.Y. 1989) .................................................................................. 40

**Statutes**

C.G.S.A. § 42a-2-202 ............................................................................................................... 29

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 1

Plaintiff John Doe ("Doe") respectfully submits this memorandum of law in opposition to defendant The Hotchkiss School's ("Hotchkiss") motion to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6).[1]

## PRELIMINARY STATEMENT

Hotchkiss would have the Court believe that this action is simply a rerun or continuation of the motion-to-enforce-settlement proceedings in 2020.  But that is a fiction, designed to gull the Court into giving this new action short shrift.  The truth is very different:  after the prior litigation was settled, Doe learned that his assent to that settlement was fraudulently induced – that Hotchkiss's specific pre-settlement representations of ongoing institutional change were false.  And Hotchkiss, true to form, betrayed Doe yet again by breaching that very settlement agreement.  Accordingly, Doe now brings new claims for, *inter alia*, fraudulent inducement and breach of contract, seeking to rescind the prior settlement, revive his claims against Hotchkiss arising out of the abuse he suffered as a child, and recover compensatory and punitive damages.

Hotchkiss's motion seeks to deny Doe his day in court based on distortions:  of Doe's allegations in the Amended Complaint, of the procedural history in the 2015 Action, and of settled legal precepts.  Hotchkiss's litigation tactics should be roundly rejected, and its bid for dismissal denied.

Thus, Hotchkiss mischaracterizes Doe's Amended Complaint as an effort to "relitigate" old claims that were settled, dismissed, and released.  That argument fails.  It is well-settled that where, as here, a defendant is alleged to have procured a settlement and dismissal by fraud, the

---

[1]     "Mtn." refers to Hotchkiss's memorandum of law in support of its motion to dismiss. "Am. Compl." refers to the Amended Complaint.  "2015 Action" means Doe's prior action against Hotchkiss, *see Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), and "2015 Action DE" means the docket in that action.  Undefined capitalized terms have the same meaning as in the Amended Complaint.

doctrines of claim and issue preclusion have no purchase.  In addition, the gravamen of this action includes new claims – claims arising out of Hotchkiss's fraudulent inducement and breach – that were not asserted in the 2015 Action.  The claims in that case were sex-abuse claims. Doe's new claims concern Hotchkiss's conduct during the settlement phase and post-settlement.

Hotchkiss attempts to get around this dispositive hurdle by pointing to the *Audubon*[2] settlement-enforcement proceeding at the tail-end of the 2015 Action, after that case was administratively closed.  But that too is unavailing.  The enforcement proceeding was confined, as a matter of settled Connecticut law, to issues of contract formation – not to issues of breach or fraud in the inducement of a contract.  Moreover, Doe's settlement-related claims in this action are based mainly on events that occurred or that were reasonably discovered after the motion-to-enforce proceeding, and thus could not have been raised in the 2015 Action in any event.

Hotchkiss's remaining arguments for dismissal fare no better.

Hotchkiss contends that Doe's fraud claim is barred by a merger and disclaimer (*i.e.*, anti-reliance) clause in the Settlement Agreement.  That circular argument defies settled Connecticut law and public policy, which make clear that a party cannot contract away fraud when the contract was engendered by that very fraud.  Nor can Hotchkiss defeat Doe's fraud claim, arising from Hotchkiss's concealment of discovery in the 2015 Action, as an attempt to "relitigate" this Court's prior privilege rulings.  Doe is not challenging Hotchkiss's legal arguments on privilege; rather, he is challenging Hotchkiss's misrepresentations and omissions underlying those arguments.  Finally, Hotchkiss's argument that Doe's fraud claim should be dismissed because Hotchkiss (allegedly) "performed" under the Settlement Agreement ignores that the fraud claim is based on promises and representations extraneous to the agreement.

_____

Hotchkiss's challenge to Doe's claims for breach of the Settlement Agreement also lacks merit.  Hotchkiss disregards the plain language and specific requirements of the Settlement Agreement – which Hotchkiss violated through its improper naming, announcement, and constitution of the Committee; ███████████████████████████████████ ████████████████████ and its phony and insincere apology.

In any event, Hotchkiss's protest that the Settlement Agreement does not expressly prohibit its actions does not shield Hotchkiss from liability.  Doe also brings an alternative claim for breach of the implied duty of good faith and fair dealing – which encompasses conduct, like Hotchkiss's here, that denied Doe the overall benefit of his bargain.

Equally unpersuasive are Hotchkiss's arguments for dismissing Doe's sex abuse and emotional distress claims as supposedly released and dismissed.  Hotchkiss's own fraud and breaches undid the release and dismissal, and Doe was not required to move to reopen a judgment procured by fraud.  Moreover, Doe also brings emotional distress claims based on Hotchkiss's conduct in connection with the settlement.  Those claims were never before litigated.

Hotchkiss's motion should therefore be denied in its entirety and this action should proceed to discovery.

## FACT ALLEGATIONS

### A. Doe Suffers Sex Abuse And Institutional Betrayal By Hotchkiss And Its Agents.

Hotchkiss is one of the most distinguished college preparatory boarding schools in the country.  (Am. Compl. ¶¶ 24-25.)  Behind that burnished veneer of privilege, however, lies a revolting history and ongoing pattern of sexual abuse and rape by Hotchkiss faculty and other authority figures, as well as retaliation against victims and reporters of sexual abuse.  Since as early as the 1900s, Hotchkiss faculty and upperclassmen routinely and systematically committed physical and sexual abuse and assaults against young boys on campus.  (*Id.* ¶ 29.)  Survivors and

witnesses reported these sexual abuses to Hotchkiss leadership and staff.  But rather than investigate and take steps to rectify those pervasive crimes, Hotchkiss and its leaders and trustees dismissed and disregarded students' reports and pleas for help; retaliated and continue to retaliate against survivors and others who dared to speak out; and actively conceal and protect the perpetrators – to this day – to protect its self-interest and that of its abusers.  (*Id.* ¶¶ 30-34.)

Doe was one of the many victims of the rampant sex abuse enabled and committed by Hotchkiss.  When Doe was an adolescent, he suffered repeated sex abuse, including rape, by faculty member and known abuser Roy Smith.  (*Id.* ¶¶ 35-44.)  Making matters worse, Doe was repeatedly and violently assaulted by Hotchkiss dormitory proctors.  (*Id.* ¶¶ 45-49.)

Doe reported the sexual assaults to multiple members of Hotchkiss staff, including the Headmaster at the time, Arthur White, as well as the assistant headmaster, Doe's dormitory corridor master, Hotchkiss's physician, a mental health counselor, and other faculty.  (*Id.* ¶¶ 51-59.)  None came to his aid.  Instead, they dismissed the reports as par for the course, blamed Doe for speaking out, and retaliated against Doe through a coordinated smear campaign led by White, in coordination with Hotchkiss's Board of Trustees president.  (*Id.*)  That retaliation involved actively ███████████████████████████████████████████████████████ ████████████████████████████████████████████ (*Id.* ¶¶ 60-61.)  Hotchkiss's acts have caused Doe irreparable physical injury and mental anguish.  (*Id.* ¶¶ 63-65.)

**B.  The 2015 Action And Settlement Agreement.**

1.  <u>Doe Brings The 2015 Action Against Hotchkiss.</u>

Doe filed a lawsuit against Hotchkiss in this Court in 2015 (the "2015 Action") for (i) negligence; (ii) recklessness; (iii) negligent infliction of emotional distress; (iv) intentional infliction of emotional distress; and (v) breach of fiduciary duty.  (*Id.* ¶ 66.)  Doe litigated that

case for over four years, including through protracted discovery further stalled by Hotchkiss's

withholding of key documents and information.  After Doe defeated Hotchkiss's motion for

summary judgment, trial was set for Fall 2019.  (*Id.* ¶ 67.)

   2.  Hotchkiss Fraudulently Procures A Settlement.

   The parties had discussed potential settlement terms for over a year leading up to August

2019.  (*Id.* ¶ 68.)  During those negotiations, Doe and his counsel communicated to Hotchkiss

and its counsel in meticulous detail the terms and conditions that Doe would be willing to accept

to settle the 2015 Action, the most important of which were nonmonetary.  (*Id.*)

   On August 27, 2019, the parties conducted a mediation, followed by significant

additional settlement discussions after the mediation concluded.  (*Id.* ¶ 69.)  Those discussions

occurred between Doe and Hotchkiss's representatives, Board of Trustees Co-President Robert

Gould and Trustee and Head of School Craig Bradley, with and without their counsel present.

(*Id.*)  During these discussions, Hotchkiss's representatives made a series of promises and

representations to Doe that adopted many settlement terms central to Doe's decision to settle the

2015 Action.  (*Id.* ¶ 69.)

   Among other promises that set the stage for settlement, Gould and Bradley represented to

Doe that Hotchkiss, at the time, was in the process of implementing, or intended to implement,

specific institutional reforms, including without limitation the following (*id.* ¶¶ 73-85):

   i.   Hotchkiss had already implemented most recommendations by a 2018 report (the
        "RAINN Report") and would finish implementing the recommendations during the
        2019-2020 school year, including hiring a full-time sexual misconduct coordinator;

   ii.  Hotchkiss would promptly and fully investigate the full history of all sexual abuse at
        Hotchkiss, including by specific perpetrators; document same; and admit all alleged
        sexual abuse at Hotchkiss committed by faculty, staff, dormitory proctors, trustees, or
        students (while protecting the confidentiality of identities of child sex abuse victims)

   iii. Hotchkiss had removed, or promptly would remove, all honors for and in the name of
        Arthur White; and

iv.    Hotchkiss had not made any other significant or comparable monetary settlements of sex abuse claims in recent years.

