## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JOHN DOE,<br>　　　*Plaintiff*,<br><br>　　　v.<br><br>HOTCHKISS SCHOOL,<br>　　　*Defendant*. | No. 3:22-CV-1088 (VAB) |

### AMENDED RULING AND ORDER ON MOTION TO DISMISS[1]

John Doe ("Plaintiff") has sued The Hotchkiss School ("Hotchkiss" or "Defendant") for breaching the settlement agreement that resolved a prior lawsuit arising out of the abuse Doe suffered while a student at Hotchkiss School. *See Doe v. Hotchkiss School*, No. 3:15-CV-160 (VAB) ("the 2015 Case"). Mr. Doe seeks to rescind the prior settlement, revive his claims against Hotchkiss, and recover compensatory and punitive damages. Am. Compl. at 65, ECF No. 59 (Aug. 31, 2023) ("Am. Compl."); Pl. John Doe's Mem. of L. in Opp'n to the Hotchkiss School's Mot. to Dismiss the Am. Compl. at 8, ECF No. 68 (Nov. 21, 2023) ("Opp'n"). Mr. Doe brings claims for breach of contract; breach of the implied covenant of good faith and fair dealing; fraud and fraudulent inducement; negligent misrepresentation; negligence; recklessness; negligent infliction of emotional distress; intentional infliction of emotional distress; and breach of fiduciary duty. Am. Compl. ¶¶ 187–266.

Hotchkiss has moved to dismiss the Amended Complaint in its entirety under the doctrines of *res judicata* and collateral estoppel, or, in the alternative, for failure to state a claim. Def.'s Mot. to Dismiss Pl.'s Am. Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) at 1–2, ECF No. 63

---

[1] This Amended Ruling and Order does not differ in substance to the Court's previous Ruling and Order, ECF No. 89.

(Oct. 31, 2023) ("Mot.").

For the following reasons, the motion to dismiss is **GRANTED**.

Mr. Doe may file a Second Amended Complaint by **September 13, 2024**, provided he can address the specific deficiencies in his Amended Complaint, laid out in more detail below.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

In 2015, Mr. Doe sued Hotchkiss in this Court, seeking damages and other relief arising from the sexual abuse he suffered while a student at Hotchkiss. Am. Compl. ¶ 8 (citing the 2015 Case).

In 2020, the parties entered into a settlement agreement that resolved all claims brought by Mr. Doe in the 2015 Action (the "Settlement Agreement"). *Id.* ¶ 1.

As part of the Settlement Agreement, Hotchkiss allegedly agreed:

1. To form a Sexual Misconduct Advisory Committee ("the Committee"), conforming to specific requirements as to its composition and operation, whose aim was to make "specific, lasting, meaningful, and impactful changes to acknowledge and address Hotchkiss's history of sexual abuse, atrocities, and institutional betrayal of Doe and others[,]"
2. To deliver to Doe, "at the same time that Hotchkiss executed the Settlement Agreement," a physically signed apology, "ratified by a resolution of Hotchkiss's Board of Trustees," for all of the misconduct underlying the 2015 Case ("the Apology"),
3. By its apology, to "acknowledge and no longer deny that Hotchkiss and its faculty, staff, trustees, proctors, and agents had committed the acts explicated in the 2015 Action's complaint[,]"
4. To "acknowledge and no longer deny that those wrongful acts had caused Doe to suffer physical and psychological traumas and other severe[,]" and
5. To "commit to sustained institutional change going forward," including by crediting reports of sexual abuse of numerous children by past and current faculty members.

*See id.* ¶¶ 9–10.

Hotchkiss's promises to Doe were allegedly "a ruse and sham." *Id.* ¶ 12. Hotchkiss

allegedly breached material terms of the Settlement Agreement by:

1. Misnaming and inappropriately forming the Committee by appointing more members than agreed upon, which allegedly "hindered the Committee from being productive and functional[,]"
2. Causing nonmembers adverse to the Committee's purpose to obstruct and dictate Committee affairs,
3. Delaying the announcement of the Committee's formation, and
4. Failing to deliver the Apology to Doe personally or by the requisite deadline.

*Id.* ¶ 13.

Additionally, after execution of the Settlement Agreement, Mr. Doe allegedly learned that Hotchkiss had intentionally made false representations during settlement negotiations, including claiming that it "intended to implement, lasting, meaningful, and specific institutional reforms." *Id.* ¶ 14. Hotchkiss also allegedly intentionally withheld material information during discovery in the 2015 Case, in order "to conceal the full extent of its knowledge of, and failure to address, widespread sex abuse, and to deceive and mislead Doe about the value of his sex abuse claims." *Id.*

These allegedly material breaches, including the alleged fraud, allegedly caused and continue to cause Mr. Doe grave and irreparable harm, including aggravating Mr. Doe's severe PTSD, trauma, emotional distress, and mental anguish. *Id.* ¶ 15.

### B. Procedural History

On August 26, 2022, Mr. Doe filed the Complaint. Compl., ECF No. 1.

On September 19, 2022, Hotchkiss filed a motion to reassign the case from the docket of the Honorable Janet C. Hall to this Court. Mot. to Reassign, ECF No. 32.

On September 21, 2022, the case was transferred to this Court. Order of Transfer, ECF No. 35.

On October 24, 2022, Hotchkiss filed a motion to dismiss. Mot. to Dismiss, ECF No. 38.

On August 31, 2023, Mr. Doe filed an Amended Complaint. Am. Compl.

On October 31, 2023, Hotchkiss filed a motion to dismiss the Amended Complaint. Mot.

On November 21, 2023, Mr. Doe filed a memorandum in opposition to the motion to dismiss. Opp'n.

On December 12, 2023, Hotchkiss filed a reply to Doe's response to the motion to dismiss. Def.'s Reply Brief in Support of the Mot. to Dismiss Pl.'s Am. Compl., ECF No. 75 ("Reply").

On July 17, 2024, the Court heard oral arguments on the motion. Min. Entry, ECF No. 86.

On July 19, 2024, Mr. Doe submitted a Notice of Supplemental Authority. Not. of Supp. Auth., ECF No. 87.

On July 23, 2024, Hotchkiss responded. Def.'s Response to Not. of Pl.'s Supp. Auth., ECF No. 88.

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]

to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### III.   DISCUSSION

Mr. Doe seeks rescission of the Settlement Agreement, which ended the 2015 Case. He alleges that Hotchkiss has materially breached the Settlement Agreement, thereby relieving him from any obligation to perform under the Agreement's release provision. Am. Compl. ¶ 16. Alternatively, Mr. Doe argues that the Settlement Agreement is no longer enforceable because it was procured by fraud. *Id.* Under either theory, Mr. Doe argues that he is entitled to renew his prior claims arising from his sexual abuse while a student at Hotchkiss, while also bringing new claims for breach of contract, fraud, and infliction of emotional distress based on Hotchkiss's post-settlement conduct. *Id.*

Hotchkiss argues that the Amended Complaint should be dismissed in its entirety. Mot. at 1.

First, Hotchkiss asserts that Mr. Doe's claims are barred under the doctrines of *res judicata* and collateral estoppel, based on this Court's prior Order to enforce the Settlement Agreement, an order which was subsequently upheld by the Second Circuit. *Id.*

Second, Hotchkiss argues that Mr. Doe's claims must be dismissed for failure to state a claim under Fed. R. Civ. P 12(b)(6) because: (1) the alleged material breaches of the Settlement Agreement fail as a matter of law because they are contradicted by the plain and unambiguous terms of the contract, *id.* at 1–2; (2) Mr. Doe's alleged fraudulent inducement claims fail because they have already been litigated or are otherwise precluded by the merger clause of the Settlement Agreement, *id.* at 2; and (3) Mr. Doe has failed to satisfy a condition precedent to seeking rescission—offering to return the settlement proceeds to Hotchkiss—and that Doe cannot revive previously released claims of sexual abuse simply by declaring the Settlement Agreement void, *id.*

The Court addresses each argument in turn.