Each of foregoing representations, made on August 27, 2019 by Gould and Bradley on Hotchkiss's behalf, was material to Doe's decision to settle the 2015 Action.  (*Id.* ¶ 86.)  And as discussed below, each was false at the time it was made.  (*Id.*)  Hotchkiss knew and intended that these misrepresentations would induce Doe into settling the 2015 Action on terms and conditions favorable to Hotchkiss, including a monetary settlement payment that comprised a small fraction (approximately ██%) of the damages Doe reasonably expected to recover at trial.  (*Id.* ¶ 87.) And as Hotchkiss intended, its assurances tipped the scale for Doe, who reached a settlement agreement in principle with Hotchkiss on August 27, 2019.  (Am. Compl. ¶ 89.)  On February 13, 2020, the Settlement Agreement was fully executed.[3]  (*Id.*)

3.  <u>Key Settlement Terms.</u>

In exchange for a dismissal of the 2015 Action and release, the Settlement Agreement obligated Hotchkiss to establish a "Sexual Misconduct Advisory Committee" at Hotchkiss, ███ ████████████████████████████████████████████████████████ ███████████████████████; provided specific requirements for the written Apology by Hotchkiss to Doe for all allegations in the 2015 Action, including Hotchkiss delivering that written apology to Doe personally; and required a monetary payment.  (*Id.* ¶ 90.)  These terms were pivotal to the Settlement Agreement for Doe, necessary conditions even more than the settlement payment, and without them, Doe would not have settled.  (*Id.*)

---

[3]    Doe pleads this action in accord with the July 2020 Order's ruling that the February 20, 2020 agreement is the operative settlement between the parties.  (Am. Compl. ¶ 11 n.2.)

  *a. The Sexual Misconduct Advisory Committee.*

During the parties' settlement discussions on August 27, 2019, Hotchkiss proposed

creating the Committee as part of its performance of its apology to Doe.  (*Id.* ¶ 91.)  Doe, while

receptive to Hotchkiss's idea, wanted to ensure that the Committee would not be simply a

rubberstamp, but rather, would expend the requisite substantial time, work, and effort to

effectuate meaningful change.  (*Id.* ¶ 92.)  Hotchkiss represented that it, too, wanted the

Committee to embrace a meaningful mission and role in implementing sustained institutional

change, including by publishing a comprehensive and credible investigative fact-finding report

on the history of sexual misconduct at Hotchkiss to stem any further denial of Hotchkiss's long

history of sexual abuse of children.  (*Id.*)

As such, the parties agreed to a provision in the Settlement Agreement, Section 2.5,

stating in relevant part that:

> "By May 29, 2020, the School will create a Sexual Misconduct
> Advisory Committee (the "Committee") . . . .  The Committee will
> consist of not less than two Trustees and at least three and not more
> than five non-Trustee members.  Each member of the Committee
> will be appointed to serve for a term of three years . . . .  The School
> will announce the formation of the Committee in the Hotchkiss
> Magazine and on the School's website and will include in these
> announcements the names of the Committee members."

(Am. Compl. ¶ 93.)  The specific requirements in Section 2.5 – on Committee naming,

composition, publicization, and member tenure – were designed to ensure that the Committee

had teeth.  (*Id.* ¶ 94.)  These requirements were not simply semantic or technical in nature.

Rather, each was integral to Doe's decision to settle.  (*Id.*)

First, the parties agreed to name the Committee the "Sexual Misconduct Advisory

Committee."  That wording was deliberate and intentional, and chosen over other names to

reflect its true focus:  offer healing and reconciliation for past victims and survivors of sex abuse

at Hotchkiss; fully investigate past sex abuse; and then, based on the lessons learned from that investigation, recommend preventative reforms to deter future abuse.  (*Id.* ¶¶ 95-97.)  Putting the focus on past abuse was a critical step for Hotchkiss to at last admit and atone for the heinous crimes that it committed and has long sought to conceal.  (*Id.*)

Second, the parties agreed that the Committee would include at least three and not more than five non-trustees – who are more independent than trustees and less likely to defend or espouse Hotchkiss's past practices out of loyalty to Hotchkiss, or those who control Hotchkiss, rather than loyalty to truth.  (*Id.* ¶ 99.)  The parties also wanted to limit the number of non-trustees and members, as too many members could paralyze the Committee's efficacy.  (*Id.*)  The parties also agreed that some members should be Hotchkiss trustees (*id.* ¶ 100), because it was important for trustees to learn about the past and ongoing instances of sexual abuse at Hotchkiss; and to use their status and influence to help drive institutional reforms.  (*Id.*)

Third, the parties agreed that by May 29, 2020, Hotchkiss must form the Committee and announce the Committee's formation on Hotchkiss's website and alumni magazine (*Hotchkiss Magazine*).  (*Id.* ¶ 101.)  It was important to Doe for the announcement to be in print, so that the Committee's formation would be publicized to a materially larger audience of influential alumni; and to be made by May 29, 2020, as close in time to the settlement as possible, as assurance that Hotchkiss was proactive in effecting atonement and structural change.  (*Id.* ¶¶ 102-04.)

Finally, the parties agreed that each initial Committee member had an unconditional three-year initial tenure.  The tenure provision's purpose was to prevent Hotchkiss from removing members, including in retaliation for their viewpoints or voting decisions, and to ensure that the Committee would have a stable, consistent membership to perform significant work over the coming three years.  (*Id.* ¶¶ 105-07.)

   b.  *Hotchkiss's Apology.*

The Apology provision in the Settlement Agreement, Section 2.3, requires that "[u]pon the Effective Date, the School will deliver to John Doe a written apology, the text of which is attached hereto as Attachment A." (*Id.* ¶ 108.)  The Apology was, and is, the most important settlement term for Doe.  (*Id.*)  In exchange for the Apology, Doe agreed to reduce his settlement demand by a nearly ███% discount – from ████████, an amount Doe reasonably believed he could obtain at trial, to ████████.  (*Id.* ¶ 109.)

The gravity of the Apology to Doe stems from his deep religious convictions and the horrific actions of Hotchkiss and its abusers.  (*Id.* ¶ 110.)  For Doe, settling the 2015 Action – and the resulting dismissal and release – signified that he could forgive Hotchkiss.  (*Id.* ¶ 111.)  But Doe could not forgive Hotchkiss unless it first made a sincere and meaningful apology.  (*Id.*)

To apologize authentically, Hotchkiss had to admit the full extent of its wrongdoing; express genuine guilt and remorse for the harm it inflicted on Doe; make amends to Doe; and signal that it has committed to a fundamental departure from its past pattern of denial, apathy, and retaliation.  (*Id.* ¶ 112.)  Doe's perspectives on the Apology and its significance have been documented extensively in scientific, religious, and humanities scholarship.  (*Id.* ¶¶ 113-16.)

Doe conveyed these same principles to Hotchkiss during settlement negotiations.  (*Id.* ¶ 117.)  During those negotiations, Hotchkiss – through Gould and Bradley, as well as counsel when present – indicated that it understood the need, in performing the required apology, to express sincere remorse and to commit to performing a sustained seismic shift in how Hotchkiss treated Doe and other victims, survivors, and reporters of sex abuse.  (*Id.*)

To effect these principles, the parties agreed to specific terms designed to ensure that the Apology was not a perfunctory act of lip service, but a sincere act of abiding significance.  The

parties agreed that Hotchkiss, itself, would deliver the written Apology to Doe, himself –
personally, not just through counsel, using Doe's real name – and on the date the Settlement
Agreement was fully executed.  (*Id.* ¶ 118.)  The Apology would be signed by Gould and Hines,
as Co-Presidents of Hotchkiss's Board of Trustees, and expressly indicate that it was approved
by a Board of Trustees resolution.  (*Id.*)

These key requirements – personal delivery to Doe on the settlement date – were not
merely technical in nature.  (*Id.* ¶ 119.)  They were substantive and material.  (*Id.*)  They were
intended to ensure that the Apology would not be empty words mouthed by Hotchkiss, but
rather, a solemn and serious commitment to the parties' shared values, an acknowledgement that
Hotchkiss did not act in accordance with those values before, and a promise that Hotchkiss
would change sustainably.  (*Id.* ¶ 119.)  Likewise, the timing requirement was essential for Doe
to abide by his religious beliefs and obligations, as he could not release Hotchkiss from liability
before Hotchkiss performed its Apology sincerely and in good faith.  (*Id.*)

### C. Hotchkiss Materially Breaches The Settlement Agreement.

From the moment it executed the Settlement Agreement to the present, Hotchkiss has
materially breached, and continues to materially breach, the Settlement Agreement – defeating
its essential purpose – neutering the Committee by violating the agreement's naming,
composition, and announcement requirements; ██████████████████████████████████
████████████████████████████████████████████ and failing to
deliver a timely and sincere written apology to Doe personally.  (*Id.* ¶ 124.)