### A.  The Applicability of the Doctrines of *Res Judicata* and Collateral Estoppel

*Res judicata* and collateral estoppel are related but distinct doctrines that, under certain circumstances, preclude a party from litigating certain claims or issues that were or could have been raised in a prior action. *See Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999).

Under the doctrine of *res judicata*, or claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). *Res judicata* assures the finality of judgments and provides that "a party may not split causes of action that could be brought and resolved together." *Vandever v. Emmanuel*, 606 F. Supp. 2d 253, 254 (D. Conn. 2009) (internal quotation marks omitted); *see also Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995).

The doctrine of collateral estoppel, or issue preclusion, "provides that 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Faraday v. Blanchette*, 596 F. Supp. 2d 508, 514 (D. Conn. 2009) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994)). Collateral estoppel "applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Flaherty*, 199 F.3d at 613 (internal quotation marks omitted) (quoting *U.S. v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999)).

Collateral estoppel is "both narrower and broader than res judicata[,]" in that it "bars *any* issue that was raised and litigated in a prior proceeding from being subsequently relitigated in a different, parallel proceeding, provided that the first proceeding offered the litigant a full and fair opportunity to litigate the issue" but it "does not prevent a litigant from raising, in a later proceeding, an issue that he could have, but did not, raise in the first proceeding." *Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999) (emphasis in original).

Hotchkiss argues that Counts One through Four (breach of contract, breach of implied covenant of good faith and fair dealing, fraudulent misrepresentation, and negligent misrepresentation) are barred by both *res judicata* and collateral estoppel. Mem. of L. in Supp. of Mot. to Dismiss Pl.'s Am. Compl. at 29–30, ECF No. 63-1 (Oct. 31, 2023) ("Mem."). More specifically, Hotchkiss argues that these counts advance claims and issues that were fully adjudicated by the Court in 2020, in the context of the Ruling and Order on Motion and Cross-Motion to Enforce Separate Settlement Agreements at 22, *Doe v. Hotchkiss*, No. 3:15-CV-160, ECF No. 417 (July 24, 2020) ("Order Enforcing Settlement Agreement"), in which this Court held that "the respective rights of the parties under the Current Settlement Agreement now have been fulfilled" and that dismissal of the case was therefore appropriate. *See* Mem. at 32.[2]

Mr. Doe responds that the issues raised in this suit cannot be barred by *res judicata* or collateral estoppel because they were not and could not have been raised in the context of the 2015 Case. Opp'n at 25. In his view, the Order Enforcing Settlement Agreement stemmed from an *Audubon* hearing conducted by the Court to determine "whether the parties entered into an enforceable settlement agreement, and if so, which iteration of the agreement was valid and

---

[2] At that time, Mr. Doe and Hotchkiss each sought to enforce a different version of the settlement agreement. Order Enforcing Settlement Agreement at 1. The Court found that Mr. Doe had ratified the Settlement Agreement at issue in this case, and therefore determined that the Settlement Agreement was enforceable. *Id.* at 21–22.

binding." *Id.* at 27 (citing *Audubon Parking Assocs. Ltd. P'ship v. Barclays & Stubbs, Inc.*, 626 A.2d 729 (Conn. 1993)). Mr. Doe argues that he could not have raised issues related to Hotchkiss's breach or fraud in the context of the *Audubon* hearing, as such claims would have been outside the scope of the hearing. *Id.* at 28. Finally, Mr. Doe argues that at least some of Hotchkiss's breaches and fraud came to light after the Court's ruling and therefore could not have been considered in that decision. *Id.*

Hotchkiss replies that the Court's Order found that Mr. Doe had ratified the Settlement Agreement by accepting all of its benefits, and that Mr. Doe did not contest or appeal this finding at the time, thereby precluding him from raising the issue again in the context of this case. Reply at 2. Hotchkiss also contests Mr. Doe's characterization of the scope of an *Audubon* hearing, arguing that issues related to breach are routinely resolved in the context of such hearings. *Id.* at 2–3. As a result, in Hotchkiss's view, by failing to raise any of his claims related to Hotchkiss's alleged breach of the Settlement Agreement in the context of the *Audubon* hearing, Mr. Doe conceded them. *Id.* Finally, Hotchkiss asserts that facts underlying Mr. Doe's breach claims were mostly known to him by early 2020, and therefore the claims could have been raised in briefing regarding cross-motions to enforce different versions of the settlement agreement. *Id.* at 3.

The Court disagrees.

In *Audubon*, the Connecticut Supreme Court held that "a trial court may summarily enforce a settlement agreement within the framework of the original lawsuit as a matter of law when the parties do not dispute the terms of the agreement." 626 A.2d at 733. The court explained that the power to order summary enforcement was "not only essential to the efficient use of judicial resources, but also preserve[d] the integrity of settlement as a meaningful way to resolve legal disputes." *Id.* Although in *Audubon* the key factor justifying the court's ability to

summarily enforce a settlement agreement was the absence of factual dispute, the Connecticut

Supreme Court later broadened the parameters under which courts could exercise such powers.

In *Ackerman v. Sobol Family Partnership, LLP*, the court held that that, in the context of an

*Audubon* hearing, a court could also resolve factual disputes connected to the motion to enforce

the settlement agreement. 4 A.3d 288, 313 (Conn. 2010). There, the court found there was no

right to a jury trial on questions of fact raised in the context of a motion to enforce, because the

motion was "essentially equitable in nature." *Id.*

Yet, even following *Ackerman*, Connecticut courts have cautioned against applying the

power conferred by *Audubon* outside of the appropriate context. Because "[t]he rule of *Audubon*

effects a delicate balance between concerns of judicial economy on the one hand and a party's

constitutional rights to a jury and to a trial on the other hand[,]" applying *Audubon* powers too

broadly "den[ies] a party these fundamental rights and would work a manifest injustice." *Reiner

v. Reiner*, 210 A.3d 668, 674 (Conn. App. Ct. 2019). Cognizant of the significant limitations on

*Audubon* hearings, Connecticut courts have held that plaintiffs who seek to litigate out-of-bounds

factual issues must instead bring separate breach of contract claims. *See*, *e.g.*, *Earth Tech., Inc. v.

Fluor NE, Inc.*, No. X-06-CV-075005595-S, 2009 WL 1424649, at *2 (Conn. Super. Ct. Apr. 30,

2009) ("A motion to enforce a settlement agreement is not the same as an action for breach of

contract precisely because of this limited nature and scope of '*Audubon*' hearing. . . . The narrow

evidentiary inquiry of an '*Audubon*' hearing is solely to determine whether there is any dispute

about the existence, terms and enforceability of a clear and unambiguous agreement, not to

resolve such disputed facts if they exist."); *Doe v. Bemer*, No. CV-175032881-S, 2021 WL

2458375, at *4 (Conn. Super. Ct. May 28, 2021) (quoting the same section of *Earth Tech., Inc.*

above and emphasizing that, "[i]f summary enforcement [under *Audubon*] is unavailable, a

common-law breach of contract action is still available, where factual disputes not amenable to disposition in a summary enforcement proceeding may be adjudicated and the right to a jury trial may be preserved").

Even as some courts—and Hotchkiss—have emphasized that the central policy goal of an *Audubon* hearing is to prevent the "precipitat[ion of] an additional lawsuit for breach of a settlement agreement[,]" *Audubon*, 626 A.2d at 733, this Court has not found—and Hotchkiss has not cited—any case in which a court made factual findings regarding allegations of a breach of a settlement agreement within the context of an *Audubon* hearing.[3]

Consequently, Hotchkiss's claims of *res judicata* and collateral estoppel must fail.

In its Order Enforcing Settlement Agreement, the Court enforced the Settlement Agreement, in part, based on Mr. Doe's receipt of the benefits promised under the Agreement and his failure to take any action to repudiate the Agreement. Order Enforcing Settlement Agreement at 14–17. Thus, at that time, "there [was] no issue as to whether Mr. Doe has received all of the benefits promised under the Current Settlement Agreement" and that "the respective rights of the parties under the Current Settlement Agreement now have been fulfilled[.]" *Id.* at 14, 22. Indeed, the Court did not have before it any information suggesting that Hotchkiss had failed to comply with the Settlement Agreement.