First, Hotchkiss unilaterally misnamed the Committee the "Advisory Committee for
Sexual Misconduct Prevention and Education," in breach of the explicit requirement to create a

"Sexual Misconduct Advisory Committee."  (*Id.* ¶¶ 126-30.)  Doe did not find out about the

breach until Hotchkiss (belatedly) announced the Committee to the public.  (*Id.* ¶ 127.)

Second, Hotchkiss improperly constituted the committee.  (*Id.* ¶¶ 131-34.)  Hotchkiss

appointed at least eight non-trustees to the Committee, in violation of the Settlement

Agreement's requirement that the Committee include only three to five non-trustee members.

(*Id.* ¶ 131.)



(*Id.* ¶ 132.)

Third, Hotchkiss failed to timely publicize the Committee.  (*Id.* ¶¶ 135-41.)  It did not

announce the Committee's formation in *Hotchkiss Magazine* until year-end 2020, more than six

months (or two magazine issues) after the May 29, 2020 deadline.  (*Id.* ¶ 136.)

Finally, Hotchkiss violated the Apology provision of the Settlement Agreement, Section

2.3, in multiple respects.  (*Id.* ¶¶ 161-66.)  Hotchkiss never delivered the Apology personally to

---

4

Doe.  (*Id.* ¶ 162.)  Instead, its counsel delivered a defective, purported apology letter to Doe's

then-counsel.  (*Id.*)  The purported apology did not include Doe's legal name or mention Doe at

all; it was not addressed to Doe; and it was not signed by Hotchkiss's Board of Trustees co-

presidents or Hotchkiss itself, but instead contained electronic images of their signatures pasted

onto the document by counsel.  (*Id.*)  There is no indication that Hotchkiss's Board of Trustees

even met or passed a resolution to apologize to Doe or authorized Hotchkiss to apologize to Doe,

and more recently, a Hotchkiss trustee has indicated to alumni and faculty that the Board of

Trustees had decided that Hotchkiss would not apologize to Doe and had not done so.  (*Id.*)

Moreover, Hotchkiss failed to deliver the Apology by the agreed-upon deadline:  the

"Effective Date" of the Settlement Agreement, or February 20, 2020.  (Am. Compl. ¶ 164.)

Instead, Hotchkiss's outside counsel delivered an obviously noncompliant "apology" to Doe's

then-counsel weeks later, on March 3, 2020, followed by another nearly-identically

noncompliant "apology" on March 6, 2020.  (*Id.*)

Even more egregiously, Hotchkiss's conduct since the execution of the Settlement

Agreement makes clear that its purported "apology" was nothing but a facile, fingers-crossed-

behind-the-back recitation of empty words – a fundamentally insincere act that in no way

satisfies the Settlement Agreement's most crucial term.  As alleged in the Amended Complaint

and discussed below, Hotchkiss failed to implement reforms it previously promised to implement

(including hiring a full-time Sexual Misconduct Coordinator), failed to acknowledge credible

allegations of abuse, publicly supported those abusers on social media and to the Hotchkiss

alumni community, reinstated an annual award in an abuser's name, and downplayed its own

reforms.  (*Id.* ¶¶ 179-82.)  These steps make a mockery of the Apology's explicit statement that

"the School is doing everything within our power to ensure that students now and in the future

will be cared for and safe." (Am. Compl., Ex. 1, Attachment A.) Hotchkiss did not genuinely apologize; indeed, it stands brazenly unrepentant.

As the Amended Complaint pleads, all of Hotchkiss's breaches were material, not mere formalities. The name of the Committee, its composition, its announcement, the unconditional three-year tenure, and the manner in which the Apology must be delivered and its format were all intended by Doe – indeed, were essential to Doe – to ensure that Hotchkiss was at last remorseful, that it was admitting to its gross failings, and was committed to institutional change.

### D. Hotchkiss's Fraud Comes To Light After Doe Settles The 2015 Action.

1. <u>Hotchkiss Made Fraudulent Representations To Doe During Settlement Negotiations.</u>

Hotchkiss's promises that it intended to implement real, lasting change at Hotchkiss – through the Committee and other reforms that represented the performance of the Apology – were false. (Am. Compl. ¶¶ 14, 70-85.) As time passed, Doe came to learn that Hotchkiss had no intention of honoring such promises at the time it negotiated the Settlement Agreement. Instead, Hotchkiss made false representations to deceive Doe into agreeing to settle.

Thus, Hotchkiss officials have indicated to Doe and others in the Hotchkiss community that Hotchkiss has not implemented all of the RAINN Report recommendations – and, worse yet, that it does not intend to implement all of them. Hotchkiss has further evaded repeated inquiries by Doe and others to provide information on which recommendations were or were not implemented. (*Id.* ¶ 180.)

In addition, Hotchkiss failed to publicly acknowledge the allegations against specific Hotchkiss faculty members, including Smith and ███████████████ (*Id.* ¶ 181.) Instead, since the Settlement Agreement was executed, Hotchkiss has continued to support both abusers and continued to deny the truth of Doe's allegations. (*Id.*)

Hotchkiss also continued to confer distinctions on Arthur White, including by awarding the so-called "Arthur White Trophy" in 2021, and affirmatively endorsed having White return to campus.  (*Id.* ¶ 182.)

Hotchkiss further deceived Doe when claiming that it did not enter into significant or comparable monetary settlements for sex abuse lawsuits in recent years.  (*Id.* ¶ 183.)  For instance, Hotchkiss's tax filings disclose that it incurred at least $7,445,000 in settlements in the 12 months ended June 30, 2019.  (Am. Compl. ¶ 183.)  And in 2020, Gould himself told Doe that he had personally negotiated settlements with "10 or 11" other sex abuse victims for Hotchkiss in the year prior to the August 2019 negotiations.  (*Id.*)

Finally, Hotchkiss's publicly released financial information, including its IRS Form 990s, do not report or otherwise indicate that Hotchkiss made the settlement payment to Doe.  (*Id.* ¶ 184.)  The absence of such disclosure puts the lie to Hotchkiss's representation that it would pay Doe the settlement amount directly without insurance funding or reimbursement, and thus be required to report that payment amount in its books and IRS filings, and amounts to yet another attempt by Hotchkiss to cover up and conceal its past sex crimes, as well as to induce Doe's assent to the Settlement Agreement.  (*Id.*)

2.  <u>Hotchkiss Fraudulently Withheld Material Discovery From Doe In The 2015 Action.</u>

Doe has also learned that Hotchkiss withheld material information from Doe throughout discovery in the 2015 Action.  Had Doe learned that information at the time, he either would not have settled at all, or would have settled on terms more favorable to him.  (*Id.* ¶¶ 167-76.)

As one example (of many), Hotchkiss refused to produce extensive investigative materials underlying a report prepared by Locke Lord (the "Locke Lord Report") on privilege grounds, claiming that Locke Lord was retained by Hotchkiss's outside counsel as part of

14

Hotchkiss's defense of the 2015 Action.  (*Id.* ¶ 168.)  That was false.  More than two years after the parties' settlement, Doe learned that it was Hotchkiss – not its outside counsel – that had directly retained Locke Lord as an independent consultant to conduct a purely factual investigation.  (*Id.* ¶ 169.)  Thus, the Locke Lord materials were nonprivileged, and Hotchkiss misrepresented the factual record to keep them from being produced.

Similarly, Hotchkiss refused to produce the investigative materials underlying an unpublished report prepared by the Carlton Fields firm in 2016-2018, again asserting privilege.  (*Id.* ¶ 170.)  But the *fact* that Hotchkiss failed to divulge was that those same materials had been shared with Locke Lord at Hotchkiss's request.  (*Id.* ¶ 171.)  Because Locke Lord had no privilege with Hotchkiss, sharing the Carlton Fields materials with Locke Lord had waived any privilege over the Carlton Fields materials.

In addition, Hotchkiss withheld from Doe, in part or in whole, additional reports and investigative materials regarding instances and allegations of sex abuse at Hotchkiss, including from multiple independent investigations that identified and substantiated sex abuse reports, and material deposition testimony.  (*Id.* ¶¶ 172-73.)

Doe only learned about the foregoing, and Hotchkiss's nondisclosures, after the Settlement Agreement was executed, and as late as 2023, ████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████  (*Id.* ¶¶ 175-76.)  Had Doe known about the information Hotchkiss withheld, he would not have settled the 2015 Action, or would have settled it on different and more favorable terms.  (*Id.* ¶ 176.)

### E.  Doe, Gravely Harmed By Hotchkiss's Ongoing Betrayals, Files This Action.

Hotchkiss's continued and new institutional betrayals after the Settlement Agreement have caused and continue to cause Doe new injuries and ongoing severe stress and emotional and physical pain and suffering, and have triggered and exacerbated his existing post-traumatic stress disorder from Hotchkiss's yearslong abuse, abandonment of its promises to Doe, and manipulation.  (*Id.* ¶ 186.)  As a result, Doe has developed additional debilitating and permanent physical injuries after the Settlement Agreement was executed, ██████████████████ ████████████████████████████████████████ which have severely impacted Doe's day-to-day functioning and long-term health.  (*Id.* ¶ 186.)