Significantly, performance under the Agreement was not the issue before the Court at that time. The Court therefore did not render "a final judgment on the merits" with respect to the

---

[3] In support of its allegation that "Plaintiff had the right to assert breach of settlement claims as part of the motion to enforce proceedings[,]" Opp'n at 30, Hotchkiss cites *Kinity v. U.S. Bancorp*, 277 A.3d 200, 221 (Conn. App. Ct. 2022). Yet that case does not stand for the proposition that a trial court may, in the context of an *Audubon* hearing, adjudicate claims of breach. Rather, the court in that case held that a court may "use its equitable powers to resolve" certain disputed factual matters "raised in connection with enforcement of the settlement agreement." *Id.* (citing *Ackerman*, 4 A.3d at 313). Importantly, in *Ackerman*, the court considered whether a court, rather than a jury, could decide "the factual question of whether there was a settlement" and, consequently, whether to enforce such a settlement. *Ackerman*, 4 A.3d at 311–12. The issue of whether the parties had performed under the settlement agreement was not at issue.

issue of breach, thereby precluding Mr. Doe from litigating that issue under the doctrine of *res judicata*. *Burgos*, 14 F.3d at 789. Nor did Mr. Doe have, in the context of the 2015 Case, a full and fair opportunity to litigate the issue of Hotchkiss's alleged breach, an essential component of collateral estoppel. *See Flaherty*, 199 F.3d at 613 ("Collateral estoppel 'applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.'" (quoting *Hussein*, 178 F.3d at 129)).

When considering whether preclusion is proper, courts must weigh the goals of "promoting judicial economy, minimizing repetitive litigation, preventing inconsistent judgments and providing repose to parties" against "the competing interest of the plaintiff in the vindication of a just claim." *Lighthouse Landings, Inc. v. Connecticut Light & Power Co.*, 15 A.3d 601, 616–17 (Conn. 2011) (quoting *Weiss v. Weiss*, 998 A.2d 766, 779 (Conn. 2010)). Indeed, "the doctrine should be flexible and must give way when [its] mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Id.*

As a result, the doctrines of *res judicata* or collateral estoppel will not be applied.

Accordingly, Mr. Does claims regarding breach are not precluded and the Court will turn to the merits.

## B.  The Breach of the Settlement Agreement Claims

Mr. Doe has advanced two causes of actions alleging breach of the Settlement Agreement: breach of contract and breach of the covenant of good faith and fair dealing. The Court first outlines the relevant standards for each and then addresses the specific arguments

raised by the parties.

"A settlement agreement, or accord, is a contract among the parties." *Ackerman*, 4 A.3d at 312. "A contract is to be construed as a whole and all relevant provisions will be considered together." *Lar-Rob Bus Corporation v. Fairfield*, 365 A.2d 1086, 1092 (Conn. 1976). Moreover, contracts should generally be interpreted so as "to effectuate the intent of the contracting parties." *Sturman v. Socha*, 463 A.2d 527, 532 (Conn. 1983).

"Where the language is unambiguous, [a court] must give the contract effect according to its terms . . . 'the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous.'" *Cantonbury Heights Condominium Ass'n, Inc. v. Local Land Development, LLC*, 873 A.2d 898, 904–05 (Conn. 2005). "Contract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996). "Where a contract term is ambiguous, the court may properly discern the intent of the parties as to the meaning of the contract by considering extrinsic evidence." *Censor v. ASC Tech. of Conn., LLC*, 900 F. Supp. 2d 181, 194 (D. Conn. 2012) (citing *United Illuminating Co. v. Wisvest-Conn., LLC*, 791 A.2d 546, 552 (Conn. 2002)).

"The general rule with respect to compliance with contract terms . . . is not one of strict compliance, but substantial compliance." *Pack 2000, Inc. v. Cushman*, 89 A.3d 869, 878 (Conn. 2014). This principle "shields contracting parties from the harsh effects of being held to the letter of their agreements." *Id.* Under this doctrine, "a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual

performance is so similar to the required performance that any breach that may have been committed is immaterial." *Id.* On the other hand, when a party materially breaches a contract, the injured party is typically relieved from any further duty to perform under the contract. *Rokalor, Inc. v. Conn. Eating Enterprises, Inc.*, 558 A.2d 265, 169 (Conn. App. Ct. 1989), *abrogated on other grounds by AGW Sono Partners, LLC v. Downtown Soho, LLC*, 273 A.3d 186 (Conn. 2022).

Whether a contract has been materially breached, and whether a party has substantially performed its obligations thereunder, is ordinarily a question of fact to be determined by a jury. *Efthimiou v. Smith*, 846 A.2d 216, 219 (Conn. 2004); *Pack 2000*, 89 A.3d at 884.

When determining whether a breach is material, courts should consider:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Bernstein v. Nemeyer*, 570 A.2d 164, 168 n.8 (Conn. 1990) (citing Restatement (Second) of Contracts § 241).

The "duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement[.]" *Geysen v. Securitas Sec. Servs. USA, Inc.*, 142 A.3d 227, 237 (Conn. 2016) (citing *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 387–88 (Conn. 2004)). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a

14

defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Id.* at 237–38.

Mr. Doe argues that Hotchkiss has breached the Settlement Agreement by: (1) naming the Committee the "Advisory Committee for Sexual Misconduct Prevention and Education" instead of the "Sexual Misconduct Advisory Committee"; (2) delivering the Apology to his counsel instead of delivering it directly to him; (3) delivering the Apology late; (4) announcing the Committee's formation in the fall edition of *Hotchkiss Magazine*; (5) appointing additional members to the Committee; and (6) removing a Committee member before the completion of a three-year term.

Hotchkiss argues that none of these events constitutes a breach because each "rest[s] upon rights and obligations not found in the plain and unambiguous language of the Settlement Agreement." Mem. at 33–34.

Mr. Doe replies that Hotchkiss's actions "breached the clear and unambiguous provisions concerning (i) the Committee and (ii) its apology to Doe." Reply at 41.

The Court disagrees.

## 1.  The Merger Clause

The Settlement Agreement contains a merger clause, which reads as follows:

> This Agreement constitutes the complete and entire agreement and understanding of the Parties and may not be modified or changed by any prior or subsequent oral agreement, and this Agreement fully supersedes any prior agreements or understandings between the Parties, whether written or oral. It is the intention of the Parties that this paragraph be construed as a merger clause, and that this Agreement be construed as an integrated document. No amendment or variation of the terms of this agreement shall be valid unless made in writing and signed by the parties.

Settlement Agreement ¶ 6.2, ECF No. 3-1 (Aug. 26, 2022).

"[A] merger clause inserted into an agreement establishes conclusive proof of the parties'

intent to create a completely integrated contract," and where a merger clause is present, "the court is forbidden from considering extrinsic evidence[.]" *Benvenuti Oil Co., Inc. v. Foss Consultants, Inc.*, 781 A.2d 435, 439 (Conn. App. Ct. 2001) (citing *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 746 A.2d 1277, 1290–91 (Conn. 2000) (describing "the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence")). While there exist some exceptions,[4] where there is valid merger clause, courts are generally "limited to the language of the contract" when interpreting the contract. *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 78 A.3d 167, 183 (Conn. App. Ct. 2013), *aff'd but criticized on other grounds*, 153 A.3d 574 (Conn. 2016).

Because the parties agree that the Settlement Agreement contains a valid merger clause, *see* Mem. at 12; Opp'n at 35, for the purposes of determining whether Hotchkiss breached the Agreement, the Court will not consider any extrinsic evidence.

### 2. The Committee

Mr. Doe has raised a number of alleged breaches stemming from the formation of the Advisory Committee for Sexual Misconduct Prevention and Education. The Settlement Agreement states, in relevant part:

> By May 29, 2020, the School will create a Sexual Misconduct Advisory Committee (the "Committee"). . . . The Committee will consist of not less than two Trustees and at least three and not more than five non-Trustee members. Each member of the Committee will be appointed to serve for a term of three years. . . . The School will announce the formation of the Committee in the *Hotchkiss Magazine* and on the School's website and will include in these announcements the names of the Committee members, . . ..