As a result of Hotchkiss's fraud and breaches, and the harms those violations have caused and continue to cause, Doe filed this action against Hotchkiss on August 26, 2022, amending his complaint on August 31, 2023.  Doe asserts new claims for breach of the Settlement Agreement and the implied duty of good faith and fair dealing (First and Second Causes of Action), fraud and fraudulent inducement (Third Cause of Action), and intentional and negligent infliction of emotional distress (Seventh and Eighth Causes of Action), each of which arises directly from Hotchkiss's unlawful acts that occurred – or were and could only be discovered – after the Settlement Agreement was executed and the 2015 Action was administratively closed.

In addition, because Doe seeks rescission of the Settlement Agreement based on Hotchkiss's fraud and material breaches, Doe reasserts his previous claims for negligence, recklessness, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of fiduciary duty (Fifth to Ninth Causes of Action) arising from the sex abuse by Smith and upperclassmen, and Hotchkiss's active enabling of same.  As shown below, each of these claims easily withstands Hotchkiss's motion to dismiss.

## ARGUMENT

In deciding Hotchkiss's Rule 12(b)(6) motion, "the Court must accept as true all factual matter alleged in a complaint and draw all reasonable inferences in a plaintiff's favor." *Moore v. Connecticut Dept. of Correction*, 2015 WL 778626, at *2 (D. Conn. 2015) (citing *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 159 (2d Cir. 2014)). The motion should be denied if the Amended Complaint, accepted as true, states a "plausible" claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). A claim has facial plausibility so long as the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citations omitted). As shown below, Doe's claims easily clear that standard, requiring denial of Hotchkiss's motion.

## I.   DOE'S CLAIMS ARE NOT BARRED BY CLAIM OR ISSUE PRECLUSION.

Hotchkiss's principal argument is that Doe's new claims are barred by the resolution of the 2015 Action and the doctrines of *res judicata* and collateral estoppel. Seeking to rewrite history for its own purposes, Hotchkiss would have the Court conclude that the prior action centered on Doe's contract and fraud claims, such that all of those claims are now barred. As shown below, neither claim preclusion nor issue preclusion defeats Doe's claims.

### A.  **Claim Preclusion Does Not Apply.**

Hotchkiss's claim preclusion arguments fail for several independent reasons. As a threshold matter, res judicata, or claim preclusion, applies only when (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000). Here, it is the third element that Hotchkiss's arguments distort. As the Second Circuit

has instructed, "courts must be mindful that a claim arising subsequent to a prior action is not barred by res judicata even if the new claim is premised on facts representing a continuance of the same course of conduct." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (internal citation and quotation marks omitted) (reversing dismissal of claims on res judicata grounds where claims rested, in part, on post-settlement conduct).  That is this case.

First, none of Doe's claims arising out of the settlement (*i.e.*, for fraud, breach of contract/the implied duty of good faith and fair dealing, and intentional and negligent infliction of emotional distress) were asserted in the 2015 Action.  Nor could they have been, as they arose years after Doe commenced that prior action – in fact, they arose after the parties agreed to settle the case and reported that agreement to the Court, which administratively closed the case.  2015 Action DE 321.  Based on this "unremarkable principle" alone, claim preclusion does not apply. *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 383 (2d Cir. 2003) ("Claims arising subsequent to a prior action," based on conduct occurring after the commencement of the earlier suit, and sufficient to state a cause of action without the need to incorporate facts preceding the first suit "need not, and often perhaps could not, have been brought in that prior action," and so "are not barred by res judicata"); *see also Prime Mgmt. Co. v. Steinegger*, 904 F.2d 811, 816 (2d Cir. 1990) (prior action did not preclude later suit regarding breaches of contract that occurred subsequent to filing of prior suit).

Hotchkiss's motion only confirms that conclusion.  ████████████████████ ██████████████████████████████████████████████████████  Hotchkiss's "chart" of the remaining contract breaches at issue, which sets forth each breach and the purported "Latest Date of Notice of Claim" for each (Mtn. at 12), also defeats its argument.  All

of the "notice" dates Hotchkiss lists in its own chart, which span March-May 2020, occurred well after the case was administratively closed in September 2019.

Second, it is black-letter law that a settlement and judgment procured through fraud cannot serve as a defense to a later action. *See, e.g.*, *Girolametti v. Michael Horton Assocs., Inc.*, 164 A.3d 731, 745-56 (Conn. App. 2017) (collecting cases, and holding that "[i]mplicit in the determination that a prior judgment has been validly rendered is the notion that it was not procured by fraud or collusion, as new litigation will not be barred if the former judgment was procured through such means"), *aff'd*, 208 A.3d 1223 (Conn. 2019); *Longi v. New York*, 2006 WL 8441210, at *35 (E.D.N.Y. June 26, 2006) ("the preclusive effect of a prior settlement may be avoided upon a showing that it was procured by duress or fraud"). Here, the Amended Complaint alleges that the Settlement Agreement – as well as the resulting dismissal – were procured by Hotchkiss's fraud. (Am. Compl. ¶¶ 69-89**,** 167-76, 179, 183, 185, 204, 218, 220.) Thus, as a matter of law, none of Doe's counts in the Amended Complaint are subject to claim preclusion.

Hotchkiss's principal argument seems to be that Doe could have, and therefore must have, brought his new causes of action in connection with the parties' cross-motions to enforce under Connecticut's *Audubon* standard, and that his failure to do so means they are barred. *See Audubon*, 626 A.2d at 733. That argument fundamentally misstates the procedural history of the 2015 Action (with which the Court is already familiar); mischaracterizes the scope of an *Audubon* proceeding; and, if adopted, would have serious doctrinal consequences and raise Constitutional concerns.

Under *Audubon*, "[a] trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous." 626

A.2d at 733; *see also Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir.

1974) ("A district court has the power to enforce summarily, on motion, a settlement agreement

reached in a case that was pending before it.").  The purpose of the Court's summary-

enforcement power under *Audubon* is to ensure "the efficient use of judicial resources," as well

as the integrity of settlement as a meaningful way to resolve legal disputes while avoiding a trial

on the merits of the claims at issue.  *Audubon*, 626 A.2d at 733; *accord Pultney Arms LLC v.

Shaw Indus., Inc.*, 2002 WL 31094971, at *2 (D. Conn. Sept. 6, 2002).

      Consistent with *Audubon's* rationale, the parties' *Audubon* motions in the 2015 Action

were properly confined to the narrow issue of contract formation:  namely, whether the parties

entered into an enforceable settlement agreement, and if so, which iteration of the agreement was

valid and binding.  The motions did not afford leeway to plead and prove new claims or defenses

arising from Hotchkiss's fraud or breach related to the Settlement Agreement – the very validity

and enforceability of which was being decided in the *Audubon* proceeding.

      Nor could the *Audubon* motions have encompassed claims for fraud or breach.  As

Connecticut courts have underscored, the scope of an *Audubon* proceeding is cabined to the

narrow issue of contract formation:  namely, the existence and enforceability of a settlement

agreement.  *See, e.g.*, *Earth Tech., Inc. v. Fluor NE, Inc.*, 2009 WL 1424649, at *2 (Conn. Super.

Ct. Apr. 30, 2009) ("The narrow evidentiary inquiry of an 'Audubon' hearing is solely to

determine whether there is any dispute about the existence, terms and enforceability of a clear

and unambiguous agreement, not to resolve such disputed facts if they exist."); *Internet Airport

Parking, LLC v. Parking Access, LLC*, 2015 WL 5893996, at *2 n. 1 (Conn. Super. Ct. Sept. 4,

2015) (distinguishing limited scope of *Audubon* hearing from action for breach of settlement

agreement); *Bonner v. City of New Haven*, 2017 WL 6029567, at *3-*5 (Conn. Super. Ct. Nov.

13, 2017) (same); *Putnam Precision Molding, Inc. v. Toutant*, 2010 WL 796767, at *3 n.1 (Conn. Super. Ct. Jan. 29, 2010); *Doe v. Bemer*, 2021 WL 2458375, at *4 (Super. Ct. May 28, 2021) (distinguishing claim for breach of settlement agreement, which is beyond the scope of an *Audubon* hearing, from the limited scope of an *Audubon* hearing, which solely concerns the existence and enforceability of a settlement agreement).

Thus, Doe could not have, as a procedural matter, brought new claims or counterclaims for fraud or breach when litigating the *Audubon* motions.  The case was administratively closed, and Hotchkiss cites no authority for the proposition that opposing an *Audubon* motion (or even bringing one) triggers a requirement to interpose a new pleading and assert all claims arising out of or relating to the settlement agreement at issue.  Even if that were the law – and it is not – Hotchkiss blithely ignores that Doe's claims turn on fraud and breaches that ripened only *after* those motions were filed.  The 2015 Action was reported settled in August 2019, and the Court administratively closed the case on September 11, 2019.  (2015 Action DE 321.)  Hotchkiss moved to enforce in March 2020, and Doe cross-moved to enforce in April 2020.  (2015 Action DE 364, 380.)  The Amended Complaint, by contrast, pleads claims that arose later:  for instance, Hotchkiss's fraud gradually came to light from spring 2020 to 2023.  (Am. Compl. ¶¶ 175-76.)  Hotchkiss committed breaches of the Settlement Agreement's Committee provision from May 2020 until April 2022 and into 2023.  (*Id.* ¶¶ 131-54.)  Thus, Doe could not have known about those violations and fraud at the time the parties filed the *Audubon* motions and/or at the time the Court entered final judgment on same.