---

[4] When interpreting a contract with a merger clause, extrinsic evidence may be considered for the following purposes: "(1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud." *TIE Commc'ns, Inc. v. Kopp*, 589 A.2d 329, 333 (Conn. 1991) (quoting *Jay Realty, Inc. v. Ahearn Dev. Corp.*, 453 A.2d 771, 773 (Conn. 1983)).

Settlement Agreement ¶ 2.5.

a.   The Name of the Committee

The plain language of the Agreement does not indicate a specific name for the

Committee. Paragraph 2.5 states only that Hotchkiss will create "a Sexual Misconduct Advisory

Committee[.]" Settlement Agreement ¶ 2.5. From the perspective of an objective, reasonably

intelligent person who has examined the context of the entire agreement, the use of the term "a"

rather than "the" suggests that the words that followed, "Sexual Misconduct Advisory

Committee," were descriptive rather than intended to delineate the title of the committee. *Nowak*,

81 F.3d at 1192 (holding that contract terms are only considered ambiguous "if they are capable

of more than one meaning when viewed objectively by a reasonably intelligent person who has

examined the context of the entire integrated agreement").

Although Mr. Doe argues that the capitalization of the terms is sufficient to indicate that

"Sexual Misconduct Advisory Committee" was the agreed-upon name of the Committee, which

Hotchkiss "unilaterally" changed, "thus diluting its title, altering its purpose and blunting its

force[,]" the Court does not agree. When read in the context of the entire paragraph, and

Agreement, there is simply no reasonable way to infer that the phrase "Sexual Misconduct

Advisory Committee" was intended by both parties to impose an obligation on Hotchkiss to

create a committee bearing that specific name. *See Lawson v. Whitey's Frame Shop*, 697 A.2d

1137, 1141 (Conn. 1997) ("A court will not torture words to import ambiguity where the

ordinary meaning leaves no room for ambiguity.").

Accordingly, as a matter of law, Hotchkiss's naming of the Committee does not

constitute a breach.

b.  The Announcement

Paragraph 2.5 contains no provision specifying the timing of the announcement of the

Committee's formation in *Hotchkiss Magazine*. The first sentence of the paragraph states that

"[b]y May 29, 2020, the School will create a Sexual Misconduct Advisory Committee[.]" The

following sentences describe the composition of the Committee—statements to which the May

29, 2020 deadline logically would not apply. Three sentences after the mention of the May 29,

2020 date, Paragraph 2.5 states that "[t]he School will announce the formation of the Committee

in the Hotchkiss Magazine and on the School's website and will include in these announcements

the names of the Committee members, . . . ." There is no explicit deadline for this announcement

and no indication that the May 29, 2020 deadline was intended to apply to this provision.

Although Mr. Doe argues that the clear and express terms of the Agreement specify that

Hotchkiss was to form and announce the Committee's formation by the May 29, 2020 date, the

Court disagrees. Read as a whole, there is simply no language to indicate that Hotchkiss was

bound to announce the formation of the Committee by May 29, 2020, and the Court "will not

torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity."

*Lawson*, 697 A.2d at 1141.

Moreover, even if the Agreement had specified that the announcement was to be made by

May 29, 2020, the alleged delay on Hotchkiss's part likely would not constitute a material

breach. "Where a time for performance is stated in an agreement, a party's tender of performance

within a reasonable time thereafter will be considered substantial performance unless the parties

intended that time for performance be of the essence." *See* J. CALAMARI & J. PERILLO,

CONTRACTS (2d ed.) § 11–22; *see also Mihalyak v. Mihalyak*, 529 A.2d 213, 217 (Conn. App.

Ct. 1987) ("Where the agreement does not specifically state that time is of the essence, it is

presumed not to be unless the parties have expressed a contrary intent."); *Grenier v. Compratt Construction Co.*, 454 A.2d 1289, 1293 (Conn. 1983) ("The fact that a contract states a date for performance does not necessarily make time of the essence.").

Accordingly, as a matter of law, Hotchkiss's announcement of the formation of the Committee in the fall issue of *Hotchkiss Magazine* did not constitute a breach of the Agreement.

### c.   The Composition of the Committee

Mr. Doe has alleged that Hotchkiss breached the settlement agreement by appointing eight non-trustee members to the Committee, when the Settlement Agreement provided that "[t]he Committee will consist of . . . at least three and not more than five non-Trustee members." Settlement Agreement ¶ 2.5.

Hotchkiss argues that Mr. Doe's allegations state only that Hotchkiss allowed non-appointed members to attend and participate in Committee meetings, something that, it emphasizes, was not prohibited by the Settlement Agreement. Mem. at 36.

Mr. Doe's Amended Complaint alleges that "Hotchkiss appointed at least eight non-trustees to the Committee," and names the following individuals: Mark Berkowitz, Ann Sprole Cheston, Christina Cooper, Brandeis Nilaja Green, Elizabeth Krimendahl, Charlie Lord, Jennifer Mahon, and Steve McKibben. Am. Compl. ¶ 131. The allegations in the Amended Complaint on this point are two-fold. First, Mr. Doe alleges that Hotchkiss introduced those eight individuals as non-trustee members of the Committee "in published announcements, emails, and an introductory meeting." *Id.* Second, he alleges that Hotchkiss "permitted them to participate" as non-trustee members, including affording them "prominent speaking roles" and allowing them to "exert[] outsize[d] influence over Committee deliberations[.]" *Id.*

As currently articulated, these allegations are insufficient to constitute a breach of the

Settlement Agreement.

As to the first point, the Settlement Agreement provides that the composition of the Committee, including the names of all members, would be announced in the Hotchkiss Magazine and on the Hotchkiss website. Settlement Agreement ¶ 2.5. Thus, according to the terms of the Agreement, those two sources—rather than other sources named in the Amended Complaint, including published announcements, emails, or verbal introductions at a meeting—constitute the definitive authority on the composition of the Committee. The Amended Complaint does not allege that either of these two sources identified more than five non-trustee members. And, at oral argument, Mr. Doe's counsel was unable to confirm that either the Hotchkiss website or the Hotchkiss Magazine announcement identified these eight alleged non-trustee members as full members of the Committee.[5] As a result, Mr. Doe's allegations on this point lack the "factual amplification . . . to render a claim plausible." *Arista Records LLC*, 604 F.3d at 120 (quoting *Turkmen*, 589 F.3d at 546).

As to the second point, any arguments that more than eight non-trustee individuals were "permitted to participate" as if they were members of the Committee must fail. Because nothing in the Settlement Agreement defines activities to be undertaken solely by Committee members, there is no basis to determine who is or is not a member of the Committee, outside of the names

---

[5] Significantly, a review of Hotchkiss's website indicates that two individuals identified in the Amended Complaint as "non-trustee members"—Christina L.M. Cooper, and Steve McKibben—are instead listed as "faculty liaisons" to the Advisory Committee, not "members." *Announcing the New Advisory Committee for Sexual Misconduct Prevention and Education*, THE HOTCHKISS SCHOOL (May 28, 2020), *available at* https://www.hotchkiss.org/post-page/~board/school-news/post/announcing-the-new-advisory-committee-for-sexual-misconduct-prevention-and-education.

Because the Settlement Agreement does not otherwise define the term "member," no plausible argument could be made that service as a "faculty liaison" makes these two individuals "members" under the Settlement Agreement. *See Lawson*, 697 A.2d at 1141 ("A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity."). If these two "faculty liaisons" are similarly listed in Hotchkiss's magazine, then there also could not be a plausible breach of contract claim arising out of allegations that these "eight non-trustees" constituted members.

listed in Hotchkiss's magazine and on Hotchkiss's website.

Accordingly, as a matter of law, Mr. Doe's claim regarding the composition of the Committee does not constitute a breach of the Settlement Agreement.

### d.   The Removal of a Committee Member

Finally, Mr. Doe alleges that Hotchkiss improperly removed a Committee member more than a year before a three-year term was to expire. Opp'n at 41. In Doe's view, the Settlement Agreement provided that a three-year term was "mandatory and unqualified," and removal before the expiration of the three-year term therefore constituted a material breach of the Settlement Agreement. *Id.*

Hotchkiss replies that the Settlement Agreement did not provide Committee members with a right to a "fixed," "unconditional," or "irrevocable" terms.