Hotchkiss's claim preclusion argument would thus require Doe to have done the impossible:  bring new claims, before they ripened, in a summary proceeding that prohibits

bringing such claims, in a case that was already settled and administratively closed by the Court. Such an absurd and unconscionable proposition is not and cannot possibly be the law.

Hotchkiss's argument, in addition to leading to an absurd result, would also be profoundly inefficient and raise serious Constitutional issues.  Requiring parties to assert any and all settlement-related claims in response to an *Audubon* motion – or otherwise forfeit them forever – would transform motions for summary enforcement into new plenary actions, with new pleadings, more discovery, additional motion practice, and extensive fact-finding.  That would destroy the very judicial efficiencies that the Connecticut Supreme Court stressed in announcing the *Audubon* proceeding in the first place.  *Audubon*, 626 A.2d at 733 (emphasizing judicial-efficiency rationale of summarily enforcing settlement agreement).  And it would raise Constitutional concerns as well, because there is no jury trial right in an *Audubon* proceeding. *See Ackerman v. Sobol Fam. P'ship, LLP*, 4 A.3d 288, 313 (2010) (no constitutional right to jury trial on motion to enforce settlement agreement under *Audubon*).  Requiring Doe to assert his breach, fraud, and infliction-of-emotional-distress claims in the course of the parties' *Audubon* motions would have improperly deprived him of his Constitutional right to have those claims tried to a jury if he so chose.  Again, that cannot be the law.

Accordingly, neither the 2015 Action, nor the summary *Audubon* proceeding that ultimately resolved it, triggers the application of claim preclusion to bar Doe's new claims.

### B.  Issue Preclusion Does Not Apply.

Hotchkiss's issue preclusion arguments similarly fail.  Collateral estoppel, or issue preclusion, applies only when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a

valid and final judgment on the merits." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks omitted).

As an initial matter, issue preclusion, like claim preclusion, does not apply where the allegedly preclusive settlement or judgment was procured by fraud. *Supra*, at Section I.A. That alone is enough to defeat Hotchkiss's argument with respect to all of Doe's claims.

In addition, Hotchkiss has failed to demonstrate the elements of issue preclusion as to Doe's new claims. The issues of fraud and breach were not actually litigated in the 2015 Action. They were plainly not "raised in the pleadings or otherwise, submitted for determination, [or] in fact determined." *Omotosho v. Freeman Inv. & Loan*, 136 F. Supp. 3d 235, 250 (D. Conn. 2016) (issue preclusion does not apply where "items properly in the record at the motion to dismiss stage do not reflect whether the plaintiff actually raised these issues in the [prior] action," regardless of whether the plaintiff could have raised those issues).

Even if Doe had somehow raised those issues (which he did not), the narrow scope of summary *Audubon* proceedings would not have afforded Doe a full and fair opportunity to litigate them. *See Henderson v. City of Meriden*, 2013 WL 2149706, at *9 (D. Conn. May 16, 2013) (issue preclusion did not apply, where defendant failed to adduce evidence that "Plaintiffs received a 'full and fair opportunity' to litigate the facts set forth in that affidavit in the narrow context of the motion to enforce Stipulated the Judgment"); *see generally Cadle Co. v. Drubner*, 303 F. Supp. 2d 143, 148 (D. Conn. 2004) ("limited purpose and narrow scope of [prior] proceedings" shows that such proceedings "are not designed to give parties the opportunity to fully litigate claims").

All Hotchkiss cites to buttress its issue-preclusion defense is a reference in the July 2020 Order to Doe's "receipt of all benefits" under the Settlement Agreement. But that statement did

not touch on Hotchkiss's material breaches of contract at issue in this action, let alone decide its

fraud and re-infliction of emotional distress, none of which was before the Court.  To the

contrary, it was made in the context of a separate issue entirely:  contract formation and

ratification.  Likewise, none of Hotchkiss's misleading citations to its own *Audubon* briefing

demonstrate that the issues of breach and fraud were actually litigated.  Hotchkiss's

characterizations of Doe's conduct (Mtn. at 18 fn. 48 (citing 2015 Action DE 397) have no

bearing on Hotchkis's breaches at issue in this action, much less fraud.  And Doe's challenge to

the now-operative Settlement Agreement as nonbinding on contract formation grounds likewise

did not equate to a challenge that the agreement should be voided or rescinded, or that Doe

should be excused from performing the agreement, in light of Hotchkiss's breaches and fraud.

Thus, as Hotchkiss's threadbare arguments confirm, issue preclusion does not attach here.

## II.    DOE STATES A CLAIM FOR FRAUD AND THE COROLLARY RIGHT TO RESCISSION.

### A.    Hotchkiss's Multiple False Statements During Settlement Negotiations Give Rise To A Fraud Claim.

The Amended Complaint amply states a claim for fraud and fraudulent inducement.

While Hotchkiss pays lip service to the basic elements of fraud (Mtn. at 32), it ignores and

mischaracterizes the actual allegations in the Amended Complaint, which amply suffice to state a

claim for fraud and fraudulent inducement.

The Amended Complaint alleges in exacting detail Hotchkiss's numerous material

misrepresentations to Doe during settlement negotiations and its withholding of material

discovery, all for the purpose of inducing Doe into a settlement that allowed Hotchkiss to avoid

an impending public jury trial and the risk of another eight-figure verdict against it.

Among other falsehoods, Hotchkiss knowingly and intentionally misrepresented facts

surrounding its enactment of specific institutional reforms and supposed overhaul in how

Hotchkiss was and would be treating and reconciling with past victims, survivors, and reporters of sex abuse at Hotchkiss.  (Am. Compl. ¶¶ 69-89.)  Specific reforms Hotchkiss lied about included implementing all the recommendations of the RAINN Report; publicly acknowledging sex abuse allegations against a slate of Hotchkiss faculty and authority figures; removing honors for former headmaster White; and fully investigating, documenting, and admitting to Hotchkiss's history of sex abuse and the roles of senior officials in responding to same.  (*Id.*)  Hotchkiss also lied about the lack of comparable monetary settlements of sex abuse claims in the years preceding Doe's settlement with Hotchkiss; its direct funding, without insurance proceeds, of the settlement payment to Doe, and reporting that payment in its tax filings.  (*Id.* ¶ 183.)

In addition, Hotchkiss represented that it would provide a meaningful and sincere apology to Doe, as well as create a Sexual Misconduct Advisory Committee with teeth and the capacity to effect real change.  (Am. Compl. ¶¶ 70-72.)

The Amended Complaint likewise alleges that Hotchkiss withheld significant and material discovery from Doe that, if properly disclosed, would have substantially impacted Doe's decision to settle and the terms of any settlement.  (*Id.* ¶¶ 14, 29, 167-76.)  That missing discovery included, among other information, investigative materials underlying the Locke Lord Report and Carlton Fields Report, which Hotchkiss characterized as privileged to Doe's counsel and to this Court.  (*Id.* ¶¶ 168-71.)  In asserting privilege over those investigative materials, Hotchkiss invented false and deceptive factual rationales – including misstatements about Locke Lord's retention and the nature of its investigation, as well as fraudulently omitting the fact that the Carlton Fields materials were shared with Locke Lord, thereby defeating any privilege associated with those materials.  (*Id.*)

The Amended Complaint further pleads that each of the foregoing misrepresentations were false when made.  (*Id.* ¶¶ 86, 169, 179, 185, 204, 218, 220.)  As to misrepresentations about what Hotchkiss would do in the future, Hotchkiss had no intent to deliver on any of those promises at the time it made them.  (*Id.* ¶¶ 177-86.)  Instead, Hotchkiss had every intention of inducing Doe into a convenient and expedient settlement agreement and avoiding the embarrassment and risks of going to trial.  (*Id.* ¶¶ 14, 88.)

The truth behind Hotchkiss's misrepresentations emerged only after Doe entered into the Settlement Agreement.  (*Id.* ¶¶ 12-14, 176, 178.)  Starting in approximately Spring 2020 and continuing through 2023, Doe gradually learned about the truth ███████████████████ █████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████   (*Id.* ¶¶ 175-76.)  But-for Hotchkiss's fraud, Doe would not have settled the 2015 Action – at least not on the terms to which Hotchkiss induced him into agreeing.  (*Id.* ¶¶ 122-25, 177-86.)

These and other particularized allegations in the Amended Complaint more than suffice to state a claim for fraud and fraudulent inducement under Connecticut law.  *See, e.g.*, *Bowen v. Daley*, 1994 WL 197592, at *5 (Conn. Super. Ct. Apr. 28, 1994) (misrepresentation "to do an act in the future" other than to perform under a contract, "when coupled with a present intent not to fulfill it," is actionable as fraud); *accord Hawkins v. Shoneck*, 2010 WL 3341606, at *2 (Conn. Super. Ct. Aug. 4, 2010) (same); *Leach Fam. Holdings, Inc. v. Raymark Indus.*, 1998 WL 211949, at *4 (Conn. Super. Ct. Apr. 24, 1998) (same).