The Court agrees.

Paragraph 2.5 of the Agreement provided only that "each member of the Committee will be appointed to serve for a term of three years," and specified, to some extent, who would be appointed to be the Committee's initial members. By appointing the Committee members, including anyone specified in the Settlement Agreement, to the Committee, Hotchkiss fulfilled its obligation. There is no provision of the Agreement that specifies whether Committee members were to be removable, nor whether any Committee member's tenure was unconditional or irrevocable. And, in the absence of plain language conferring such a right onto Committee members, the Court cannot infer one. *Cantonbury Heights Condominium Ass'n, Inc.*, 873 A.2d at 904–05 ("Where the language is unambiguous, [a court] must give the contract effect according to its terms . . . .").

Accordingly, the removal of a Committee member does not constitute a breach of the

Settlement Agreement.

### 3. The Apology

Mr. Doe has alleged that the apology delivered by Hotchkiss violated the terms of the Agreement because it was late and it was delivered to his attorney, rather than being delivered to him personally.

Hotchkiss argues that the Settlement Agreement did not specify a date upon which the Apology was to be delivered, nor did it require the Apology to be delivered personally to Mr. Doe. Mem. at 38–39.

The Court agrees.

The Settlement Agreement states, in relevant part: "[u]pon the Effective Date, the School will deliver to John Doe a written apology, the text of which is attached hereto as Attachment A." Settlement Agreement § 2.3.

The text does not specify a date upon which the Apology was to be delivered to Mr. Doe. By using the term "upon," the clause suggests that sometime after the effective date of the Settlement Agreement, Hotchkiss would have an Apology delivered to Mr. Doe—an obligation that, both parties agree, Hotchkiss met. If the Effective Date were intended as a deadline, the Paragraph would more naturally have used "by" in place of "upon." Regardless, as discussed above, "[w]here a time for performance is stated in an agreement, a party's tender of performance within a reasonable time thereafter will be considered substantial performance unless the parties intended that time for performance be of the essence." *See* J. CALAMARI & J. PERILLO, CONTRACTS (2d ed.) § 11–22; *see also Mihalyak*, 529 A.2d at 217 ("Where the agreement does not specifically state that time is of the essence, it is presumed not to be unless the parties have expressed a contrary intent.").

The Court also cannot find that Hotchkiss's delivery of the letter to Mr. Doe's counsel, rather than to him personally, constituted a breach. While it is true that other clauses of the Settlement Agreement specified that certain documents and payments were to be delivered to Mr. Doe's counsel and the relevant Paragraph states that the Apology was to be delivered to Mr. Doe, this is a distinction without a difference.

"[T]he attorney-client relationship is one of agency." *Kubeck v. Foremost Foods Co.*, 461 A.2d 1380, 1383 n.6 (Conn. 1983). "[I]t is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment." *Ackerman*, 4 A.3d at 298 (quoting *Maharishi School of Vedic Sciences, Inc. (Conn.) v. Conn. Constitution Assoc. Ltd. P'ship*, 799 A.2d 1027, 1031–32 (Conn. 2002)). And, "[i]f a principal has given an agent general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority." *Ackerman*, 4 A.3d at 512 (quoting 1 Restatement (Third), The Law Governing Lawyers § 3.03, cmt. (b)).

Here, it was reasonable for Hotchkiss to deliver the apology to Mr. Doe's attorney, rather than to him personally, because Mr. Doe's counsel had been given general authority to accept documents and payments on Mr. Doe's behalf. To the extent that Mr. Doe's counsel was not authorized to accept the Apology on his behalf, it was incumbent upon Mr. Doe or his counsel to communicate that limitation to Hotchkiss. As there is no clear or explicit indication in the Agreement that only personal service on Mr. Doe would suffice, the Court cannot find that Hotchkiss should have made such a distinction. *Cf. Gordon v. Tobias*, 817 A.2d 683, 689 (Conn.

2003) ("Generally, Payment to an agent constitutes payment to the principal.").

Accordingly, as a matter of law, Hotchkiss's service of the Apology on Mr. Doe's counsel cannot be considered a breach.

### C. Fraud and Negligent Misrepresentation

In addition to the allegations of breach described above, Mr. Doe alleges that, throughout the 2015 Case and settlement negotiations, Hotchkiss made negligent and fraudulent misrepresentations of fact and omissions, in order to induce him into the Settlement Agreement. Am. Compl. ¶¶ 200, 214–15. More specifically, he argues that, during negotiations, Hotchkiss falsely represented that it intended "to implement concrete, meaningful institutional changes that would admit to and address past sexual abuse at the school." *Id.* ¶ 202. Some of these specific reforms included publicly acknowledging sex abuse allegations against a number of faculty and authority figures, removing honors for former headmaster White, and fully investigating, documenting, and admitting to Hotchkiss's history of sexual abuse. Opp'n at 32.

Mr. Doe additionally alleges that Hotchkiss fraudulently claimed that it had not entered into other comparable monetary settlements of sex abuse claims in the years preceding Mr. Doe's settlement. *Id.* ¶ 78 (Hotchkiss "promised, consistent with Hotchkiss's disclosures in ongoing discovery, that Hotchkiss had not made any other significant or comparable monetary settlements related to sex abuse lawsuits in recent years."); *id.* ¶ 183 ("Hotchkiss's own public tax filings disclose that it incurred at least $7,445,000 in settlements in the 12 months ended June 30, 2019. And in 2020, Gould himself told Doe that he had personally negotiated settlements with '10 or 11' other sex abuse victims for Hotchkiss in the year prior to the August 2019 negotiations."). He also alleges that during negotiations, Hotchkiss promised that it would fund the Settlement Payment from its own accounts, rather than having its insurer issue the payment.

Am. Compl. ¶ 79.

Finally, Mr. Doe alleges that Hotchkiss made fraudulent misrepresentations and omissions during the discovery process in the 2015 Case, namely by withholding material discovery, including investigative materials underlying two reports that this Court reviewed *in camera* and determined to be attorney-client work product. *Id.* ¶ 205; Mem. at 41; Order, 2015 Case at 6–7, ECF No. 254 (Oct. 25, 2018).

"[T]he essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury". *Capp Indus., Inc. v. Schoenberg*, 932 A.2d 453, 464 (Conn. App. Ct. 2007) (quoting *Duplissie v. Devino*, 902 A.2d 30, 38 (Conn. App. Ct. 2006), *cert. denied*, 908 A.2d 536 (Conn. 2006)).

The Restatement (Second) of Torts § 552 (1977) describes negligent misrepresentation as follows: "[o]ne who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Kramer v. Petisi*, 940 A.2d 800, 805 (Conn. 2008). The distinction between a negligent representation and a fraudulent one is that a fraudulent misrepresentation is "knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it." *Id.* at 806 n.9 (internal quotation marks omitted).

While, as discussed above, the presence of a merger clause in a settlement agreement will generally bar the consideration of extrinsic evidence, *see Tallmadge Bros. v. Iroquois Gas*

*Transmission Sys., L.P.*, 746 A.2d 1277, 1291–92 (Conn. 2000), "[a] merger clause, of course, will not operate as a bar to the introduction of evidence of fraud by one of the contracting parties. The opportunity to present evidence of fraud long has been recognized as an exception to the parol evidence rule." *Id.*

Hotchkiss argues that Mr. Doe "cannot allege that he relied upon statements made by Hotchkiss during negotiations in August of 2019 because the Settlement Agreement contains both a merger clause and a disclaimer of reliance." Mem. at 43. As to Mr. Doe's claims regarding discovery issues, Hotchkiss argues that its claims of privilege in the 2015 Case cannot be factual misrepresentations because: (1) privilege assertions are legal positions rather than factual statements, (2) Mr. Doe had an opportunity to challenge Hotchkiss's claims of privilege and did so in the context of the 2015 Case, (3) the Court completed an *in camera* review of the documents and concluded that they represented attorney-client work product, and (4) by the time Mr. Doe entered into the Settlement Agreement, discovery had already closed and he therefore had no right to seek additional discovery or to challenge privilege assertions made by Hotchkiss. *Id.* at 40–41.