**B. None Of Hotchkiss's Remaining Arguments For Dismissal Has Merit.**

    i.    <u>The Settlement Agreement Does Not Defeat Doe's Fraud Claim.</u>

Faced with Doe's well-pleaded allegations of fraud, Hotchkiss resorts to arguing that the merger and non-reliance clauses in the Settlement Agreement prohibit Doe's claims.  (Mtn. at 34-36.)  Hotchkiss's entreaty for what would amount to a license to lie defies common sense and ignores controlling precedent.

Connecticut law is clear that "fraud cannot be contracted against," and that "[a] claim that a seller's intentional, reckless or negligent misrepresentations caused a buyer to enter into a contract . . . is a valid cause of action, even if the contract that the parties entered into constituted the entire agreement between the parties and the contract included a clause disclaiming any representations by the seller as to the condition of the property."  *Martinez v. Zovich*, 867 A.2d 149, 156 (Conn. App. 2005), *cert. denied*, 876 A.2d 1202 (Conn. 2005).

Likewise, Connecticut precedent emphatically rejects the notion that a merger clause in a contract bars a fraud claim.  *See Drbul v. Gooding*, 2018 WL 11399595, at *7 (Conn. Super. Ct. Feb. 15, 2018) (applying Connecticut law, and holding that defendants "are mistaken" that merger provision precludes tort claims sounding in fraud); *see also FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 143 (2d Cir. 2019) ("general merger clause does not preclude parol testimony where a claim is based on fraud in the inducement").

Likewise, "an action for fraudulent or reckless misrepresentation of material facts in the inducement of a contract is not defeated by contractual provisions waiving reliance on warranties or representations."  *Ridgefield Pro. Off. Park v. ASML US, Inc.*, 2008 WL 5511219, at *2 (Conn. Super. Ct. Dec. 8, 2008) (citing *Dalton v. Dampf*, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 04 0199611 (April 12, 2005) ("[A] party cannot induce another to contract by [] misrepresentation of a material fact, then shield itself from the

consequences with a general disclaimer")); *Zovich*, 867 A.2d, 156 (Conn. App. 2005) (allowing

non-reliance clauses to preclude fraud claims "would violate public policy").

To even come close to precluding a fraud claim, a disclaimer must be more than

boilerplate.  Rather, a disclaimer is only sufficient to preclude reasonable reliance on material

factual misrepresentations if it "tracks the substance of the alleged misrepresentation[.]"  *Caiola*

*v. Citibank, N.A., New York*, 295 F.3d 312, 330-31 (2d Cir. 2002) (disclaimers ineffective

because, while "[plaintiff] specifically allege[d] that [defendant] offered false assurances . . .

"[t]he disclaimer . . . state[d] only in general terms that neither party relie[d] 'on any advice,

statements or recommendation (whether written or oral) of the other party'"); *see also Harsco*

*Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996) (disclaimer sufficiently specific where it states

that defendants "make no representation or warranty to" plaintiff regarding "any projections,

estimates or budgets heretofore delivered to or made available to Purchaser of future revenues,

expenses or expenditures, future results of operations (or any component thereof), future cash

flows or future financial condition . . ."); *Carlin v. Martinez*, 2021 WL 2011207, at *17-18

(Conn. Super. Ct. Apr. 26, 2021) (disclaimer must include explicit language indicating a plaintiff

is not relying on statements outside the written contract).

These well-settled precepts defeat Hotchkiss's bid to "contract against" its own fraud

based on the generic merger and non-reliance clauses in the Settlement Agreement.

Section 4.3 of the Settlement Agreement, the purported disclaimer Hotchkiss relies on,

does not track Hotchkiss's misrepresentations.  Instead, that provision is boilerplate and simply

states that Doe "has not been influenced to any extent whatsoever in entering into this

Agreement by any representations, statements, suggestions, indications, or other expression

regarding any matter by the School Releasees or any of them."  (Am. Compl., Ex. 1 § 4.3.)  Such

a vague and generalized disclaimer cannot absolve Hotchkiss from liability for fraud. *See, e.g.*, *Carlin*, 2021 WL 2011207, at *17-18; *see also Petrucelli v. Palmer*, 596 F. Supp. 2d 347, 361 (D. Conn. 2009) (plaintiffs not precluded from pleading their reliance notwithstanding contractual disclaimer, which states that "neither the Seller, nor any representative of the Seller, has made any representation upon which the Buyer relies except as herein expressly set forth").

The scant handful of cases on which Hotchkiss relies only illustrate why Hotchkiss is wrong.  In *Aviamax Aviation Limited v. Bombardier Aerospace Corporation*, the disclaimer clause stated:  "No party has been induced to enter into this Amendment by, nor is any party relying on, any representation or warranty outside those expressly set forth in this Amendment." 2010 WL 1882316, at *6 (D. Conn. May 10, 2010) (emphasis added).  This clause included explicit language by which "the plaintiff contractually promises to not rely upon statements *outside the agreement*" – language "necessary to bar a fraud claim as a matter of law."  *Id.* at *6 (D. Conn. May 10, 2010) (emphasis added).  Here, by contrast, there is no requisite "anti-reliance language" in the Settlement Agreement that explicitly disclaims reliance on statements outside the Settlement Agreement.[5]

Accordingly, Hotchkiss cannot hide behind the Settlement Agreement to shield its repeated acts of fraud.

    ii.    Hotchkiss's Privilege Arguments Mischaracterize Doe's Allegations.

Hotchkiss's attempts to defend its factually false privilege-related assertions in the 2015 Action (Mtn. at 32-34) are equally unavailing.  The Amended Complaint does not, as Hotchkiss

---

[5]    Hotchkiss's only other cited authority in purported support of its argument that Section 4.3 of the Settlement Agreement precludes Doe's fraud claim, *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, is entirely inapposite.  78 A.3d 167 (2013), *aff'd but criticized*, 153 A.3d 574 (2016).  That case was governed by a preclusive parol evidence rule in the sales article of Connecticut's Uniform Commercial Code, which is inapposite here.  *Id.* at 183-91 (citing C.G.S.A. § 42a-2-202).

claims, re-litigate the Court's privilege determinations in the 2015 Action.  Instead, Doe alleges

that Hotchkiss, in claiming that the Locke Lord and Carlton Fields materials were privileged,

misstated and omitted *facts* surrounding the allegedly privileged status of those materials.

Hotchkiss represented that Locke Lord was retained by counsel, when in fact it was retained

directly by Hotchkiss as an independent consultant (Am. Compl. ¶¶ 168-69); represented that

Locke Lord's investigation was legal, when in fact it was factual (*id.*); and failed to disclose that

the Carlton Fields Report was shared with Locke Lord, thus waiving any claim of privilege (*id.*

¶¶ 170-71).

The Court's prior rulings do not help Hotchkiss's argument.  Doe did not discover

Hotchkiss's discovery fraud until well after the 2015 Action was settled, so the Court could not

have addressed it in prior discovery rulings.  (*See, e.g.*, 2015 Action DE 254.)[6]  And the prior

Order cited by Hotchkiss (*id.*) did not even address the Locke Lord report, which was published

in August 2018 after briefing on the discovery motion had concluded.  2015 Action DE 209.

iii.   Hotchkiss's Cursory Argument That It "Performed"
Under The Settlement Agreement Likewise Fails.

Hotchkiss's argument that Doe's fraud claim should be dismissed because "this Court

already found that Hotchkiss fulfilled all settlement obligations" is a complete red herring:  the

---

[6]      Tellingly, none of the authorities Hotchkiss cites support its tenuous positions as to its
fraudulent representations and omissions during the discovery process in the 2015 Action.  *See
Sasmor v. Meisels*, 708 F. App'x 728, 731 (2d Cir. 2017) (discussing litigation expenses, not
privilege assertions, let alone factual predicates for same); *United States v. Town of Oyster Bay*,
2022 WL 34586, at *6 (E.D.N.Y. Jan. 3, 2022), *aff'd as modified*, 2022 WL 4485154 (E.D.N.Y.
Sept. 27, 2022) (discussion of discovery deadlines without any discussion of fraud or improper
withholdings).  Perhaps most egregious, *Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.* does
not in any way support Hotchkiss's contention that its privilege logs cannot form the basis of a
concealment claim – neither fraud nor concealment is at issue at all in that opinion.  240 F.R.D.
44 (D. Conn. 2007).

misrepresentations on which Doe grounds his fraud claim were collateral to the terms of the

Settlement Agreement and were never previously adjudicated by this Court.[7]

Claims for fraud in the inducement based on matters collateral to the contract can always

be pursued in tandem with breach-of-contract claims.  As Hotchkiss's own authorities make

clear, "[c]laims for wrongfully inducing a party to enter into a contract can be pursued along

with a claim for breach of contract."  *Wilenta Feed, Inc. v. Arnold Food Co.*, 2006 WL 798916,

at *2 (D. Conn. Mar. 29, 2006) (cited at Mtn. at 36-37); *see also United States Reg'l Econ. Dev.*

*Auth., LLC v. Matthews*, 2017 WL 5992384, at *7 (D. Conn. Dec. 4, 2017) (cited at Mtn. at 36)

("[N]ot every fraud claim is foreclosed in an action also involving a contract . . . .  [T]he Second

Circuit . . . specifically recognizes causes of action for fraud in the inducement when the

misrepresentation is collateral to the contract it induced, so that a misrepresentation of material

fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient

to sustain a cause of action alleging fraud.").