Mr. Doe responds that Connecticut law prevents parties from contracting against fraud and generally allows parties to bring claims sounding in fraud, despite the existence of a merger clause. Opp'n at 34. He argues that courts are especially willing to allow plaintiffs to advance fraud claims in cases where the merger or non-reliance clause is generic or boilerplate—as, he contends, in this case. *Id.* at 35.

The Court disagrees.

As a matter of law, a merger clause does not preclude claims of fraudulent inducement. *See ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.*, 407 F. Supp. 3d 98, 104 (D. Conn. 2019)

("a contractual merger clause does not preclude a plaintiff from claiming that a defendant's fraudulent misrepresentation induced the plaintiff to enter into the contract"); *FIH, LLC v. Foundation Capital Partners LLC*, 920 F.3d 134, 140–41 (2d Cir. 2019) (reversing the district court's holding that the merger clause made plaintiff's reliance on defendants' misrepresentations unreasonable as a matter of law, and instead holding that "the issue of reasonable reliance requires [courts to] consider 'the entire context of the transaction, including . . . its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.'" (citing *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006))).

And, while the Connecticut Supreme Court has not yet definitively ruled on the effect of a merger clause on the viability of a claim of negligent misrepresentation, several Connecticut courts have held that such claims may proceed. *See ARMOUR Cap. Mgmt. LP*, 407 F. Supp. 3d at 105 ("In light of my duty to predict how the state's highest court would rule on this issue, I conclude that the Connecticut Supreme Court would most likely rule that a contract's merger clause does not categorically preclude a negligent misrepresentation claim." (citing *Gibson v. Capano*, 699 A.2d 68, 72 (Conn. 1997) (citing prior precedent in which "[w]e concluded that a seller's misrepresentations as to the boundaries of land to be sold, if made negligently or recklessly and relied upon by a buyer without conducting an independent survey, can support an award of damages even if the written contract constitutes the entire agreement of the parties, specifically disclaims any representations of the buyer as to the condition of the land, and contains a contrary description of the land"))); *Solomon v. Rosenberg*, No. LLI-CV-21-6028891-S, 2022 WL 20279168, at *9 (Conn. Super. Ct. June 28, 2022) (following *ARMOUR Cap. Mgmt.*

*LP*, 407 F. Supp. 3d at 104).[6]

Here, in addition to the merger clause, there was other express language in the Settlement Agreement affirming that "in entering into this Agreement, [Mr. Doe] expressly understands and agrees that he relies upon his own judgment, belief, and knowledge of the nature, extent, and duration of his injuries and damage, and that he has not been influenced to any extent whatsoever in entering into this Agreement by any representations, statements, suggestions, indications, or other expression regarding any matter by the School Releasees or any of them." Settlement Agreement § 4.3. Mr. Doe nevertheless claims to have been induced to enter the Settlement Agreement based on various false representations by Hotchkiss.[7]

The Court agrees with Mr. Doe that, consistent with applicable Connecticut law, merger clauses and disclaimer language do not categorically foreclose a subsequent claim of fraudulent inducement. The Court is unpersuaded, however, that Mr. Doe's allegations in the Amended Complaint constitute fraud, as contemplated by the relevant caselaw.

Significantly, the Connecticut Supreme Court in *Gibson*, while not categorically foreclosing the type of claim brought by Mr. Doe, did not leave the door open far enough to

---

[6] Citing *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, Hotchkiss suggests that statements made before the signing of a contract cannot support a claim of negligent misrepresentation, where a merger clause is present. 78 A.3d 167, 186 (Conn. App. Ct. 2013), *aff'd but criticized*, 153 A.3d 574 (Conn. 2016) ("Given the presence of the merger clause in the contract and the fact that these representations were made prior to the signing of the contract, however, it would be unreasonable for the plaintiff to rely on these representations. The representations were made prior to the plaintiff signing the contract. Such representations were explicitly superseded by the merger clause. The language of the merger clause made it clear to the plaintiff that [the defendant] did not intend to be bound by any representation made prior to the contract being signed and, therefore, reliance by the plaintiff on any such representation would not have been reasonable."). Yet, as noted by U.S. District Judge Jeffrey A. Meyer in *ARMOUR Cap. Mgmt. LP*, that case "does not acknowledge or reckon with contrary authority of both the Connecticut Appellate Court and the Connecticut Supreme Court, [and therefore] its holding does not undermine" the conclusion that a merger clause will not categorically preclude claims of negligent misrepresentation. 407 F. Supp. 3d at 104.

[7] To the extent that Hotchkiss argues that its prior claims of privilege in the 2015 Case were not statements of fact and therefore cannot constitute false representations, *see* Mem. at 40–41, the Court declines to address this issue at this time, although this aspect of the claim fails for reasons discussed below. Mr. Doe has alleged that Hotchkiss misrepresented facts pertaining to the preparation of two reports, which affected this Court's determination that they were privileged. Opp'n at 21–22. Accordingly, he appears to contest not only Hotchkiss's legal argument that the reports were privileged, but also its factual representations related to the reports' provenance.

allow this lawsuit to proceed past this preliminary stage. The court there reiterated that: "It is well established that where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." *Gibson*, 699 A.2d at 71–72 (citation and internal quotation marks omitted). The court further noted that: "We will not import terms into this agreement, however, that are not reflected in the contract. It is axiomatic that courts do not rewrite contracts for the parties . . . ." *Id.* (citations and internal quotations omitted). As a result, in that case, the Connecticut Supreme Court "conclude[d] that the clear and unambiguous disclaimer of warranties in the contract between the plaintiffs and the defendants must be given effect and that the breach of warranty claim [was] precluded."

Moreover, in *Gibson*, the Connecticut Supreme Court relied on its earlier decision in *Warman v. Delaney*, 172 A.2d 188 (1961), where it permitted a fraudulent inducement claim to survive with respect to a contract because, in that property transaction, the defendant knew or should have known that the plaintiffs relied on her false representations regarding material attributes of the property—namely, the boundaries of the property, the state of the grounds, and the structures on the property. *Warman*, 172 A.2d at 189. In permitting this type of claim the *Warman* court reiterated that these claims were permissible because the plaintiffs were "not seeking to add to, subtract from or alter the terms of the written contract itself." *Id.* at 190.

Notably, and not surprisingly since *Warman*, fraudulent or negligent misrepresentation claims allowed to progress, despite the existence of a merger clause or disclaimer language in the contract, generally arise in the context of real estate transactions. *See, e.g.*, *Martinez v. Zovich*, 867 A.2d 149, 156 (Conn. App. 2005) ("A claim that a seller's intentional, reckless, or negligent misrepresentations caused a buyer to enter into a contract for the sale of property is a valid cause of action, even if the contract that the parties entered into constituted the entire agreement

between the parties and the contract included a clause disclaiming any representation by the seller as to the condition to the property." (citation omitted)); *Foley v. Huntington Co.*, 682 A.2d 1026, 1035 (Conn. App. 1996) ("A misrepresentation by a seller as to the boundaries of land to be sold, if made negligently or recklessly and relied upon by a buyer without conducting an independent survey, can support an award of damages even if the written agreement constitutes the entire agreement of the parties and the contract specifically disclaims any representations of the seller as to the condition of the land and contains a contrary description of the land." (citations omitted)); *see also Hull v. Fonck*, 999 A.2d 775, 779 (Conn. App. Ct. 2010) (citing to *Martinez*, 867 A.2d at 151, as to the scope of such claim).