In fact, the two cases that Hotchkiss cites in ostensible support of its position (Mtn. at 36-

37) actually *defeat* its argument.  In *Matthews*, the Court held that misrepresentations of

presently existing facts, including as to "imminent" future action, concerned matters collateral to

the contract between the parties which, "if proven at trial, would establish a viable claim for

fraudulent inducement."  2017 WL 5992384, at *7.  That is because "a promise to take some

future action which is collateral to the contract can be considered a 'misrepresentation' for

purposes of a fraud in the inducement cause of action and a promise not contained in the written

---

[7]      As discussed *infra*, Hotchkiss did *not* perform its obligations under the Settlement
Agreement.  Moreover, Hotchkiss's compliance – or lack thereof – with its extra-contractual
representations was not before the Court in the 2015 Action or in the *Audubon* proceedings that
took place after the 2015 Action was reported settled and administratively closed.

agreement made with a preconceived and undisclosed intention of not performing it . . .

constitutes a misrepresentation for purposes of a fraud in the inducement cause of action."  *Id.*

Likewise, in *Wilenta*, the Court held that "the complaint can be interpreted to allege that

plaintiff entered into the contract in reliance on intentional or negligent misrepresentations," and

therefore that "Defendants' argument that these allegations have no utility independent of a

breach of contract claim is [] unavailing."  2006 WL 798916, at *2.

So too here, the Amended Complaint alleges that Hotchkiss fraudulently induced Doe

into signing the Settlement Agreement based on misrepresentations that were collateral to, and

independent of, its breaches of that agreement.  Throughout the August 27, 2019 settlement

negotiations, Hotchkiss made misrepresentations to Doe regarding material institutional reforms

that it was purportedly implementing at the time, as well as reforms Hotchkiss claimed it would

promptly implement in the future.  (Am. Compl. ¶¶ 73-77, 80-86.)  Hotchkiss also falsely

represented to Doe that it did not enter into significant or comparable monetary settlements for

sex abuse lawsuits in recent years.  (*Id.* ¶¶ 78, 183.)  The Amended Complaint further details the

catalogue of material information that Hotchkiss withheld from Doe that would have influenced

his decision to sign the Settlement Agreement.  (*Id.* ¶¶ 69-89.)

Because the detailed allegations in the Amended Complaint establish that Hotchkiss's

fraudulent inducement was collateral to its representations in the Settlement Agreement,

Hotchkiss's argument that it "performed" has no relevance to Doe's fraud claim.

### C.  Hotchkiss's Fraud Entitles Doe To Rescission Of The Settlement Agreement.

Because the Amended Complaint states a claim for fraud, Doe has pled his right to

rescission of the Settlement Agreement.  A victim of fraudulent inducement may elect one of two

remedies:  (a) rescind the contract and restore both parties to their original positions, or (b)

affirm the contract and sue for damages while retaining any consideration received in the transaction. *See Beckenstein v. Naier*, 2010 WL 4885648, at *9 (Conn. Super. Ct. Nov. 4, 2010).

Hotchkiss's argument against rescission is based solely on its false claim that Doe has not offered to return the settlement payment. (Mtn. at 22-24.) The law is clear – indeed, Hotchkiss's own case (*Carlin v. Martinez*, cited at Mtn. 24) explicitly holds – that the offer to rescind can be made "*at the same time* as the assertion of the rescission claim." (*Id.* (emphasis added)). That is exactly what Doe did in the Amended Complaint: offer to return the settlement payment.[8] (Am. Compl. ¶ 212 ("If awarded a judgment of rescission, Plaintiff would be ready and willing to take all necessary steps to restore the parties to the status quo before the Settlement Agreement was executed, including, for instance, by returning the full settlement payment to Defendant's insurer.")[9] Doe's offer suffices, and Hotchkiss cites nothing to the contrary.[10]

---

[8]    If this Court deems it necessary, Doe is in a position to further amend his complaint to reflect the fact that he did, in fact, offer to return the settlement payment before initiating this action, which offer Hotchkiss through its counsel rejected.

[9]    Moreover, Hotchkiss's aspersion that it is "doubtful" Doe can return the settlement payment, merely because a portion of the settlement proceeds were spent, is sheer speculation. Money is fungible, Doe has explicitly alleged that he is ready to return the full settlement payment (*id.* ¶ 212), and at this stage of the proceedings that allegation must be taken as true.

[10]    Unlike the facts at hand, the authority Hotchkiss cites in this regard involve: (i) pleadings devoid of *any* allegations that a party offered to restore the other to its former position, *see Carlin*, 2021 WL 2011207 at *21 ("[P]laintiff has not alleged that she offered to restore other parties to the pre-agreement status, a necessary precondition to a claim for rescission"); *Final Cut, LLC v. Sharkey*, 2009 WL 1532281, at *4 (Conn. Super. Ct. May 5, 2009) ("[T]here is no allegation . . . anywhere [] in the complaint, that the plaintiff offered to restore the defendants to their previous condition."); *Lazzaro v. JFS, Inc.*, 1998 WL 27148, at *1 (Conn. Super. Ct. Jan. 15, 1998) (no allegation that plaintiff offered to return defendant to its former condition as nearly as possible); *Burt's Spirit Shop, Inc. v. Ridgway*, 576 A.2d 1267, 1270 (Conn. 1990) ("The defendants never offered to restore the plaintiff to its former position"); (ii) substantial delay in offering to restore the other party to its former position, *see R&R Pool & Home, Inc. v. Fong*, 2021 WL 1782324, at *26 (Conn. Super. Ct. Apr. 6, 2021) (offer of rescission of prior and unrelated settlement made two years after litigation commenced); or (iii) a grant of rescission, *see Conley v. 1008 Bank St., LLC*, 2020 WL 4926599, at *12 (D. Conn. Aug. 22, 2020) ("Accepting Plaintiff's allegations as true, and construing all reasonable inferences in his favor,

### III.   THE AMENDED COMPLAINT STATES CLAIMS FOR BREACH OF CONTRACT AND OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Contrary to Hotchkiss's argument that Doe's breach of contract and implied covenant claims are barred by the terms of the Settlement Agreement (Mtn. at 25-31), a straightforward reading of the Settlement Agreement demonstrates that Hotchkiss breached the clear and unambiguous provisions concerning (i) the Committee and (ii) its apology to Doe.



---

as the Court must, Plaintiff has established that he offered to restore [party] to its former condition as nearly as possible.  Accordingly . . . [the] Contract . . . is hereby rescinded").

██████████████████████████████████████████

██████████████████████████████████████

### B. The Settlement Agreement Prohibits Hotchkiss's Improper Naming Of The Committee.

The Settlement Agreement's plain language requires a committee named the "Sexual Misconduct Advisory Committee." (Am. Compl. ¶¶ 9, 90-97.) Hotchkiss's argument that "[t]he Settlement Agreement does not dictate a specific title, stating only that the School shall form 'a' Sexual Misconduct Advisory Committee (as opposed to 'the' 'Sexual Misconduct Advisory Committee')" (Mtn. at 27) is too cute by half, and ignores that "Sexual Misconduct Advisory Committee" is the specific name delineated, with capital letters, in the Settlement Agreement.

As the Amended Complaint alleges, that wording was deliberate and intentional, chosen by Doe in an effort to focus on past abuse and preventative reforms, and agreed to by Hotchkiss. (Am. Compl. ¶¶ 96-97.) Nevertheless, Hotchkiss unilaterally misnamed the Committee the "Advisory Committee for Sexual Misconduct Prevention and Education," thus diluting its title, altering its purpose, and blunting its force. Based on a plain reading of the Settlement Agreement, Hotchkiss's improper naming of the Committee breached the agreement.

### C. The Settlement Agreement Prohibits Hotchkiss's Improper Constitution Of The Committee.

The Settlement Agreement also manifestly requires that the Committee would comprise at least three and not more than five non-trustees. (Am. Compl. ¶¶ 98-100.)

Putting aside the individuals Hotchkiss improperly permitted to participate in Committee meetings (Mtn. at 28), the Amended Complaint alleges that Hotchkiss *appointed at least eight*

---

11 ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████

*non-trustees* to the Committee, in a black-and-white violation of the agreement's requirement that the Committee include only three to five non-trustee members.  (Am. Compl. ¶¶ 131-34.)

Hotchkiss's arguments in rebuttal are a nonstarter and hinge entirely on a mischaracterization of Doe's actual allegations.  Doe alleges not only that those individuals were allowed to participate in meetings (*id.* ¶ 131), but also that Hotchkiss introduced and publicized those individuals *as members*, and permitted them to participate *as members* at meetings (*id.* ¶ 132).  That was a breach.

### D.  The Settlement Agreement Prohibits Hotchkiss's Improper And Untimely Announcement Of The Committee.

The Settlement Agreement's unambiguous terms provide that by May 29, 2020, Hotchkiss must form the Committee and announce the Committee's formation on Hotchkiss's website and alumni magazine.  (Am. Compl. ¶¶ 101-04.)  Hotchkiss's parsing of the Settlement Agreement to delineate deadlines by which it was to "create" and "announce" the Committee is nothing more than an attempt to create ambiguities in the Settlement Agreement where none exist, while at the same time accusing Doe of "graft[ing] additional obligations" thereunder.