Put another way, fraudulent or negligent misrepresentation claims are available to ensure that the parties receive precisely what they bargained for—often, in the case of the paradigmatic real estate transaction, this means good title or the property in exactly the condition (or quantity) promised—nothing more, and certainly not anything less. *See Hull*, 999 A.2d at 780 (noting that "defendant's misrepresentation in this case was reinforced by his representation in the contract of sale that the floor areas under any rugs or furniture were in substantially the same condition and material as the floor areas that were visible to inspection by the plaintiff"); *Martinez*, 867 A.2d at 156 (noting that "defendant represented to the plaintiffs that the property being sold was a three-floor dwelling with an illegally converted attic to make it appear to be a legal three-family dwelling . . . . [and] plaintiffs were unaware of the true nature of the property when they entered into the contract and they only entered into the contract because of the defendant's misrepresentations"); *Foley*, 682 A.2d at 1035 (noting that, "[t]he misrepresentation was not that a 3.74 acre parcel would meet zoning regulations, but that [the seller] would sell enough land for the operation of a nursing home.").

In contrast, Doe's alleged fraudulent and negligent misrepresentation claims seek not to obtain what he bargained for within the Settlement Agreement, but rather, something beyond what precisely was bargained for.[8] This is especially true of Hotchkiss's alleged misrepresentations about actions and reforms the institution allegedly intended to implement in the future, but which were not enumerated within the Agreement. Am. Compl. ¶ 14 ("[A]fter the Settlement Agreement was executed, Doe learned that Hotchkiss had intentionally made false representations during settlement negotiations that it was, at such time, in the process of implementing, or intended to implement, lasting, meaningful, and specific institutional reforms."). But it also is true of Mr. Doe's allegations that Hotchkiss misled him about its history of settling sexual abuse cases with other victims or misrepresented the true nature of two experts in the 2015 Case. *Id.* ¶ 167 ("Hotchkiss withheld material information from Doe throughout discovery in the 2015 Action. Had Doe been aware of these critical facts and documents, he would not have entered into the Settlement Agreement."); *id.* ¶ 183 ("Hotchkiss deceived Doe when claiming that it did not enter into significant or comparable monetary settlements for sex abuse lawsuits in recent years.").

---

[8] The cases cited by Mr. Doe in his Notice of Supplemental Authority, ECF No. 87 (July 19, 2024), are distinguishable based on this point. Two of the Connecticut cases involve allegations of misrepresentations that affected the value of benefits conferred by the settlement. *See Beckenstein v. Naier*, No. HHD-CV-085-019254-S, 2010 WL 4885648, at *1–2 (Conn. Super. Ct. Nov. 4, 2010) (defendant alleged fraudulent inducement as a special defense, arguing that it was induced to settle based on plaintiffs' false representation that they would exchange properties owned by the parties' partnerships for "like kind" property, rather than sell the properties to third parties, resulting in a liquidation of interests for less than full value); *Gold Ridge Micro Cap I v. Aftokinito Properties, Inc.*, No. DBD-CV-13-6011692-S, 2015 WL 13633279, at *1–2 (Conn. Super. Ct. Dec. 18, 2015) (plaintiff was induced to settle based on defendant's false claim that it owned ten antique vehicles, which were to serve as collateral). The other two cases do not involve similar circumstances whatsoever. *See Rizzitelli v. Thompson*, No. CV-095-009384-S, at *7–8 (Conn. Super. Ct. Aug. 2, 2010) (defendant alleged that plaintiff fraudulently induced him to draft and enter into a settlement agreement, where plaintiff then used the agreement as the basis for subsequent extortion claims brought against the defendant); *Fernandes v. McManus*, No. CV-950381135-S, 1996 WL 677268, at *2 (Conn. Super. Ct. Nov. 12, 1996) (plaintiff brought fraudulent inducement claims against defendant, who claimed that rescission was not an available remedy and therefore moved to strike; the court concluded only that a plaintiff may claim both rescission and damages in a complaint, where he has alleged fraudulent inducement, with the decision about which remedy is appropriate to be determined at trial.). The New York cases cited in Mr. Doe's Notice of Supplemental Authority are inapplicable here because they apply New York state law.

None of these alleged misrepresentations correspond to obligations bargained-for within the context of the Settlement Agreement. And, after negotiating the settlement of a case based on a written settlement agreement, a party cannot create a basis for a fraudulent or negligent misrepresentation claim by citing to additional terms not included within the agreement that, in hindsight, it wishes it had negotiated for. In other words, Mr. Doe is plainly trying "to add to, subtract from or alter the terms of the written contract itself." *Warman*, 172 A.2d at 190. Indeed, as to the allegations that Hotchkiss misled him about its history of settling sexual abuse cases, Mr. Doe admits as much. *See* Reply at 26 ("But-for Hotchkiss's fraud, Doe would not have settled the 2015 Action – at least not on the terms to which Hotchkiss induced him into agreeing." (citation omitted)). Likewise, as to the alleged discovery abuses, other than to describe them as fraud, Mr. Doe does not explain how he is not merely trying to rewrite the terms of the settlement agreement already in force. *See Am. Compl.* ¶ 176 ("Had Doe been aware of the critical information that Hotchkiss withheld from him, he would not have entered into the Settlement Agreement in the 2015 Action.").

In other words, Mr. Doe's factual allegations fail to clearly articulate the difference between the bargain actually made, and the bargain that would have been made had Mr. Doe not been fraudulently or negligently induced. This is the critical difference between the vague claims of fraudulent and negligent misrepresentation made by Mr. Doe here, and the very specific claims of the plaintiffs in other cases, who plainly did not receive the benefit of the bargain made, when they were deceived about specific characteristics of land they purchased, *Foley,* 682 A.2d 1026, 1035; the condition of floor areas hidden under rugs or furniture, *Hull*, 999 A.2d at 780; or the fact that the three-floor dwelling they purchased had an illegally converted attic, *Martinez*, 867 A.2d at 156. Under *Iqbal* and *Twombly*, this difference matters.

Mr. Doe has failed to satisfy his "obligation to provide the 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions . . . ." *Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). These allegations, however specific they appear at first glance, lack the "factual amplification . . . to render a claim plausible." *Arista Records LLC*, 604 F.3d at 120 (quoting *Turkmen*, 589 F.3d at 546).

Given the history of this case, even if the applicable standard under *Iqbal* and *Twombly* did not require more, common sense would require this Court to scrutinize very carefully the factual allegations underlying Mr. Doe's legal claims in this lawsuit. Mr. Doe has had multiple sets of counsel in pursuit of relief against Hotchkiss—by this Court's count, Mr. Doe is now on his fourth set of lawyers. And as to the Settlement Agreement at issue here, Mr. Doe's third set of counsel moved to withdraw from representing him because it was their "position that this matter is now fully settled and should be dismissed pursuant to Fed.R.Civ.P. 41(a)(1)(a)(i). However, Mr. Doe does not agree with Counsel's position and will not agree to voluntary dismissal of the case at this time." Order Enforcing Settlement Agreement at 2.

Following the release of that counsel, Mr. Doe's fourth and current set of counsel sought but failed to enforce something other than the Settlement Agreement now at issue here. *See id.* at 22 ("[H]aving determined that the Current Settlement Agreement is enforceable and that the respective rights of the parties under the Current Settlement Agreement now have been fulfilled, this case will be dismissed and definitively closed."). Before enforcing this Settlement Agreement, the Court noted that: "Mr. Doe had repeatedly told the Court that 'additional terms concerning the release remain open must be resolved to each party's mutual satisfaction." *Id.* at 21 n.5. The Court then enforced the Settlement Agreement, meaning that those "open questions" had been "resolved." *Id.* On appeal, the Second Circuit affirmed that Order. *Doe v. Hotchkiss*

*School*, No. 20-2778-cv, 2022 WL 211699 (2d Cir. Jan. 5, 2022) ("The District Court did not

clearly err . . . when it found that Hotchkiss accepted Doe's offer and created an enforceable

settlement agreement by countersigning the agreement in February 2020.").