The Amended Complaint does not "graft" or otherwise attempt to read the Settlement Agreement in any way other than in accordance with its express terms, which direct that Hotchkiss was to form and announce the Committee's formation – on Hotchkiss's website and in its alumni magazine – by May 29, 2020.  Hotchkiss's failure to publish an announcement about the Committee's formation in *Hotchkiss Magazine* until year-end 2020, more than six months (approximately two magazine issues) after the May 29, 2020 deadline, was a straightforward breach of the Settlement Agreement.

**E.  The Settlement Agreement Prohibits Hotchkiss's Insincere And Feigned Apology.**

As alleged in the Amended Complaint, the Apology provision in the Settlement Agreement, Section 2.3, requires that "[u]pon the Effective Date, the School will deliver to John Doe a written apology, the text of which is attached hereto as Attachment A."  (Am. Compl. ¶ 108.)  The Apology was at the heart of Doe's agreement to settle the case, and each of the provisions concerning the Apology was deliberately intended, and carefully crafted, to cement the seriousness, solemnity, and unequivocal nature of Hotchkiss's atonement.

Hotchkiss agreed to those provisions, but now seeks to morph the unambiguous Settlement Agreement into a different contract, riddled with variant meanings.  (Mtn. at 30-31.)  But to no avail.  The Settlement Agreement *does* direct *Hotchkiss* (not anyone else) to deliver the written Apology, directly to Doe, upon the effective date of the agreement.  (Am. Compl., Ex. 1 § 2.3 ("Upon the Effective Date"; "the School" "will deliver" "to John Doe" a written apology); *compare* § 2.1 ("the School will *cause to be delivered* to Lieff Cabraser Heimann & Bernstein, LLP, *as counsel for and on behalf of* John Doe") (emphasis added).)  Hotchkiss breached that provision of the Settlement Agreement by, among other things:  (i) failing to deliver the Apology personally to Doe; (ii) ultimately delivering a purported but defective apology from Hotchkiss's outside counsel not addressed to Doe; (iii) omitting Doe's legal name from the apology; and (iv) failing to have its Board of Trustees' Co-Presidents actually sign the purported Apology.  (Am. Compl. ¶¶ 161-66.)

Each of these breaches by Hotchkiss denigrated the parties' agreed-upon Apology protocol, which is unsurprising given Hotchkiss's more-fundamental breach – delivering a non-apology Apology that was completely insincere, that reflected no genuine remorse or commitment to change, and that ultimately was nothing but empty words.  The Amended

Complaint details how Hotchkiss actually conducted itself after delivering the Apology (*id.* ¶¶ 180-84) – a course of conduct that was just more-of-the-same, and that put the lie to Doe's concept of an apology (a concept attested to in extensive academic literature, *id.* ¶¶ 113-16). Hotchkiss's conduct was completely at odds with the words of the Apology itself, by which Hotchkiss solemnly undertook that: "the School is doing everything within our power to ensure that students now and in the future will be cared for and safe." (Am. Compl., Ex. 1, Attachment A.) A rote recitation of empty words, with no sincerity, no remorse, and no commitment to change, is not an apology at all – and was not an apology under the Settlement Agreement.

In sum, Hotchkiss's numerous breaches of the Settlement Agreement's plain and unambiguous terms demonstrate that Doe has stated a claim for breach of contract.

### F. Alternatively, The Settlement Agreement's Implied Duty Of Good Faith And Fair Dealing Prohibits Hotchkiss's Breaches.

The Amended Complaint states an alternative contract claim for breach of the implied duty of good faith and fair dealing, to the extent the Court finds that certain contractual obligations of Hotchkiss are not expressly set forth in the Settlement Agreement.

Hotchkiss does not seriously challenge this alternative claim for breach. Its exclusive premise for dismissing the claim is that the breaches "rest upon rights and obligations not found in the plain and unambiguous language of the Settlement Agreement." (Mtn. at 25-26.) But that argument is self-defeating. The whole point of a good faith and fair dealing claim is to allow recourse for breaches of a contract's non-explicit, *implied* terms. *See Landry v. Spitz*, 925 A.2d 334, 341 (Conn. App. 2007) ("It is axiomatic that the duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship."). Thus, Hotchkiss's argument for dismissing this claim easily falls flat.

IV.    **The Amended Complaint States Causes Of Action For Intentional And Negligent Infliction Of Emotional Distress.**

The Amended Complaint pleads claims for intentional and negligent infliction of emotional distress based on two distinct categories of misconduct, both of which resulted in foreseeable illness and bodily harm to Doe:  (i) Hotchkiss's historical acts that fostered, facilitated, and concealed the sex abuse that Doe and other victims and survivors suffered, and (ii) Hotchkiss's intentional and callous false promises to Doe during settlement negotiations to deceive him into settling the 2015 Action.  (Am. Compl. ¶¶ 29-34, 35-49, 69-89.)

Hotchkiss's only argument for dismissing these claims is that they were supposedly "released and dismissed."  (Mtn. at 21.)  Not so.  Once again, the claims were not released in light of Hotchkiss's fraud and material breaches.  *Supra*, at Sections II, III.  For the same reason, Doe has the right to resurrect the emotional distress claims based on Hotchkiss's historical misconduct.  *Id.*; *see also infra*, at Section V.  And the emotional distress claims based on Hotchkiss's fraud and breaches in connection with and postdating the Settlement Agreement are new to the instant action and thus never "dismissed."

V.    **DOE PROPERLY REVIVES THE SEX ABUSE CLAIMS HE WAS DEFRAUDED INTO SETTLING.**

Last but not least, Doe has stated sex abuse claims, because Hotchkiss's fraud and material breaches of the Settlement Agreement warrant either rescission of the Settlement Agreement or a declaration that Doe is excused from performing the release provision of that agreement.  Either remedy, in turn, revives Doe's sex abuse claims.  *See supra*, at Sections II, III; *Microboard Processing, Inc. v. Crestron Elec., Inc.*, 2011 WL 1213177, at *4 n.3 (D. Conn. Mar. 29, 2011) ("[u]nder Connecticut law, an uncured, material failure of performance by one contracting party discharges the other party from any further performance under the contract, which is rendered unenforceable"); *see generally Warner v. Rossignol*, 513 F.2d 678, 683 (1st

Cir. 1975) (collecting cases giving "strong support to the presumption that a settlement agreement, however labeled, will not bar recourse to the original cause of action in the event that defendant repudiates or commits a breach of the terms of the agreement").

In addition to arguing without merit that the sex abuse claims are barred by claim and issue preclusion (*see supra*), Hotchkiss's only other argument for dismissing those claims is that they should have been brought in the context of a motion to reopen, modify, or vacate the Court's judgment in the 2015 Action.  That hypertechnical contention is refuted by the law.

There is simply no authority, and Hotchkiss cites none, requiring that Doe bring an action for fraud or breach of contract through the vehicle of a motion to vacate or reopen the prior action.  Instead, courts are clear that such actions may be brought either as a motion to enforce *or* as a separate action for fraud or breach, coupled with the underlying claims that were settled. *See, e.g.*, *Yeadon v. New York City Transit Auth.*, 719 F. Supp. 204, 211 (S.D.N.Y. 1989) ("If fraud is thus proved, the plaintiff must then elect remedies:  he must either seek rescission of the settlement and sue again on his original claims, or bring a claim for the fraud in connection with the settlement.  Whether he elects to pursue his new fraud claim or to rescind and pursue his original claims, the damages will reflect the value of the original claims.") (citations omitted).

Indeed, in every case where, as here, a defendant raises claim or issue preclusion, the court in the *new* action decides the preclusive effect of the prior action.  The plaintiff is not required to seek to reopen the prior action in order to bring new claims.  That is not how the Federal Rules work, and Hotchkiss cannot invent procedural roadblocks to deny Doe his substantive right to elect to bring his new claims in a new action – flowing from, no less, new misconduct by Hotchkiss that was never before litigated and never before decided.

Thus, Hotchkiss's procedural argument affirmatively contravenes the law and must fail.

**CONCLUSION**

For the reasons stated, Plaintiff respectfully requests that the Court deny Hotchkiss's

motion to dismiss in its entirety.[12]

Dated:    November 21, 2023        **GLENN AGRE BERGMAN & FUENTES LLP**

By:    _/s/ Jed I. Bergman_____

Jed I. Bergman (admitted *pro hac vice*)
Tian "Skye" Gao (admitted *pro hac vice*)
Megan M. Reilly (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, NY 10036
Tel: (212) 970-1600
jbergman@glennagre.com
sgao@glennagre.com
mreilly@glennagre.com

-and-

**ZEISLER & ZEISLER, P.C.**

By:    _/s/ Aaron A. Romney_____
Aaron A. Romney (ct28144)
10 Middle Street
Bridgeport, CT 06604
Tel: (203) 368-4234
Fax: (203) 367-9678
aromney@zeislaw.com

*Counsel for Plaintiff John Doe*

---

[12]    While leave to amend is unnecessary, Doe is entitled to amend to supplement his allegations. *See, e.g.*, *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) ("[L]eave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.*, if it appears *beyond doubt* that the plaintiff can plead no set of facts that would entitle him to relief") (emphasis added).  Accordingly, if the Court for any reason is inclined to dismiss the Amended Complaint, Doe respectfully requests leave to file a further amended pleading to address any issues identified by the Court.