As a result, given the differences in perspective between Mr. Doe and his former counsel

(the third set) on the meaning of the Settlement Agreement, Mr. Doe's previous representations

about "open questions" which exist no longer, and the fact that Mr. Doe's current claims are

made by lawyers who were not involved in nor have any firsthand knowledge of the specific

negotiations undertaken and resulting in the Settlement Agreement, to state viable fraudulent and

negligent misrepresentation claims here, which do not "add to, subtract from or alter the terms of

the written contract itself," *Warman*, 172 A.2d at 190, Mr. Doe must do far more than what he

has alleged so far, even if only to satisfy this Court that all of these allegations about fraudulent

and negligent misrepresentations have been made in good-faith. *Cf.* Fed. R. Civ. P. 11(b) ("By

presenting to the court, a pleading, written motion, or other paper – whether by signing, filing,

submitting, or other later advocating it – an attorney or unrepresented person certifies that to the

best of the person's knowledge, information, and belief, formed after an inquiry reasonable under

the circumstances . . . .").

Furthermore, in order to sustain a cause of action for fraudulent inducement, Mr. Doe

"must allege and prove that [his] reliance on [Hotchkiss's] misstatement was justified or

reasonable." *Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222 (Conn. 1995).

While typically a question of fact to be reserved for a jury, given all of this history, as well as the

merger and non-reliance clauses, the allegations in the Amended Complaint do not provide a

sufficient basis from which the Court can conclude that it is plausible that Mr. Doe reasonably

relied on Hotchkiss's alleged misrepresentations in entering into the Settlement Agreement.

34

Accordingly, Mr. Doe's third and fourth causes of action, alleging fraud and fraudulent inducement and negligent misrepresentation, will be dismissed.

### D. Rescission

There are two types of remedies available to a plaintiff who has been fraudulently induced to enter a transaction: "rescission of the underlying contract and restitution, or affirmance of the contract and recovery of the damages caused by the defendant's fraud." *Leisure Resort Tech., Inc. v. Trading Cove Assoc.*, 889 A.2d 785, 793 (Conn. 2006). "As a condition precedent to a rescission, the plaintiffs [are] required to allege and prove that they had restored or offered to restore [the defendant] to its former condition as nearly as possible." *Keyes v. Brown*, 232 A.2d 486, 490 (Conn. 1967).

As a result, a plaintiff's failure to offer to restore the defendant may be fatal to their claim of a right to rescission. *See, e.g.*, *Keyes v. Brown*, 232 A.2d 486, 490 (Conn. 1967) ("There is nothing in the record which indicates that the plaintiffs alleged, or offered any evidence to prove, that they had satisfied this condition precedent to a right of rescission. Since they have elected to retain the freezer, justice requires that they should be obligated to pay for it."); *Burt's Spirit Shop, Inc. v. Ridgway*, 576 A.2d 1267, 1270 (Conn. 1990) (because "[t]he defendants never offered to restore the plaintiff to its former position . . . the defendants did not, in timely and proper fashion, avail themselves of any right to rescission that they might have had . . . [and therefore] we need not discuss the substantive contours of their rescissionary claim").

Hotchkiss argues that Mr. Doe has failed to allege a viable claim of rescission because he did not timely or adequately offered to restore Hotchkiss to its pre-contract position, namely by offering to return the Settlement Payment. Mem. at 30–31.

Mr. Doe responds that Hotchkiss's argument "is based solely on its false claim that Doe

has not offered to return the settlement payment." Opp'n at 40. Mr. Doe contends that the Amended Complaint contained an offer to return the Settlement Payment, and that such an offer suffices, as long as it is made at the same time as the assertion of the rescission claim. *Id.*

Hotchkiss replies that, "there is an obvious difference between having *offered* to return the settlement payment and being '*willing to*' return the payment at the end of trial." Reply at 10. Because, in its view, Mr. Doe has only alleged the latter and the law requires the former, Mr. Doe's claims must be dismissed in their entirety.

The Court disagrees.

Offers to restore may be made roughly contemporaneously with the commencement of litigation seeking rescission. *Conley v. 1008 Bank Street, LLC*, No. 20-CV-284 (CSH), 2020 WL 4926599, at *12 (D. Conn. Aug. 22, 2020) (finding that, on a motion to dismiss, where the plaintiff alleged that he had demanded rescission but did not explicitly allege that he had offered to restore, "construing all reasonable inferences in his favor, as the Court must . . . Plaintiff ha[d] established that he 'offered to restore'"); *cf. R&R Pool & Home, Inc. v. Fong*, No. FST-CV-176032853-S, 2021 WL 1782324, at *26–27 (Conn. Super. Ct. Apr. 6, 2021) (finding that, where the offer to restore was made nearly two years after the commencement of the litigation, "[t]he offer to restore was both too little and too late" and "the plaintiff did not timely or adequately offer to restore the defendant to pre-agreement status").

Here, the Amended Complaint states, "If awarded a judgment of rescission, Plaintiff would be ready and willing to take all necessary steps to restore the parties to the status quo before the Settlement Agreement was executed, including, for instance, by returning the full settlement payment to Defendant's insurer." Am. Compl. ¶ 212.

It is true, as Hotchkiss argues, that the Amended Complaint does not allege that Mr. Doe

has already offered to restore Hotchkiss to its pre-Settlement position by offering to return the Settlement Payment. But Mr. Doe has alleged that he is willing to restore Hotchkiss by returning the Settlement Payment, and this allegation was made contemporaneously with his commencement of the suit.[9] Construing his allegations broadly, as the Court must at this point, Mr. Doe has offered to restore by indicating his willingness to return the full Settlement Payment to Hotchkiss. At this point in the proceedings, nothing more is required.

Accordingly, the Court will not dismiss this case based on Mr. Doe's failure to offer to restore, *Burt's Spirit Shop, Inc.*, 576 A.2d at 1270 ("the decision to award a remedy for rescission for breach of contract always depends upon a showing of what justice requires in the particular circumstances, and thus necessarily rests in the discretion of the trial court"), although for the reasons already stated above, this case will be dismissed.

### E.  The Remaining Claims

Mr. Doe has reasserted four claims from the 2015 Case—negligence, recklessness, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of fiduciary duty—arguing that rescission of the Settlement Agreement would allow him to revive them here. Opp'n at 23. Mr. Doe's emotional distress claims additionally incorporate allegations regarding Hotchkiss's alleged fraud and breach of the Settlement Agreement. *Id.* at 39.

Mr. Doe cannot revive claims already alleged and settled without rescinding the Settlement Agreement. Likewise, to the extent that Mr. Doe's breach and fraud claims fail,

---

[9] Hotchkiss appears to assert that Mr. Doe's offer to restore is untimely because it was made more than three years after the execution of the Settlement Agreement. Mem. at 31–32. Yet, this position is not supported by any caselaw, including the cases cited by Hotchkiss. An offer to restore must be made roughly contemporaneously with the filing of a rescission action, which would mean the filing of the instant lawsuit. As discussed above, Mr. Doe has met this requirement.

derivative emotional distress claims based on Hotchkiss's alleged breach and fraudulent conduct cannot stand. Because each of these claims depends on the success of Mr. Doe's breach and fraud claims, which the Court has dismissed, these claims, too, must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED**.

The Court will permit Mr. Doe to file a Second Amended Complaint by **September 13, 2024**, re-alleging only the following claims, provided that he can allege sufficient specifics to address the issues identified by the Court in this Order:

(1) The breach of contract claim, based only on the composition of the Advisory Committee for Sexual Misconduct Prevention and Education, provided that Mr. Doe can allege that Hotchkiss itself identified more than eight non-trustee members in an official announcement, either in the Hotchkiss Magazine or on the Hotchkiss website;

(2) The fraudulent inducement and negligent misrepresentation claims, provided that Mr. Doe alleges specific factual misrepresentations, articulates how these misrepresentations concretely altered the terms of the Settlement Agreement, as written, and alleges a sufficient basis to establish that his reliance on any such misrepresentations was plausibly reasonable[10];

(3) The negligence, recklessness, and emotional distress claims, provided that Mr. Doe can successfully re-plead the breach and fraud claims, as outlined above.

**SO ORDERED** at New Haven, Connecticut, this 7th day of August, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[10] For example, to the extent that Mr. Doe's former counsel are willing to attest that these factual misrepresentations were made, and reasonably relied upon by Mr. Doe in deciding to enter into the Settlement Agreement, such allegations arguably could plausibly state a claim for relief under *Iqbal* and *Twombly*.

38